IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
BALTIMORE DIVISION

| | | |
|---|---|---|
| SPS LIMITED PARTNERSHIP, LLLP, et al., | ) ) ) | |
| Plaintiffs, | ) ) ) | Case No. 1:10-cv-02579 |
| v. | ) ) | Judge J. Frederick Motz |
| SEVERSTAL SPARROWS POINT, LLC, et al., | ) ) ) | |
| Defendants. | ) ) | |

MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT ARCELORMITTAL USA INC.'S MOTION TO DISMISS

Defendant ArcelorMittal USA Inc. ("ArcelorMittal") is not a proper party to this proceeding because it has never owned or operated any portion of the Sparrows Point steelmaking facility ("the Facility") formerly owned and operated by Bethlehem Steel Corporation ("BSC"). Since 2003, when the Facility was sold by BSC pursuant to a Bankruptcy Court Sale Order, it has been continuously owned and operated exclusively by co-Defendant Severstal Sparrows Point, LLC. Plaintiffs' claims for relief with respect to their own neighboring Shipyard property are barred by the terms of the 2003 Sale Order, which expressly prohibits such successorship claims against Defendants for off-site contamination arising out of BSC's prior operations. Accordingly, Plaintiffs have failed to state a claim against ArcelorMittal, and ArcelorMittal should be dismissed from this action with prejudice as a matter of law.

I.      STATEMENT OF FACTS.

This lawsuit is the latest of three separate actions pending before this Court asserting various environmental claims relating to the former BSC Facility now owned and operated by

co-Defendant Severstal Sparrows Point LLC.  The Facility was "operated for more than 100 years" for steel production, and was formerly owned and operated for many decades by BSC, "the original owner and operator."  Cmplt. (Doc. #1) ¶¶3, 4.  Unlike the other two pending cases, however, the Complaint filed herein by Plaintiffs SPS Limited Partnership, LLLP ("SPS LP") and SPS 35, LLC ("SPS 35") seeks relief with respect to alleged contamination at a former 226-acre portion of the Facility known as the "Shipyard," which BSC sold off in 1997, over 13 years ago.  *See id.* ¶2.  Neither Defendant Severstal Sparrows Point, LLC nor ArcelorMittal has ever owned or operated the Shipyard at any time.  In fact, Plaintiffs admit that they themselves have owned the Shipyard since 2004.[1]

Moreover, in 2006, and with knowledge of the property's preexisting environmental condition, Plaintiff SPS LP successfully petitioned the U.S. Environmental Protection Agency ("U.S. EPA") and the Maryland Department of Environmental Protection ("MDE") to *exclude* the Shipyard property from all requirements of this Court's comprehensive 1997 Consent Decree (*see* discussion *infra*), in exchange for SPS LP's commitment to address all environmental issues at its Shipyard property itself pursuant to the Maryland Voluntary Compliance Program ("VCP") statute, Md. Code Ann., Env. §7-501 *et seq*.  Consequently, it is Plaintiffs, rather than the Defendants, who are legally responsible for addressing the environmental conditions of their own Shipyard property.[2]

---

[1]  *See* Cmplt. (Doc. #1) ¶16, which admits that SPS LP acquired title to the Shipyard "on or about March 4, 2004" and SPS 35 acquired a minority ownership interest in the Shipyard "on or about June 8, 2006."

[2]  In fact, SPS LP's own VCP Application submitted to MDE in September 2006 admitted that SPS LP is a "Responsible Person" under Md. Code Ann., Env. §7-201 with respect to environmental conditions at the Shipyard, and this Application was certified as accurate "under penalty of law" by SPS LP's own General Partner.  Consequently, if ArcelorMittal USA Inc.'s Motion to Dismiss is not granted, it intends to file a counterclaim against Plaintiffs.

As for the other two pending actions asserting environmental claims with respect to the Facility, the first was filed in 1997 by U.S. EPA and MDE against BSC and is currently styled *Severstal Sparrows Point, LLC v. United States Envt'l Pro. Agency and State of Maryland Dept. of Envt.*, Case Nos. 97-cv-00558-JFM & 97-cv-00559-JFM (D. Md.). In this original case, the plaintiff agencies asserted, *inter alia*, one of the exact same claims now asserted by the Plaintiffs in this action—a "citizen suit" under Section 7002(a)(1)(B) of the Resource Conservation and Recovery Act ("RCRA") based upon an alleged "imminent and substantial endangerment." This 1997 proceeding resulted in a final judgment in the form of a comprehensive Consent Decree entered on October 8, 1997, which expressly addresses all environmental conditions at the Facility that could pose any threat to public health, welfare or the environment.

As further detailed below, co-Defendant Severstal Sparrows Point LLC assumed *some* (but importantly, *not all*) of BSC's obligations under this Consent Decree when certain BSC assets (including the Facility) were transferred to it pursuant to an April 23, 2003 Sale Order entered by the U.S. Bankruptcy Court for the Southern District of New York in *In re Bethlehem Steel Corp., et al.*, Ch. 11 Case Nos. 01-15288 through -15302, 01-15308 through -1531. However, these "Acquired Assets" did <u>not</u> include any portion of Plaintiff's Shipyard property, which BSC had sold off years earlier in 1997. This original 1997 case before this Court is once again active as a result of Severstal's Petition for Resolution of Dispute Pursuant to the October 1997 Consent Decree (Doc. #10 in Case No. 1:97-cv-00558-JFM). ArcelorMittal is not a party to that proceeding.

The other action pending before this Court asserting environmental claims with respect to the former BSC facility is styled *Chesapeake Bay Fdn., et al., v. Severstal Sparrows Point, LLC*, Case No. 1:10-cv-01861-JFM (D. Md.) ("the CBF Litigation"). The Complaint in that

proceeding also asserts a citizen suit under Section 7002(a)(1)(B) of RCRA based upon an alleged "imminent and substantial endangerment."  The Complaint filed by SPS LP and SPS 35 herein essentially copied the averments against ArcelorMittal in the CBF Litigation Complaint. *Cf.* Cmplt. herein (Doc. #1) ¶¶12-15 with Cmplt. in CBF Litig. ¶¶9-12.  It is not surprising, then, that Plaintiffs' claims herein against ArcelorMittal suffer from the same defects as those in the CBF Litigation.

    A.    <u>**The 1997 Consent Decree.**</u>

In February 1997, the United States, on behalf of U.S. EPA, and the State of Maryland, on behalf of the MDE, filed separate civil complaints against BSC in this Court asserting various environmental claims relating to the Facility.  *See* Cons. Cases Nos. 1:97-cv-00558-JFM and 1:97-cv-00559-JFM.  The U.S. filed its Complaint against BSC under Section 3008(h) of RCRA, 42 U.S.C. § 6928(h), alleging that contamination at and around BSC's Facility constituted an "endangerment to public health, welfare or the environment".  *See* Oct. 8, 1997 Consent Decree at 1, Ex. 1 to Defendant Severstal Sparrows Point, LLC's ("Severstal's") Motion to Dismiss. The U.S.'s claims were based upon the allegation that "there has been a release of hazardous wastes and/or hazardous constituents into the environment at and/or from the Site".  *Id*. at 2.[3]

MDE's Complaint against BSC included a citizen suit claim under Section 7002(a)(1)(B) of RCRA, 42 U.S.C. §6972(a)(1)(B), alleging an "endangerment to human health and the environment from contamination at and around the Site".  *Id*.  MDE further alleged that BSC's

---

[3] Likewise, Count Three of Plaintiffs' Complaint herein also alleges an imminent and substantial endangerment under RCRA allegedly due to "solid or hazardous wastes" "associated with the operations at the coke oven area" at the Facility.  *See* Cmplt. (Doc. #1) ¶56.

operations "have caused the release or threatened release of hazardous substances to the environment". *Id.*[4]

These Complaints against BSC by U.S. EPA and MDE resulted in a final judgment in the form of a very detailed and extensive Consent Decree entered on October 8, 1997, which remains in effect to this day. *See id.* The 1997 Consent Decree provided comprehensive relief with respect to *all* significant environmental issues at the Facility in order to protect public health and the environment:

> The purposes of this Consent Decree, as well as the intention of the Parties, are: 1) to **comprehensively** address issues at the Bethlehem Steel – Sparrows Point Facilities … ; [and] 2) **to protect the public health, welfare and the environment** ….

*Id.* Sec. II at 4 (emphasis added). It provides that in the event either U.S. EPA or MDE discovers any additional threats to human health or the environment, the agency may require the Facility to undertake additional actions beyond those set forth in the Consent Decree:

> **If at any time EPA and/or MDE determines**, based on consideration of the factors specified in paragraph 5, below, **that a release from the Facility poses a threat to human health or the environment requiring action** prior to the implementation of a final remedy, EPA and/or MDE will notify BSC. Within forty-five (45) calendar days of receipt of such notice from EPA or MDE, BSC shall submit to EPA and MDE for approval an IM Workplan which identifies Interim Measures **which will protect human health and the environment from such release** ….

*Id.* Sec. V.A.4[5] at pp. 11-12 (emphasis added). Moreover, the Consent Decree expressly reserves any rights U.S. EPA and MDE may have pursuant to RCRA or any other authority to address any "imminent or substantial endangerment" that might arise in the future. *See id.* Sec.

---

[4]  Similarly, Plaintiffs' alleged imminent and substantial endangerment claim in Count Three of the Complaint also is brought under Section 7002(a)(1)(B) of RCRA. *See* Cmplt. (Doc. #1) ¶57.

[5]  On ArcelorMittal's information and belief, no such "threat to human health or the environment" has ever been identified by either U.S. EPA or MDE since entry of the Consent Decree authorizing them to invoke this provision.

XXVI.3.3 at 80; *see also, id.* Sec. XXVI.4 at 80.  This Court has retained jurisdiction over the Consent Decree.  *Id*. Sec. XXXII at 84.

        **B.**     **Plaintiffs' Acquisition of the Shipyard.**

       Plaintiffs' Shipyard began operations about 130 years ago, in approximately 1880.  Cmplt. (Doc. #1) ¶17.  The Shipyard's operations have included the repair, modification, dismantling and construction of ships.  *Id*.  The Shipyard also includes a 13.4-acre "Graving Dock," which was constructed in 1969.  *Id*.  The Graving Dock can be pumped dry to facilitate repair, maintenance and construction work on ships.  *Id*.  Plaintiffs' claims in this case relate principally to Plaintiffs' current discharges of water pumped from the Graving Dock, which are subject to certain environmental regulatory requirements.

       By Deed dated September 30, 1997, BSC sold the 226-acre Shipyard property to Baltimore Marine Industries, Inc. ("BMI").  *See* Sep. 30, 1997 Deed, Ex. A hereto.  This Deed was recorded after the proposed 1997 Consent Decree was lodged with this Court and noticed for public comment.  Accordingly, the Deed noted:

> The Grantee recognizes that the implementation of corrective action or response actions under a consent decree lodged on February 25, 1997 in the cases of <u>United States v. Bethlehem Steel Corporation, Defendant</u>, Civil Action No. JFM-97-559 and <u>Maryland v. Bethlehem Steel Corporation</u>, Civil Action No. JFM-97-558, in the United States District Court for the District of Maryland, (the "Consent Decree") at the above-described tract of land may interfere with the Grantee's use of the above-described tract of land, and may require closure of its operations or a part thereof.

*Id*. at 10.  Thus, when BMI acquired the Shipyard in 1997, it was already a matter of public record that environmental conditions at the Shipyard itself could require "corrective action or response actions" under the 1997 Consent Decree which could interfere with or even require closure of the Shipyard's operations.

By Deed dated March 4, 2004, BMI transferred ownership of the Shipyard to Plaintiff SPS LP.  *See* March 4, 2004 Deed, Ex. B hereto.  This Deed also expressly acknowledged that either U.S. EPA or MDE could "require[] remedial work to be done on the above-referenced tract of land" (*i.e.*, the Shipyard) under the 1997 Consent Decree.  *Id*. at 6.  Thus, there is no question that Plaintiffs clearly knew and understood the conditions at the Shipyard property itself could require active remediation under the 1997 Consent Decree entered by this Court when they acquired the property in 2004.

At no time has either Defendant Severstal Sparrows Point LLC nor ArcelorMittal ever owned or operated any portion of Plaintiffs' Shipyard.

### C.   Plaintiffs' Assumption of Responsibility to Address Environmental Conditions at The Shipyard.

In 2006, with full knowledge that environmental conditions at the Shipyard might require remediation, Plaintiffs sought to have the Shipyard excluded from the 1997 Consent Decree so that, on ArcelorMittal's information and belief, Plaintiffs could become eligible for certain available funding.  Accordingly, with Plaintiffs' full consent and participation, "[o]n or about June 15, 2006, the Shipyard Site was removed from the Consent Decree pursuant to approval and direction of the USEPA on the condition that the Shipyard Parties [*i.e.*, Plaintiffs SPS LP and SPS 35] address environmental issues at the Shipyard Site pursuant to Maryland environmental law."  Plaintiffs' May 10, 2010 Notice of Intent to Sue, Ex. C hereto, at 3; *see also* Cmplt. (Doc. #1) ¶21.

An MDE online public record titled "Facts About... Sparrows Point Shipyard (Voluntary Action Program)"[6] last updated July 22, 2008 also memorializes Plaintiffs' assumption of responsibility to address environmental conditions at the Shipyard:

> In June 2006, EPA and MDE agreed to remove the former shipyard area from inclusion within the larger steel production facility for purposes of the Consent Decree. **Investigations and/or corrective measures required under the terms of the Consent Decree will be pursued through the Voluntary Cleanup Program (VCP)**.

Fact Sheet at pp. 1-2 (emphasis added). MDE's Fact Sheet also notes: "The ground water at the shipyard site may be impacted by an off-site source on the neighboring steel plant." *Id.* at 2.

On September 22, 2006, Plaintiff SPS LP submitted to MDE a Voluntary Cleanup Program ("VCP") Application under Md. Code Ann., Env. §7-501. In this 2006 Application, which was certified as accurate "under penalty of law" by its own General Partner, Plaintiff SPS LP admitted that it is a "Responsible Person" under Md. Code Ann., Env. §7-201 with respect to environmental conditions at the Shipyard. *See also,* MDE Fact Sheet at 2 ("SPS Limited Partnership, LLLP submitted a VCP application for the Sparrows Point Shipyard property on September 22, 2006 seeking a Certificate of Completion as a responsible person").

D.    **The 2003 BSC Bankruptcy Court Sale Order.**

On October 15, 2001, years after BSC sold off the Shipyard property to BMI, BSC and its affiliates filed voluntary cases for reorganization under Chapter 11 of the U.S. Bankruptcy Code in the U.S. Bankruptcy Court for the Southern District of New York. *In re Bethlehem Steel Corp., et al.*, Ch. 11 Case Nos. 01-15288 through -15302, 01-15308 through -1531. On April 23,

---

[6]  http://www.mde.state.md.us/assets/document/Sparrows%20Point%20Shipyard%20LLP(1).pdf Such online agency fact sheets are public documents, of which this court may "properly take judicial notice". *Secretary of State for Defence v. Trimble Navig. Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007) (citing *Hall v. Virginia*, 385 F.3d 421, 424, n. 3 (4th Cir. 2004)).

2003, the Bankruptcy Court entered a Sale Order[7] authorizing the sale of certain BSC assets, including the Facility (minus, of course, the Shipyard), to affiliates of International Steel Group Inc. pursuant to Sections 105(a) and 363(f) of the Bankruptcy Code "free and clear of all Interests of any kind or nature whatsoever," except for certain specified Assumed Liabilities.  *Id*. ¶7 at 11.  The Bankruptcy Court specifically noted that "ISG would not have entered into the Agreement and would not consummate the transactions contemplated thereby, … if ISG would, or in the future could, be liable for any of the Interests including, but not limited to … (5) environmental Claims or Liens arising from conditions first existing on or prior to Closing (including, without limitation, the presence of hazardous, toxic, polluting, or contaminating substances or waste) that may be asserted on any basis …."  *Id*. ¶R at 7.

The Sale Order approved all of the terms and conditions of an Asset Purchase Agreement ("APA") dated March 12, 2003,[8] as amended, which defined the Assumed Liabilities assumed by the Buyer[9] as well as the Excluded Liabilities retained by BSC.  Section 1.4 of the Bankruptcy

---

[7]  "Order Authorizing (I) Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims and Encumbrances, (II) Assumption and Assignment of Certain Executory Contracts, and (III) Assumption of Certain Liabilities" (referred to herein simply as "Sale Order"; Ex. 7 to Severstal's Motion to Dismiss).

[8]  A copy of the approved APA is Ex. 6 to Severstal's Motion to Dismiss.

[9]  The APA provided that the "Buyer" of the Acquired Assets would be an entity created for this purpose known as "ISG Acquisition Inc."  *Id*. at 1.  Under Section 11.4 of the APA, *id*. at 51, this Buyer entity had the right to assign its right to acquire any of the Acquired Assets (which did not include the Shipyard), along with the Assumed Liabilities relating thereto, to any other Person or entity, after which Buyer would be "fully released" from such liabilities.  *Id*. at 51.  The Sparrows Point Facility property (minus the Shipyard), as well as all Assumed Liabilities relating thereto, were assigned by Buyer to a Delaware corporation known as "ISG Sparrows Point Inc." "ISG Sparrows Point Inc." is the *exact same entity* as Defendant Severstal Sparrows Point, LLC, which has been the *one and only* owner and operator of the Sparrows Point Facility (excluding the Shipyard) since the Facility was sold by BSC in 2003.

Court-APA expressly provided that the "Excluded Liabilities" which were retained by the BSC

and not assumed by the Buyer included, without limitation:

> all liabilities and obligations of Sellers for (i) **any environmental, health or safety matter** (including, without limitation, any liability or obligation arising under any Environmental Law) (A) **relating to any property or assets <u>other than the Acquired Assets</u>**; [and/or] (B) **resulting from the transport, disposal or treatment of any Hazardous Materials by any Seller on or prior to the Closing Date to or at any location other than the Real Property** ….

Ex. 6 to Severstal Motion to Dismiss at 6 (emphasis added.)  Thus, any *off-site* contamination at

property other than the Acquired Assets caused by BSC's *pre-bankruptcy* operations were

*Excluded* Liabilities under the APA.  Because the Shipyard was <u>not</u> part of the Acquired Assets,

ISG Sparrows Point Inc. (which is now Defendant Severstal Sparrows Point LLC) did not

assume any liability of BSC in connection with any environmental conditions thereon.  Because

Plaintiffs' claims relate to "property or assets other than the Acquired Assets" (*i.e.*, the Shipyard),

they are barred by the 2003 Bankruptcy Court Sale Order.

### E.    Plaintiffs' Claims Are Based Upon Historic Off-site Contamination from BSC's Coke Oven Operations.

Plaintiffs' claims in this action clearly are based upon historic, off-site (as the Shipyard

has not been part of the Facility for over 13 years) contamination arising out of BSC's pre-

bankruptcy operations at the former Coke Oven Area of the Facility.  This is made very clear in

Plaintiffs' Notice of Intent to Sue letter dated May 10, 2010, which states:

> Operation of the coke ovens and facilities associated with the coke ovens (including, without limitation, the structure known as the "litol/benzene plant") at the Steel Mill Site has resulted in releases of hazardous substances (including, without limitation, benzene, naphthalene, toluene, ethylbenzene, xylenes, other organic substances, and arsenic, lead and other metals) to the soil and groundwater at the Steel Mill Site, which hazardous substances have migrated, and are migrating, to the Shipyard Site.

Pltffs' May 10, 2010 Notice of Intent to Sue, Ex. C at 3; *see also* Cmplt. (Doc. #1) ¶¶23-26.

Indeed, the Complaint clearly alleges that "the area of the coke oven operations is the 'source

area' of contamination".  Cmplt. (Doc. #1) ¶26.  Plaintiffs contend that as a result of this historic

off-site contamination, they have "incurred substantial costs associated with installing a

wastewater treatment system designed to remove benzene at the Shipyard's Graving Dock."

Pltffs' May 10, 2010 Notice of Intent to Sue, Ex. C at pp. 3-4.

However, ArcelorMittal has never owned or operated any part of the Facility, and

Defendant Severstal Sparrows Point LLC could not have operated the Facility's coke ovens.  As

U.S. EPA's own fact sheet titled "Severstal Sparrows Point (Formerly: ISG Sparrows Point,

Bethlehem Steel)"[10] states: "During peak production in 1959, the facility operated 12 coke-oven

batteries, 10 blast furnaces, and four open-hearth furnaces. **The coke ovens ceased operations

in December 1991 and the coke batteries have been or are being torn down**."  p. 8 (emphasis

added).  Consequently, by the time Plaintiff SP LP acquired the Shipyard property in 2004,

BSC's coke ovens had been out of operation for over 12 years.

As noted above, the September 30, 1997 Deed under which BSC sold the Shipyard

property to BMI expressly contemplated "corrective action or response actions" *at the Shipyard

property itself* under BSC's 1997 Consent Decree which could interfere with the Shipyard's

operations or even require their closure.  Ex. A at 10.  Thus, there is no question that this off-site

contamination was already present at the Shipyard prior to issuance of the BSC Bankruptcy Sale

Order in 2003.  Accordingly, because Plaintiffs' claims herein relate to historic, pre-bankruptcy,

off-site contamination caused by BSC's operation of the coke ovens prior to December 1991,

Plaintiff's claims are barred and enjoined by the express terms of the 2003 Sale Order.

Therefore, all such claims should be dismissed with prejudice.

---

[10]  http://www.epa.gov/reg3wcmd/ca/md/pdf/mdd053945432.pdf

## II.     LEGAL ARGUMENT.

### A.     Plaintiffs' Claims Are Barred by the Bankruptcy Court Sale Order Because They Seek to Impose Liability for Historic, Off-Site Contamination Due to BSC's Operations.

Plaintiffs have the burden of proving that this Court has subject matter jurisdiction over their claims. *Piney Run Preserv. Assoc. v. County Commrs. of Carroll Cty.*, 523 F.3d 453, 459 (4th Cir. 2008); *Community of Cambridge Envt'l Health and Comty. Dev. Group v. City of Cambridge*, 115 F. Supp.2d 550, 553 (D. Md. 2000) (citing *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999)).  "When a defendant challenges subject matter jurisdiction pursuant to Rule 12(b)(1), 'the district court is to regard the pleadings as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment.'"  *Community of Cambridge*, 115 F. Supp.2d at 553 (quoting *Richmond, Fredericksburg & Potomac R. Co. v. United States, 945 F.2d 765, 768 (4th Cir.1991)*); *Piney Run*, 523 F.3d at 459, n. 6 ("When presented with a Rule 12(b)(1) motion, district courts are permitted to consider materials outside the pleadings.").

Plaintiffs' claims seek to impose successor liability upon Defendants for off-site contamination caused by BSC's pre-bankruptcy operation of the Facility's coke ovens.  *See, e.g.,* Cmplt. (Doc. #1) ¶4 (alleging that "Defendants are **successor owners and operators to Bethlehem Steel Corporation** ('BSC'), the original owner and operator of the Steel Mill Site"; emphasis added).  However, the 2003 Bankruptcy Court Sale Order expressly bars and enjoins such successorship claims against Defendants:

> **Under no circumstances shall ISG be deemed a successor of or to the Sellers for any Interest against or in the Sellers or the Acquired Assets of any kind or nature whatsoever….**  Except for the Assumed Liabilities, **all persons holding Interests against or in the Sellers or the Acquired Assets of any kind or nature whatsoever** (including but not limited to … administrative agencies, governmental units, … federal, state and local officials, **maintaining any authority relating to any environmental, health and safety laws**, and their

12

> respective successors or assigns) **shall be, and hereby are, forever barred, estopped, and permanently enjoined from asserting, prosecuting, or otherwise pursuing such Interests of any kind or nature whatsoever against ISG, its property, its successors and assigns, or the Acquired Assets, as an alleged successor or otherwise,** with respect to any Interest of any kind or nature whatsoever such person or entity had, has, or may have against or in a Seller … or the Acquired Assets.

Ex. 7 to Severstal Motion to Dismiss, ¶34 at 21 (emphasis added). Such "Interests" specifically included "environmental Claims or Liens arising from conditions first existing on or prior to the Closing (including, without limitation, the presence of hazardous, toxic, polluting, or contaminating substances or waste)". *Id*. ¶ R at 7.

As noted above, Section 1.4 of the APA approved by the Sale Order expressly defined the "Excluded Liabilities" retained by BSC to include, without limitation:

> all liabilities and obligations of Sellers for (i) **any environmental, health or safety matter** (including, without limitation, any liability or obligation arising under any Environmental Law) (A) **relating to any property or assets other than the Acquired Assets**; [and/or] (B) **resulting from the transport, disposal or treatment of any Hazardous Materials by any Seller on or prior to the Closing Date to or at any location other than the Real Property** ….

Ex. 6 to Severstal Motion to Dismiss at 6 (emphasis added). Sec. 1.1 of the APA states: "***Acquired Assets***" shall mean all of the properties and assets of Sellers …. including, without limitation, … (b) all owned real property ("***Owned Real Property***") … of any Seller …." *Id*. at 2.

As detailed above, BSC sold the Shipyard to BMI in 1997, approximately six years before the 2003 Bankruptcy Court Sale Order was entered. *See* Sep. 30, 1997 Deed, Ex. A. Accordingly, the Shipyard was not part of BSC's "Owned Real Property" nor part of the "Acquired Assets" under the Sale Order. Consequently, Plaintiff's claims herein relate solely to excluded BSC liabilities relating to "property or assets other than the Acquired Assets" and/or "resulting from the transport, disposal or treatment of any Hazardous Materials by any Seller on or prior to the Closing Date to or at any location other than the Real Property". Therefore, all of

Plaintiff's claims are expressly barred and enjoined by the Sale Order, and Plaintiffs cannot prove that this Court has subject matter jurisdiction over their claims.

### B. Plaintiffs' Complaint Fails to Allege Well-Pleaded Facts Showing that ArcelorMittal Was the Facility "Owner and Operator" at the Time of Disposal under CERCLA.

As the Complaint concedes, ArcelorMittal is a Delaware corporation with its principal place of business in Chicago, Illinois. Cmplt. (Doc. #1) ¶13. Nonetheless, in support of its cost recovery claim under Section 107 of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. §§9601 *et seq.* (Count One), Plaintiffs simply make the conclusory allegation, "[u]pon information and relief," that ArcelorMittal was "a former owner and/or operator of the Steel Mill Site at a time when hazardous substances were disposed of at the Steel Mill Site." *Id.* ¶43. However, Plaintiffs allege no well-pleaded facts showing this to have been the case. This is not surprising, because ArcelorMittal has *never* owned or operated any part of the former BSC Facility. In fact, only *one entity* has ever owned or operated the Facility since BSC's bankruptcy sale in 2003, and that entity is Defendant Severstal Sparrows Point, LLC.

The May 7, 2003 Special Warranty Deed recorded following the issuance of the 2003 Sale Order (Ex. D hereto) plainly shows that legal title to the Facility (minus the Shipyard) was transferred directly from Grantor Bethlehem Steel Corporation to Grantee "ISG Sparrows Point Inc." The Special Warranty Deed specifically references, and even attaches, the April 23, 2003 Sale Order: "This Deed is being filed pursuant to an Order, dated April 23, 2003, a copy of which is attached hereto as Exhibit B, incorporated by reference herein ('the Order'), issued in connection with the voluntary cases for reorganization under Chapter 11 of the United States Bankruptcy Code commenced by Grantor …." Consequently, both the Special Warranty Deed and the Sale Order were recorded and are a matter of public record in the state of Maryland.

14

Attached hereto as Exhibit E is an August 31, 2010 Certification by the Secretary of State for the State of Delaware attesting to the authenticity of the following public records, which are appended to the Certification:

- the Certificate of Incorporation of Grantee ISG Sparrows Point Inc. filed April 3, 2003;

- the Certificate of Conversion by which ISG Sparrows Point Inc. was converted to a limited liability company and renamed "ISG Sparrows Point LLC", filed Dec. 30, 2003;

- the Certificate of Formation of ISG Sparrows Point LLC filed Dec. 30, 2003; and

- the Certificate of Merger of Severstal Sparrows Point Holding LLC *into* ISG Sparrows Point LLC, which renamed the surviving entity "**Severstal Sparrows Point, LLC**," filed May 13, 2008.

These certified public records conclusively establish that BSC's Grantee, ISG Sparrows Point Inc., which acquired the Facility from BSC under the May 7, 2003 Special Warranty Deed, was converted from a corporation into a limited liability company known as "ISG Sparrows Point LLC" effective January 1, 2004. *Id.* On or about May 13, 2008, an entity known as "Severstal Sparrows Point Holding LLC" was *merged into* ISG Sparrows Point LLC, with ISG Sparrows Point LLC as the surviving entity of the merger. *Id.* Thereupon the surviving entity, ISG Sparrows Point LLC, was *renamed* "Severstal Sparrows Point, LLC" which of course is the other named Defendant in Plaintiffs' Complaint.

These public records conclusively demonstrate that a single entity now known as Defendant Severstal Sparrows Point, LLC has *continuously owned and operated* the Facility since 2003. Conversely, no other person or entity has ever owned or operated the Facility since it was transferred by BSC pursuant to the Sale Order. This has been acknowledged by both U.S. EPA and MDE in the October 16, 2010 "United States' Response to Petition of Severstal Sparrows Point, LLC for Resolution of Dispute" (hereinafter "Agencies' Response"; Doc. # 22)

filed in *Severstal Sparrows Point, LLC v. United States Envt'l Pro. Agency and State of Maryland Dept. of Envt.*, Case Nos. 97-cv-00558-JFM & 97-cv-00559-JFM (D. Md.). MDE expressly joined in the filing of this Response. *See id.* at 1, n. 1. The Agencies' Response confirms that "[i]n 2003 [the Facility] was sold to Petitioner Severstal Sparrows Point, LLC", (*id.* at 1), that "Severstal (in one corporate form or another) has been operating the steel mill for over seven years" (*id.* at 6), and that "[f]rom April, 2003 to this day it appears that one entity—ISG Sparrows Point, LLC—has actually owned the Facility, which is today named Severstal Sparrows Point, LLC. (*id.* at 14). In fact, the Agencies' Response even attaches the Delaware Secretary of State documents attached hereto as Ex. E, which ArcelorMittal originally filed in support of its Motion to Dismiss in the CBF Litigation.

The Complaint suggests that Plaintiffs were aware of these facts. Paragraph 15 of the Complaint acknowledges that "ISG Sparrows Point, LLC ('**ISG**') acquired the Steel Mill Site from BSC on or about April 30, 2003. ISG is now known as Severstal Sparrows Point LLC." (Emphasis added.) But the Complaint also seeks to create confusion on this point by misleadingly using the very same shorthand of "ISG" to refer simultaneously to a distinctly separate corporate entity. Paragraph 14 of the Complaint alleges: "Mittal Steel acquired the Steel Mill Site when it merged with or acquired International Steel Group (**ISG**) on or about April 5, 2005." (Emphasis added.) (These inaccurate statements, as well as the confusing use of "ISG" to refer simultaneously to two separate and distinct entities, were copied nearly verbatim from the CBF Litigation Complaint, except that the term "Steel Mill Site" was substituted for "Sparrows Point Facilities." *Cf.* CBF Litigation Cmplt. ¶¶11&12.)

As the public records discussed above demonstrate, however, Plaintiffs' conclusory allegations are not accurate and cannot be supported by any well-pleaded facts. The May 7, 2003

Special Warranty Deed (Ex. D) and certified Delaware Secretary of State records (Ex. E) plainly show that the only entity which has ever owned and operated the Facility since BSC is its current owner and operator, Defendant Severstal Sparrows Point LLC.

Although ArcelorMittal formerly held an interest in Defendant Severstal Sparrows Point, LLC (when the latter's name was still "ISG Sparrows Point LLC"), this is not sufficient to show that ArcelorMittal was doing business within the State under Maryland law. As the Fourth Circuit Court of Appeals has noted: "'[A] foreign corporation is not construed as doing business within a state merely because of its ownership of all of the shares of another corporation doing business in the state'". *Mylan Labs., Inc. v. Akzo, N.V.*, 2 F.3d 56, 63 (4th Cir. 1993) (quoting *Vitro Elec. v. Milgray Elec., Inc*., 255 Md. 498, 502 (1969) and applying Maryland law).

Fed. R. Civ. P. 8(a)(2) requires that a pleading which seeks to state a claim for relief contain "a short and plain statement of the claim showing that the pleader is entitled to relief". In *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009), the U.S. Supreme Court stated that "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" (Quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

In particular, the Court made clear in *Iqbal* that "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. It further instructed: "Although for the purposes of a motion to dismiss we must

take all of the factual allegations in the complaint as true, we 'are not bound to accept as true a legal conclusion couched as a factual allegation'". *Id.* at 1949-50 (quoting *Twombly*). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 1950.

The U.S. Supreme Court's holdings in *Twombly* and *Iqbal* make clear that the Complaint's threadbare recitals that ArcelorMittal was the "former owner and/or operator" of the Facility are nothing more than "legal conclusions couched as a factual allegations" which are not entitled to any assumption of truth for purposes of ArcelorMittal's Motion to Dismiss. Plaintiffs assert no factual allegations whatsoever to support these labels and conclusions. They make no attempt to allege any facts which could possibly support a colorable theory of derivative liability against ArcelorMittal based upon piercing of the corporate veil. Nor do they allege any facts which might plausibly suggest any direct participation by ArcelorMittal in the Facility's operations. Because their Complaint contains absolutely no well-pleaded facts to support their naked assertions that ArcelorMittal formerly owned and operated the Facility, Plaintiffs have failed to state a claim under CERCLA upon which relief can be granted against ArcelorMittal.

Moreover, even if Plaintiffs could plausibly allege well-pleaded facts showing that ArcelorMittal as a former owner or operator of the Facility, they certainly cannot allege any well-pleaded facts showing that the alleged "disposals" relating to the Facility's coke oven area occurred *during* the period of any such alleged ownership or operation. As noted in U.S. EPA's online fact sheet titled "Severstal Sparrows Point (Formerly: ISG Sparrows Point, Bethlehem Steel),"[11] "the coke ovens ceased operations in December 1991 and the coke batteries have been or are being torn down." p. 8. These coke oven operations ceased many years before the date of

---

[11] http://www.epa.gov/reg3wcmd/ca/md/pdf/mdd053945432.pdf

Defendants' earliest connection to the Facility alleged by Plaintiffs—April 30, 2003.  *See* Cmplt. (Doc. #1) ¶15.

Finally, Plaintiffs' Complaint fails to allege any well-pleaded facts demonstrating their compliance with the National Contingency Plan (NCP), which is one of the *prima facie* elements for a private cost recovery claim under CERCLA.  *See* 42 U.S.C. §9607(a)(4)(B).  To begin with, Plaintiffs' Complaint cites the wrong standard of NCP compliance for a private cost recovery claim, alleging that their claimed response costs are "not inconsistent" with the NCP.  Cmplt. (Doc. #1) ¶45.  The law is clear, however, that Plaintiffs must show that their alleged response costs were both "necessary" and "consistent" with the NCP.  42 U.S.C. §9607(a)(4)(B); *accord, Westfarm Assoc. L.P. v. Washington Suburban Sanitary Comm'n*, 66 F.3d 669, 677 (4th Cir. 1995) (a *prima facie* case for liability under §9607(a) requires plaintiffs to show, in part, that they have incurred "necessary cleanup costs …consistent with the national contingency plan"); *Sherwin-Williams Co. v. Artra Group, Inc.*, 125 F. Supp. 2d 739, 751 (D. Md. 2001) (claimant must prove that its response costs are consistent with the NCP); *United States v. Fairchild Indus., Inc.*, 766 F. Supp. 405, 409 (D. Md. 1991) (citing *U.S. v. Monsanto Co.*, 858 F.2d 160, 167 (4th Cir. 1988)).  "Not inconsistent" is the Government's standard for NCP compliance under 42 U.S.C. §9607(a)(4)(C).  *See, e.g., United States v. Northeastern Pharm. & Chem. Co., Inc.*, 810 F.2d 726, 747 (8th Cir. 1986) ("Contrary to appellants' argument, 'not inconsistent' is not, at least for purposes of statutory construction and not syntax, the same as 'consistent.'").

The NCP is a detailed set of U.S. EPA regulations which detail precisely how CERCLA response action is to be undertaken.  *See* 40 C.F.R. Part 300.  However, Plaintiffs fail to allege any well-pleaded facts plausibly showing that they complied with any of these regulatory requirements.  In particular, Plaintiffs fail to allege any facts plausibly demonstrating they have

complied with 40 C.F.R. §300.700(c)(6), which requires that private parties "provide an opportunity for public comment concerning the selection of the response action". *Id.*

Several courts have dismissed CERCLA §107(a) claims where private plaintiffs failed to allege well-pleaded facts plausibly demonstrating their NCP compliance as required by *Twombly* and *Iqbal, supra*. For example, in *Sanchez v. Esso Std. Oil*, 2010 WL 682542 (D. P.R. 2010), the Court dismissed the defendant's private Section 107(a) counterclaim on the grounds that the supporting allegations were merely "conclusory with respect to the manner in which such measures conform with the NCP, because we have no details from which to infer Defendant's compliance with CERCLA." *Id.* at *4; *see also*, *Chubb Custom Ins. Co. v. Space Systems/Loral, Inc.*, 2010 WL 689940, *6 (N.D. Cal. 2010) (failure to allege sufficient facts resulted in dismissal of Section 107(a) claims against co-defendants). Finally, in *Ford Motor Co. v. Michigan Consol. Gas.*, 2010 WL 3419502, **5-7 (E.D. Mich. 2010), the Court dismissed a private Section 107 counterclaim because it was based upon threadbare recitals of the elements rather than well-pleaded facts. The Court noted that "when a complaint omits facts that, if they existed, would clearly dominate the case, it seems fair to assume that those facts do not exist." *Id.* at *6.

Consequently, for all of the reasons noted above, Count One of the Complaint fails to state a CERCLA Section 107 claim against ArcelorMittal in accordance with the pleading standards established by Fed. R. Civ. P. 8(a) and the U.S. Supreme Court's rulings in *Twombly* and *Iqbal, supra*.[12]

---

[12]  For these same reasons, Plaintiffs fail to state a claim against ArcelorMittal for declaratory judgment under CERCLA in Count Two of the Complaint, and this claim also should be dismissed as a matter of law.

**C.    Plaintiffs' Complaint Fails to Allege Well-Pleaded Facts Showing that ArcelorMittal "Contributed" to the Waste at the Coke Oven Area Alleged to Present an Imminent and Substantial Endangerment Under RCRA.**

In Count Three of the Complaint, Plaintiffs allege an "imminent and substantial endangerment" under RCRA Section 7002(a)(1)(B), 42 U.S.C. §6972(a)(1)(B), based specifically on "[b]enzene and other wastes associated with the operations at the coke oven area at the Steel Mill Site".  Cmplt. (Doc. #1) ¶56.  In order to state such a claim against ArcelorMittal, Plaintiffs must allege well-pleaded facts plausibly showing that ArcelorMittal "contributed … to the past … handling, storage, treatment, transportation or disposal" of the "[b]enzene and other wastes associated with the operations at the coke oven area" upon which this claim is based.  *See* 42 U.S.C. §6972(a)(1)(B).

As  U.S. Supreme Court made clear in *Iqbal*, *supra*, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  129 S. Ct. at 1949 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2006)).  However, Plaintiffs' Complaint is devoid of any well-pleaded facts plausibly showing how ArcelorMittal could possibly have contributed to the "handling, storage, treatment, transportation or disposal" of "[b]enzene and other wastes" at the coke oven area.  Instead, Plaintiffs' Complaint offers nothing but "labels and conclusions," "a formulaic recitation of the elements of a cause of action" and "'naked assertion[s]' devoid of 'further factual enhancement.'"  *Iqbal*, *supra*, 129 S. Ct. at 1949 (quoting *Twombly*, *supra*, 550 U.S. at 555-57). The Supreme Court made clear that "we 'are not bound to accept as true a legal conclusion couched as a factual allegation'".  *Id*. at 1949-50 (quoting *Twombly*).

The omission of any well-pleaded facts plausibly showing that ArcelorMittal "contributed" to waste handling at the coke oven area is hardly surprising, because it is a matter of public record that "the coke ovens ceased operations in December 1991".  *See* U.S. EPA's

fact sheet, "Severstal Sparrows Point (Formerly: ISG Sparrows Point, Bethlehem Steel)" at 8.[13] Thus, the very coke oven area operations which gave rise to these wastes *ceased* completely at least a *decade before* Defendant Severstal Sparrows Point, LLC acquired the BSC Facility pursuant to the 2003 Bankruptcy Court Sale Order. Indeed, as recognized in the 1997 Deed by which BSC transferred title to the Shipyard to BMI, it was already known at that time that the Shipyard was contaminated and likely would require remediation. *See* Sep. 30, 1997 Deed, Ex. A.

Even Plaintiffs' own May 10, 2010 Notice of Intent to Sue letter seems to recognize that no RCRA citizen suit cause of action can be stated against ArcelorMittal. *See* Ex. C. The letter advises that Plaintiffs intend to sue both Defendants Severstal Sparrows Point, LLC and ArcelorMittal under RCRA and CERCLA. *Id.* However, it advises that Plaintiffs intend to seek injunctive relief to abate the alleged RCRA imminent and substantial endangerment against Severstal only:

> The Shipyard Parties [*i.e.*, Plaintiffs] intend to seek all available relief in such an action, including **an injunction requiring <u>Severstal</u> to take all actions necessary to eliminate the imminent and substantial endangerment to health and the environment** resulting from the above-described contamination and releases, and well as the recovery from all Defendants of the cleanup and other response costs incurred ….

*Id.* (emphasis added).

Because Plaintiff's Complaint fails to allege any well-pleaded facts plausibly showing that ArcelorMittal "contributed" to the coke oven area wastes that allegedly present an "imminent and substantial endangerment," Plaintiffs' Count Three RCRA citizen suit claim against ArcelorMittal should be dismissed.

---

[13]  http://www.epa.gov/reg3wcmd/ca/md/pdf/mdd053945432.pdf

**D.    Plaintiffs' Common Law Claims for Negligence, Trespass, Nuisance and Strict Liability are Barred by Maryland's Three-Year Statute of Limitations.**

Plaintiffs' Complaint also asserts various common law causes of action based upon negligence (Count Four), trespass (Count Five), nuisance (Count Six) and strict liability (Count Seven).  However, all of these claims are barred under Maryland's three-year general tort statute of limitations.  Md. Code Ann., Courts §5-101.[14]  *See, e.g., Harig v. Johns-Manville Prods. Corp.*, 284 Md. 70, 83 (Md. 1978) (three year general tort limitations period also applies to strict liability cause of action).  The Fourth Circuit has ruled that dismissal under Fed. R. Civ. P. 12(b)(6) is "appropriate when the face of the complaint clearly reveals the existence of a meritorious affirmative defense."  *Brooks v. City of Winston-Salem, N.C.*, 85 F.3d 178, 181 (4th Cir. 1996) (citing 5A Wright & Miller, *Federal Practice and Procedure* § 1357, at 352 (1990) ("'A complaint showing that the statute of limitations has run on the claim is the most common situation in which the affirmative defense appears on the face of the pleading,' rendering dismissal appropriate.")); *accord*, *Edwards v. Demedis*, 703 A.2d 240, 246 (Md. Ct. Spec. App. 1997) ("When there is no genuine issue as to a material fact relative to the accrual of a cause of action, the date of accrual may be determined as a matter of law." (citations omitted)).

Maryland applies the "discovery rule" in all tort actions, under which "the cause of action accrues when the claimant in fact knew or reasonably should have known of the wrong." *Poffenberger v. Risser*, 290 Md. 631, 636 (Md. 1981); *Edwards, supra*, 703 A.2d at 246.  Under the discovery rule, the statute of limitations starts to run upon "inquiry notice,"

> or awareness implied from "knowledge of circumstances which ought to have put a person of ordinary prudence on inquiry … with notice of all facts which such an

---

[14]    The Complaint falsely states that Plaintiffs entered into a Tolling Agreement with "Defendants" on or about September 5, 2008. Cmplt. (Doc. #1) ¶8.  ArcelorMittal has never entered into any such tolling agreement with Plaintiffs.  Plaintiffs' September 5, 2008 Tolling Agreement with Defendant Severstal Sparrows Point LLC is attached as Ex. F.  As can be plainly seen, ArcelorMittal is not a signatory to this Agreement.

> investigation would in all probability have disclosed if it had been properly pursued…. In other words, a purchaser cannot fail to investigate when the propriety of the investigation is naturally suggested by circumstances known to him; and if he neglects to make such inquiry, he will be held guilty of bad faith and must suffer from his neglect."

*Poffenberger, supra* at 637 (citations omitted); *see also*, *Edwards, supra*, 703 A.2d at 246 ("A cause of action accrues when knowledge of facts and circumstances are sufficient to put a claimant on notice to make inquiry. [Citations omitted] Once on inquiry notice, a claimant has a duty to seek out facts supporting a cause of action." (citing *Pennwalt Corp. v. Nasios*, 314 Md. 433 (Md. 1988))).

In this case, there is no question that Plaintiffs were at the very least on "inquiry notice" concerning contamination of the Shipyard property by no later than March 4, 2004, the date of the Deed by which BMI transferred ownership of the Shipyard to Plaintiff SPS LP. Ex. B. This Deed also expressly acknowledged that either U.S. EPA or MDE could "require[] remedial work to be done on the above-referenced tract of land" (*i.e.*, the Shipyard) under the 1997 Consent Decree. *Id*. at 6. Therefore, because Plaintiffs waited well over three years thereafter to file their Complaint, their common law causes of action based upon negligence, trespass, nuisance, and strict liability[15] are barred under Md. Code Ann., Courts §5-101.

---

[15] In addition, Plaintiffs are precluded from asserting a claim for strict liability based upon alleged abnormally hazardous activity at the Facility as a matter of law because they are "subsequent users" of a portion of the property (*i.e.*, the Shipyard) "who were able to avoid the harm completely by inspecting the property prior to purchasing … it. Thus, it is not unreasonable to expect subsequent users to bear the risk of such harm." *Rosenblatt v. Exxon Co.*, 642 A.2d 180, 188 & n. 7 (Md. 1994) (noting that "the common law rule of caveat emptor … is still applicable in Maryland with regard to the sale of commercial property."). Moreover, Plaintiffs' allegation of "uncontained storage" in support of this Count Seven is oxymoronic and flies in the face of RCRA's "storage" definition, which specifically requires "containment" of waste. *See* 42 U.S.C. §6903(33).

III.    **CONCLUSION.**

For all of the foregoing reasons, Defendant ArcelorMittal USA Inc. respectfully requests that this Court dismiss all claims against it in Plaintiffs' Complaint with prejudice, and grant such other relief in its favor as this Court deems equitable and just.

Dated:  November 29, 2010

                                            Respectfully submitted,

                                            /s/ Vincent Atriano
                                            Vincent Atriano (Ohio Bar No. 0041084)
                                            Andrew O. Etter (Ohio Bar No. 0085013)
                                            Squire, Sanders & Dempsey L.L.P.
                                            2000 Huntington Center
                                            41 South High Street
                                            Columbus, OH  43215
                                            Phone: (614) 365-2700
                                            Fax:  (614) 365-2499
                                            Email: vatriano@ssd.com
                                                    aetter@ssd.com

                                            Dale E. Papajcik (Ohio Bar No. 0036939)
                                            William V. Shaklee (Ohio Bar No. 0075507)
                                            Squire, Sanders & Dempsey L.L.P.
                                            4900 Key Tower
                                            127 Public Square
                                            Cleveland, Ohio 44114
                                            Phone: (216) 479-8500
                                            Fax: (216) 479-8780
                                            Email: dpapajcik@ssd.com
                                                    wshaklee@ssd.com

                                            Amy L. Brown (Bar #15455)
                                            Squire, Sanders & Dempsey L.L.P.
                                            1201 Pennsylvania Avenue, N.W.
                                            Suite 500
                                            Washington, D.C. 20004
                                            Phone: (202) 626-6600
                                            Fax: (202) 626-6780
                                            Email: abrown@ssd.com

                                            *Attorneys for Defendant ArcelorMittal USA Inc.*

**Exhibits**

Exhibit A:    Sep. 30, 1997 Deed between Bethlehem Steel Corporation and Baltimore Marine Industries, Inc. relating to Shipyard

Exhibit B:    March 4, 2004 Deed between Baltimore Marine Industries, Inc. and Plaintiff SPS Limited Partnership, LLLP relating to Shipyard

Exhibit C:    May 10, 2010 Plaintiffs' Notice of Intent to Sue

Exhibit D:    May 7, 2003 Special Warranty Deed between Grantor BSC and Grantee ISG Sparrows Point Inc.

Exhibit E:    Aug. 31, 2010 Delaware Secretary of State Certification with:

- Certificate of Incorporation of ISG Sparrows Point Inc. filed April 3, 2003;

- Certificate of Conversion of ISG Sparrows Point Inc. to ISG Sparrows Point LLC filed Dec. 30, 2003;

- Certificate of Formation of ISG Sparrows Point LLC filed Dec. 30, 2003; and

- Certificate of Merger of Severstal Sparrows Point Holding LLC into ISG Sparrows Point LLC filed May 13, 2008.

Exhibit F:    Sept. 5, 2008 Tolling Agreement between Plaintiffs and Defendant Severstal Sparrows Point LLC