**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Northern Division**

| | | |
|---|---|---|
| SPS LIMITED PARTNERSHIP, LLLP and | ) | |
| SPS 35, LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:10-cv-02579-JFM |
| | ) | |
| SEVERSTAL SPARROWS POINT, LLC, a/k/a | ) | |
| SEVERSTAL NORTH AMERICA, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT SEVERSTAL SPARROWS POINT, LLC's
<u>MOTION TO DISMISS THE COMPLAINT</u>**

Pursuant to Fed. R. Civ. P. 12(b)(1) and (6), Defendant Severstal Sparrows Point, LLC

("Severstal Sparrows"), by and through its counsel, Eckert Seamans Cherin & Mellott, LLC,

moves this Court to dismiss Plaintiffs' Complaint with prejudice, on the following grounds:

(1)     Plaintiffs cannot establish that this Court has subject matter jurisdiction over their

claims because such claims seek to impose successor liability for off-site contamination

allegedly caused by pre-bankruptcy operations of Bethlehem Steel Corporation ("BSC"), and

therefore are expressly barred and enjoined by the terms of the April 23, 2003 Sale Order entered

by the U.S. Bankruptcy Court for the Southern District of New York in *In re: Bethlehem Steel

Corp., et. al.,* Ch. 11 Case Nos. 01-15288 through -15302, 01-15308 through -15315;

(2)     Plaintiffs have failed to state a claim under Section 107 of the Comprehensive

Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9607

(Counts I and II) and under Section 7002 of the Resource Conservation and Recovery Act

("RCRA"), 42 U.S.C. §6972 (Count III), against Severstal Sparrows because in all three counts,

Plaintiffs have failed to plead sufficient facts to state a valid claim;

(3)    this Court lacks subject matter jurisdiction over Count III of the Complaint under RCRA.  Specifically, the alleged citizen suits under RCRA, are barred by the Government's diligent prosecution of an existing Consent Decree and therefore, this Court does not have jurisdiction over this claim;

(4)    this Court lacks subject matter jurisdiction over Plaintiffs' common law claims for negligence (Count IV), trespass (Count V), nuisance (Count VI), and strict liability (Count VII) because all of these claims are barred by the three-year general tort statute of limitations in Md. Code, Courts and Judicial Proceedings, § 5-101; and

(5)    Plaintiffs have failed to state a valid claim for strict liability (Count VII) because Severstal Sparrows is not engaged in an abnormally dangerous activity as a matter of law.

The grounds and law supporting this Motion are more fully set forth in the attached Memorandum of Points and Authorities which are supported by the exhibits appended thereto and incorporated herein by reference.

Pursuant to Local Rule 105.6, Defendant, Severstal Sparrows Point, LLC respectfully requests oral argument on all issues raised herein.

Respectfully submitted,

**ECKERT SEAMANS CHERIN
  & MELLOTT, LLC**

*/s/ Edward J. Longosz, II*

Edward J. Longosz, II (#07509)
Mark A. Johnston (#15973)
Gabriella V. Cellarosi (#28292)
1717 Pennsylvania Avenue, NW, Suite 1200
Washington, DC  20006
(202) 659-6600
elongosz@eckertseamans.com
mjohnston@eckertseamans.com
gcellarosi@eckertseamans.com

*Attorneys for Defendant,
Severstal Sparrows Point, LLC*

Of Counsel:

Scott R. Dismukes, Esq.
David A. Rockman, Esq.
Jessica L. Sharrow, Esq.
Eckert Seamans Cherin & Mellott, LLC
600 Grant Street, 44th Floor
Pittsburgh, PA 15219
412-566-6000
sdismukes@eckertseamans.com
drockman@eckertseamans.com
jsharrow@eckertseamans.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**Northern Division**

| | |
|---|---|
| SPS LIMITED PARTNERSHIP, LLLP and ) | |
| SPS 35, LLC, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Case No. 1:10-cv-02579-JFM |
| ) | |
| SEVERSTAL SPARROWS POINT, LLC, a/k/a ) | |
| SEVERSTAL NORTH AMERICA, *et al*., ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
**DEFENDANT SEVERSTAL SPARROWS POINT, LLC's**
**MOTION TO DISMISS THE COMPLAINT**

**ECKERT SEAMANS CHERIN**
**& MELLOTT, LLC**

1717 Pennsylvania Avenue, NW
Suite 1200
Washington, DC  20006
Tel:  (202) 659-6600

*Attorneys for Defendant,*
*Severstal Sparrows Point, LLC*

## TABLE OF CONTENTS

**Page No.**

TABLE OF AUTHORITIES ............................................................................ iii

INTRODUCTION .......................................................................................... 1

PRELIMINARY STATEMENT ...................................................................... 2

FACTUAL BACKGROUND ........................................................................... 3

    A.    The Consent Decree ......................................................................... 3

        1.    Consent Decree Background .............................................. 3

        2.    Consent Decree Overview ................................................. 4

    B.    History of the Sparrows Point Facility ............................................. 6

    C.    Bethlehem Steel Bankruptcy .......................................................... 6

    D.    Implementation of the Consent Decree ........................................... 7

        1.    Corrective Action During 1997 - 2008 Time Frame ......... 8

        2.    Corrective Action Work Since 2008 .................................. 9

        3.    Interim Measures .............................................................. 10

    E.    The Shipyard Property .................................................................. 10

STANDARD OF REVIEW ............................................................................ 12

ARGUMENT ................................................................................................. 15

I.    Plaintiffs' Claims are Barred by the Bankruptcy Court Sale Order Because They Seek to Impose Liability for Historic, Off-Site Contamination Due to Bethlehem Steel's Operations ......................................................................... 15

II.    Counts I, II and III of the Complaint Fail to State a Claim under the *Twombly* Standard ........................................................................... 15

III.    Count III of the Complaint Must be Dismissed for Lack of Subject Matter Jurisdiction Because EPA and MDE Have Commenced and Are Diligently Prosecuting An Action Against Severstal Sparrows through the Consent Decree ............................... 16

A.     EPA and State Environmental Agencies Retain Primary Enforcement Authority under RCRA.................................................................................................16

        1.     EPA and MDE Have Commenced a Civil Action that Meets the Requirements of 42 U.S.C. § 6972(b) Resulting in the Consent Decree that Fully Covers Plaintiffs' Allegations in Count III ......................................18

        2.     EPA and MDE Have Been and Are Engaged in Diligent Prosecution..... 19

B.     The Court Should Abstain from Entertaining Count III Based on the Doctrine of Primary Jurisdiction Because of EPA's and MDE's Continuing Jurisdiction Over, and Expertise at, Enforcement of the Consent Decree ...........................................24

IV.     Counts IV, V, VI and VII Are Barred by the Maryland's Three Year Statute of Limitations ........................................................................................................26

V.     The Complaint Fails to State a Valid Claim for Strict Liability (Count VII) ...................29

A.     Plaintiffs Cannot Establish that Defendant Severstal Sparrows Engaged in an Abnormally Dangerous Activity.............................................................................30

B.     Risks Associated with Severstal Sparrows' Operations Can be Eliminated by the Exercise of Reasonable Care Thereby Defeating Plaintiffs' Strict Liability Claim.................................................................................................................31

C.     Severstal Sparrows' Operations are Appropriate to the Locale ...........................34

D.     Plaintiffs Have Not Sufficiently Alleged a High Degree of Harm ......................35

RELIEF REQUESTED........................................................................................................36

ORAL ARGUMENT REQUESTED.......................................................................................36

# TABLE OF AUTHORITIES

**Cases**                                                                   **Page   No.**

*Adams v. Bain,*
    697 F.2d 1213 (4th Cir. 1982) ................................................................. 12-13

*Ailor v. City of Maynardville,*
    368 F.3d 587 (6th Cir. 2004) ......................................................................... 19

*Arkansas Wildlife Fed'n v. ICI Americas Inc.,*
    842 F. Supp. 1140 (E.D. Ark. 1993) ............................................................. 22

*Arlington Forest Assoc. v. Exxon Corp.,*
    774 F. Supp. 387 (E.D. Va. 1991) ................................................................. 32

*Ashcroft v. Iqbal,*
    129 S. Ct. 1937 (2009) ................................................................................. 12

*AT&T Corp. v. PAB, Inc.,*
    935 F. Supp. 584 (E.D. Pa. 1996) ................................................................. 25

*Bass v. E.I. DuPont de Nemours & Co.,*
    324 F.3d 761 (4th Cir. 2003) ......................................................................... 12

*Beckham v. AMTRAK,*
    569 F. Supp.2d 542 (D. Md. 2008) ............................................................... 13

*Bell Atlantic Corp. v. Twombly,*
    127 S. Ct. 1955 (2007) ................................................................................. 12

*Blackwell v. Wyeth,*
    971 A.2d 235 (Md. 2009) ............................................................................. 30

*Board of County Comm'rs v. Bell-Atlantic Maryland,*
    695 A.2d 171 (1997) ................................................................................. 31-32

*Brooks v. City of Winston-Salem, N.C.,*
    85 F.3d 178 (4th Cir. 1996) ....................................................................... 26-27

*Burnette v. Rowland,*
    1998 U.S. Dist. LEXIS 11710 (D. Conn. May 4, 1998) ................................ 19

*CACI Int'l., Inc. v. St. Paul Fire and Marine Ins. Co.,*
    566 F.3d 150 (4th Cir. 2009) ................................................................... 13-14

*Carrier Corp. v. Piper,*
    460 F. Supp.2d 853 (W.D. Tenn. 2006).......................................................... 17

*Clean Air Council v. Sunoco,*
    2003 U.S. Dist. LEXIS 5346 (D. Del. Apr. 2, 2003)....................................22-23

*Community of Cambridge Envtl. Health and Cmty. Dev. Group  v. City of Cambridge,*
    115 F. Supp.2d 550 (D. Md. 2000)......................................................19-21, 22

*Connecticut Coastal Fishermen's Ass'n v. Remington Arms Co.,*
    777 F. Supp. 173 (D. Conn. 1991)........................................................20-21

*Connecticut Fund for Env't v. Contract Plating Co.,*
    631 F. Supp. 1291 (D. Conn. 1986)........................................................21-22

*Cox v. City of Dallas,*
    256 F.3d 281 (5th Cir. 2001) ...................................................................... 19

*Davies v. Nat'l Co-op Refinery Ass'n,*
    963 F. Supp. 990 (D. Kan. 1997).............................................................24-25

*Davis v. City of Portsmouth,*
    579 F. Supp. 1205 (E.D. Va. 1983), *aff'd,* 742 F.2d 1448 (4th Cir. 1984)...................... 12

*Ellis v. Gallatin Steel*,
    390 F.3d 461 (6th Cir. 2004) ...................................................................21-22

*Envtl. Integrity Project v. Mirant Corp.*,
    2007 U.S. Dist. LEXIS 1219 (D. Md. Jan. 3, 2007)....................................19-23

*Fisher v. Md. Dep't of Pub. Safety & Corr. Servs.*,
    2010 U.S. Dist. LEXIS 68772 (D. Md. July 8, 2010)...................................... 14

*Friends of Santa Fe County v. LAC Minerals,*
    892 F. Supp. 1333 (D.N.M. 1995) .........................................................24-25

*Gallagher v. H.V. Pierhomes, LLC,*
    957 A.2d 628 (2008) ..............................................................30-32, 35-36

*Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found.*,
    484 U.S. 49 (1987)................................................................................................ 16

*Hess v. Firestone Plastics Co.*,
    872 F.2d 417, 1989 WL 27489  (4th Cir. 1989) ............................................. 27

*Incorporated Village of Garden City v. Genesco, Inc.*,
    2009 U.S. Dist. LEXIS 87354 (E.D.N.Y. Sept. 23, 2009)............................... 17

*Karr v. Hefner*,
    475 F.3d 1192 (10th Cir. 2007) ................................................................20-23

*Little Gem Life Sci. LLC v. Orphan Med., Inc.*,
    537 F.3d 913 (8th Cir. 2008) ...................................................................13-14

*Matthews v. Amberwood Associates Ltd. Partnership, Inc.*,
    719 A.2d 119 (Md. 1998) ............................................................................ 30

*McGregor v. Industrial Excess Landfill, Inc.*,
    709 F. Supp. 1401 (N.D. Ohio 1987)........................................................... 17

*MCI Commc'n Corp. v. Am. Tel. & Tel. Co.*,
    496 F.2d 214 (3d Cir. 1974)......................................................................... 24

*McNutt v. General Motors Acceptance Corp.*,
    298 U.S. 178 (1936)...............................................................................12-13

*Meghrig v. KFC Western, Inc.*,
    516 U.S. 479 (1996)...................................................................................... 17

*Mortensen v. First Fed. Sav. & Loan Ass'n*,
    549 F.2d 884 (3d Cir. 1977)......................................................................... 13

*National Communications Ass'n v. American Tel. and Tel. Co.*,
    46 F.3d 220 (2d Cir. 1995)........................................................................... 25

*National Telephone Coop. Ass'n v. Exxon Corp.*,
    38 F. Supp.2d 1 (D.D.C. 1998) ............................................................... 33, 34

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*,
    591 F.3d 250 (4th Cir. 2009) ....................................................................... 12

*North & South Rivers Watershed Ass'n v. Town of Scituate*,
    949 F.2d 552, 558 (1st Cir. 1991) ............................................................... 21

v

*Organic Chems. Site PRP Group v. Total Petroleum, Inc.*,
    6 F. Supp.2d 660 (W.D. Mich. 1998) ............................................................ 17

*Pennenvironment v. RRI Energy Northeast Mgmt. Co.*,
    2009 U.S. Dist. LEXIS 118955 (W.D. Pa. Dec. 22, 2009)............................. 13

*Piney Run Preservation Ass'n v. County Comm'rs*,
    523 F.3d 453 (4th Cir. 2008) ..................................................................20-22

*Poffenberger v. Risser*,
    431 A.2d 677 (Md. 1981) ............................................................................. 27

*Pryor v. NCAA*,
    288 F.3d 548 (3d Cir. 2002).....................................................................13-14

*R.E. Goodson Constr. Co. v. Int'l Paper Co.*,
    2005 U.S. Dist. LEXIS 42909 (D.S.C. Oct. 13, 2005) ................................... 17

*Raritan Baykeeper, Inc. v. NL Indus., Inc.*,
    2010 U.S. Dist. LEXIS 52542 (D.N.J. May 26, 2010) ...............................24-26

*Reiter v. Cooper*,
    507 U.S. 258 (1993)..................................................................................... 24

*Russo v. Ascher*,
    545 A.2d 714 (1988) .................................................................................... 27

*Sherwin-Williams Co. v. ATRA Group, Inc.*,
    125 F. Supp.2d 739 (D. Md. 2001).........................................................27-28

*Supporters to Oppose Pollution v. Heritage Group*,
    973 F.2d 1320 (7th Cir. 1992) ............................................................19, 20-21

*United States v. Hooker Chems. & Plastics Corp.*,
    749 F.2d 968 (2d Cir. 1984)......................................................................... 19

*United States. Dep't of Energy v. Ohio*,
    503 U.S. 607 (1992)..................................................................................... 19

*Voss v. Waste Management of Illinois, Inc.*,
    2006 U.S. Dist. LEXIS 4302 (N.D. Ill. Feb. 2, 2006) ................................... 17

vi

*Walker v. S.W.I.F.T. SCRL,*
    517 F. Supp.2d 801 (E.D. Va. 2007) ............................................................... 14

*Weyerhaeuser Corp. v. Koppers Co., Inc.,*
    771 F. Supp. 1406 (D. Md. 1991) ................................................................. 27

*White v. CMA Constr. Co.,*
    947 F. Supp. 231 (E.D. Va. 1996) ................................................................ 13

*Williams v. United States,*
    50 F.3d 299 (4th Cir. 1995) .......................................................................... 13

*Yommer v. McKenzie,*
    257 A.2d 138 (1969) ............................................................................... 31-36

## **Federal Rules, Statutes, and Regulations**

42 U.S.C. § 6901 ................................................................................................... 1

42 U.S.C. § 6928(h) ............................................................................................. 18

42 U.S.C. § 6972 ...................................................................................... *passim*

Fed. R. Civ. P. 12(b)(1) .......................................................................... 1, 12, 36

Fed. R. Civ. P. 12(b)(6) ............................................................................ *passim*

Fed. R. Civ. P. 12(d) ............................................................................................ 14

Local Rule 105.6 ................................................................................................. 36

62 Fed. Reg. 11917 (Mar. 13, 1997) ............................................................. 4, 28

## **State Rules, Statutes, and Regulations**

Md. Code, Courts and Judicial Proceedings, § 5-101 ..................................... 26

## **Other Authorities**

Restatement (Second) Torts §§ 519 and 520 ........................................ 31, 33, 35-36

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**Northern Division**

| | | |
|---|---|---|
| SPS LIMITED PARTNERSHIP, LLLP and | ) | |
| SPS 35, LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:10-cv-02579-JFM |
| | ) | |
| SEVERSTAL SPARROWS POINT, LLC, a/k/a | ) | |
| SEVERSTAL NORTH AMERICA, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
**DEFENDANT SEVERSTAL SPARROWS POINT, LLC's**
**MOTION TO DISMISS THE COMPLAINT**

**INTRODUCTION**

Defendant Severstal Sparrows Point, LLC[1] ("Severstal Sparrows") moves pursuant to

Fed. R. Civ. P. 12(b)(1) and 12(b)(6) for dismissal with prejudice of the Complaint filed by

plaintiffs SPS Limited Partnership, LLLP ("SPS LLLP") and SPS 35, LLC ("SPS 35")

(collectively "Plaintiffs") for failure to state a claim and lack of subject matter jurisdiction.

Counts I, II, III and VII are barred for failure to state a claim, while Count III, a citizen suit claim

under the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq.* ("RCRA"), is also

barred because this Court does not have subject matter jurisdiction due to diligent prosecution

under an existing Consent Decree.  Additionally, the Complaint's four common law claims,

Counts IV through VII, for negligence, trespass, nuisance and strict liability, are barred by the

statute of limitations.  Finally, the Complaint is barred in its entirety by the 2003 Bankruptcy

---

[1]  Although named in the Complaint as Severstal Sparrows Point, LLC a/k/a Severstal North America, as
acknowledged in the Stipulation filed on October 20, 2010, Severstal North America is the name of a separate entity,
and Severstal North America did not accept service of the Complaint pursuant to the Stipulation.

Court Sale Order to the extent it seeks to impose successor liability on Severstal Sparrows for

contamination arising out of the historic activities of the Bethlehem Steel Company.

## PRELIMINARY STATEMENT

Severstal Sparrows is the current owner and operator of the Sparrows Point steel mill

("Sparrows Point Facility") in Sparrows Point, Maryland.  Severstal Sparrows has never operated

or owned the neighboring Shipyard Site, which is apparently owned by Plaintiffs and is the

subject of Plaintiffs' Complaint.  Instead,  Bethlehem Steel Company ("Bethlehem Steel"), the

prior owner of the Sparrows Point Facility, also owned the Shipyard Site and sold it to a third

party in 1997.  To the extent there is historic contamination from steel mill operations at the

Shipyard Site, such is solely the responsibility of Bethlehem Steel, and all subsequent owners of

the Shipyard Site, and is not chargeable to Severstal Sparrows.

The Sparrows Point Facility was purchased by ISG Acquisition, Inc., and International

Steel Group ("ISG") out of bankruptcy from Bethlehem Steel pursuant to an April 2003

Bankruptcy Court Sale Order that approved the terms of an Asset Purchase Agreement that

specifically defined and limited what assets were being acquired and what liabilities were being

assumed.  *See* Exhs. 6 and 7.  Both the Asset Purchase Agreement and the 2003 Bankruptcy

Court Sale Order  excluded from assumption by ISG any liabilities or obligations for

environmental contamination located, or which came to be located, outside the physical

boundaries of the acquired properties (which did not include the Shipyard Site).  *See* Exh. 6 at

Section 1.4.

As this Court is well aware, the United States Environmental Protection Agency ("EPA")

and the Maryland Department of the Environment ("MDE") have been working for years with

the owners of the Sparrows Point Facility to investigate and characterize any threats to human

2

health or the environment at the facility property resulting from 100+ years of steel manufacturing activities. In 1997, EPA, MDE and Bethlehem Steel entered into a judicially enforceable Consent Decree with this Court for this purpose. *See* Exh. 1. The Consent Decree is active, applicable and remains subject to this Court's jurisdiction.[2]

The Shipyard Site was originally included in the geographic area covered by the Consent Decree, until it was removed from the Consent Decree in 2006. *See* Exhs. 1, 5 and 29. Plaintiffs acquired interests in the Shipyard Site beginning in 2004, at which time the Shipyard Site was subject to the Consent Decree. EPA agreed to remove the Shipyard Site from the Consent Decree because Plaintiffs had submitted the Shipyard Site to Maryland's Voluntary Cleanup Program.[3] *See* Exh. 29. Plaintiffs freely acknowledge these facts in their Complaint, and admit that the potential for contamination of the Shipyard Site was known to them when the property was acquired in 2004. *See* Complaint, ¶¶ 19 -21.

## FACTUAL BACKGROUND[4]

### A.    The Consent Decree

#### 1.    Consent Decree Background

Numerous enforcement and compliance issues at the Sparrows Point Facility were resolved when EPA, MDE, and Bethlehem Steel executed a comprehensive Consent Decree in 1997, which was entered by this Court on or about October 8, 1997 and titled *United States v. Bethlehem Steel Corp.*, Civil Action No. JFM-97-559 and *Maryland Department of the*

---

[2] In fact, a dispute over the Consent Decree was recently submitted to this Court via a Petition filed by Severstal Sparrows on July 30, 2010 (docketed in 97-cv-00558-JFM and 97-cv-00559-JFM).

[3] Indeed, SPS LLLP submitted an application to submit the Shipyard Site to Maryland's Voluntary Cleanup Program even before it acquired title to the property. *See* Exh. 28.

[4] The facts contained herein without record citations are common facts provided to give the Court historical context to the claims asserted in Plaintiffs' Complaint and are not provided to challenge the factual allegations of the Complaint.

*Environment v. Bethlehem Steel Corp.*, Civil Action No. JFM-97-558 ("Consent Decree").  *See* Exh. 1.

Beginning in or about 1985, both MDE and EPA pursued civil enforcement actions against Bethlehem Steel, seeking, among other things, the implementation of corrective action to address hazardous waste and hazardous constituent contamination at the Sparrows Point Facility. The United States' Complaint sought injunctive relief under RCRA to require Bethlehem Steel to conduct corrective action.  *See* JFM-97-559, Dckt No. 1 (attached as Exh. 3).  Maryland's Complaint asserted claims under both federal and state law, including a citizen's suit pursuant to RCRA seeking relief from alleged imminent and substantial endangerment to human health and the environment from contamination at and around the facility, including a specific count focused on operation of the on-site landfills, as well as claims for violation of state air and water protection laws and regulations.  *See* JFM-97-558, Dckt. No. 1 (attached as Exh. 4).  All of these outstanding claims and actions were consolidated and ultimately resolved via the Consent Decree.[5]  Prior to becoming final, this Consent Decree was subject to public notice and comment.  *See* 62 Fed. Reg. 11917 (Mar. 13, 1997).

## 2. Consent Decree Overview

Under the RCRA corrective action provisions of the Consent Decree, Bethlehem Steel was required to conduct a site-wide investigation to define the extent of hazardous wastes and hazardous constituents in the groundwater system and to identify, characterize and determine the impact of releases of hazardous wastes and hazardous constituents to the air, groundwater,

---

[5]  The Consent Decree terminated and superseded MDE's prior administrative complaint in order C-O-85-179, and addressed the contaminant investigation and corrective measures requirements of its previous orders C-O-92-056, 057, and 058.  Exh. 1 at p. 78.

surface water, sediment and soil throughout the Sparrows Point Facility.[6]  Exh. 1 at pp. 13-14.

Specifically, the site-wide investigation under the Consent Decree must:

- Define the horizontal and vertical extent of hazardous waste and hazardous constituents in the groundwater system.  Exh. 1, Attach. B at p. 3.

- Identify, characterize, and determine the full impact of releases of any hazardous wastes or hazardous constituents from Solid Waste Management Units and Areas of Concern to air, groundwater, surface water, sediment, and soil.  Exh. 1, Attach. B at p. 3.

- Conduct area-specific characterizations through sampling of subsurface conditions, contamination in, and releases from: Tin Mill Canal/Finishing Mills; Greys Landfill; Coke Point Landfill; Coke Oven Areas; and Humphrey Impoundment.  Ultimately, Bethlehem Steel was required to characterize all releases of hazardous wastes and hazardous constituents, which present a threat or potential threat to human health and/or the environment.  Exh. 1, Attach. B at p. 4.

- Perform human health and ecological risk assessments, to investigate media pathways that could be responsible for any current and reasonable future human health and environmental risks to on-site and off-site receptors.  Exh. 1, Attach. B at pp. 4-7.

The Consent Decree also required Bethlehem Steel to implement "interim measures" and conduct a "corrective measures study."  Interim measures are required when EPA and/or MDE determine that a release from the facility poses a threat to human health or the environment requiring action prior to the development and implementation of a final remedy.  Exh. 1, pp. 11-12.  The Corrective Measures Study is necessary in order to develop and evaluate corrective action alternatives for removal, containment, treatment, and/or remediation of the contamination and to recommend the corrective measure or measures to be taken at the facility.  Exh. 1, Attach. D at pp. 1-2.  Corrective action is a highly detailed step-by-step process of environmental investigation and assessment, with review, comment, oversight and approval by EPA and MDE at every step.  *See* Exh 1., Attachs. A, B, C, D and E.

---

[6]  The Consent Decree defines the "facility" with reference to a map, referenced therein as Exhibit 1, and attached here as Exhibit 5, that shows the boundary of the facility follows the shoreline and does not extend into the water.

### B.    History of the Sparrows Point Facility

The first furnace was built at Sparrows Point in 1887, and the first iron was cast in 1889. Bethlehem Steel purchased the Sparrows Point Facility in 1916 and enlarged it by building mills to produce hot rolled sheet, cold rolled sheet, galvanized sheet, tin mill products, and steel plate. Most of these products are still produced at the facility today.

During peak production in 1959, the facility operated 12 coke oven batteries, 10 blast furnaces, and four open hearth furnaces. The coke ovens ceased operations in December 1991 and were subsequently demolished. Nine blast furnaces have been demolished leaving the "L" blast furnace as the sole operating furnace. The open hearth furnaces ceased operation and have been demolished, and steel is currently made in two Basic Oxygen Furnaces (BOFs).

Interestingly, Plaintiffs' Complaint and their May 10, 2010 Notice of Intent to Sue focus on the operation of the coke ovens and facilities associated with the coke ovens as the source of releases of hazardous substances at the Sparrows Point Facility that Plaintiffs contend have migrated to the Shipyard Site. *See* Complaint, at ¶ 24 and Exh. 2, at p. 3. However, operation of the coke ovens was discontinued by the end of 1991, as recognized in EPA's underlying complaint. *See* Exh. 3, at ¶ 13. Plaintiffs' Complaint is appropriately devoid of any allegation that Severstal Sparrows operated the coke ovens.

### C.    Bethlehem Steel Bankruptcy

Subsequent to the entry of the Consent Decree, Bethlehem Steel filed for bankruptcy protection pursuant to Chapter 11 of Title 11 of the United States Bankruptcy Code on October 15, 2001. On March 12, 2003, Bethlehem Steel Corporation entered into the Asset Purchase Agreement with ISG for the purchase of specified assets and the assumption of certain liabilities from Bethlehem Steel, including the Sparrows Point Facility. *See* Exh. 6. On April 23, 2003,

the Bankruptcy Court entered a Bankruptcy Sale Order approving, among other things, Bethlehem Steel's sale of the Sparrows Point Facility pursuant to the terms of the Asset Purchase Agreement and enjoining third parties from pursuing ISG and its subsequent purchasers for successor liability issues.  *See* Exh. 7.

The Asset Purchase Agreement specifies assumed and excluded liabilities, and excluded from assumption by ISG any liabilities or obligations for environmental contamination located, or which came to be located, outside the physical boundaries of the acquired properties (which included the Sparrows Point Facility).  *See* Exh. 6 at Section 1.4.  Consistent with the Asset Purchase Agreement, the Bankruptcy Court sanctioned the sale to ISG by issuing a Sale Order under Section 363(f) of the Bankruptcy Code that expressly authorizes the sale of property "free and clear of all Interests of any kind or nature whatsoever", thus authorizing the transfer of the property free and clear of successor liability.  *See* Exh. 7, ¶ 7 at p. 11.  The Bankruptcy Sale Order also affirmatively and expressly stated that ISG was not assuming any successor liability, and would not have entered into the transaction if it were not purchasing the assets free and clear of any successor liability.  Exh. 7 at ¶ R at pp. 7-8, and ¶¶ 33-34 at pp. 20-22.

Collectively, these documents establish that Bethlehem Steel's obligations for contamination outside the boundaries of the Sparrows Point Facility were not transferred to, or assumed by, ISG in its purchase of the Sparrows Point Facility.[7]  As such, Severstal Sparrows has no responsibility for historic off-site contamination caused by Bethlehem Steel.

**D.    Implementation of the Consent Decree**

The owners of the Sparrows Point Facility, at the direction of EPA and MDE, have engaged in an extensive amount of work implementing various elements of the Consent Decree.

---

[7]  On or about May 7, 2008, pursuant to a divestiture order from the U.S. Department of Justice, ownership of ISG Sparrows Point, LLC was transferred and the company was renamed Severstal Sparrows Point, LLC.

All of the reports and submittals to EPA and MDE listed herein are matters of public record.[8]

**1.    Corrective Action During 1997 - 2008 Time Frame**

Corrective action work from the entry of the Consent Decree through the 2008 time

frame included the following:

- Submittal of the Description of Current Conditions in January 1998 which described and assessed the nature and extent of contamination based on existing information as required by Consent Decree (Exh. 1, Attach. C at pp. 3-5).

- Definition of the horizontal and vertical extent of hazardous constituents in the groundwater system as required by Attachment B of the Consent Decree (Exh. 1, Attach. B at p. 3).  This work included:
  - Groundwater Study Work Plan, June 2000 (CH2M Hill);

  - Site Wide Investigation Groundwater Study Report (CH2M Hill 2001);

  - Site-Wide Investigation Release Site Characterization Study, June 2002 (RSC Study);

  - SWI/Work Plan to Evaluate the Nature and Extent of Releases to Groundwater from the Special Study Areas for BSC (CH2M Hill, 2002b);

  - Addendum to SWI Work Plan to Evaluate the Nature and Extent of Releases to Groundwater from Special Study Areas for BSC, September 30, 2002 (SAIC, 2002);

  - Addendum to SWI Work Plan to Evaluate the Nature and Extent of Releases to Groundwater from Special Study Areas for ISG, March 12, 2004 (Abate, 2004);

  - Site Wide Investigation Report of Nature & Extent of Releases to Groundwater from the Special Study Areas, URS 2005 supplemental figures 2007.

- Completion of a facility investigation and human health risk evaluation in June 2005 as required by the Consent Decree.  *See* Exh. 1, Attach. B. at  pp. 3-4.

- Repairs and/or replacements of sumps and storage tanks as specified in the Consent Decree and the approved "Sump/Tank Work Plan and Schedule" were completed in 2003.  As part of the operating maintenance activities for the facility, upgrades to tank support structures and secondary containment were

---

[8]  For the convenience of the Court, copies of selected key documents from the past two years are being attached as exhibits.  *See* discussion, *infra*, in the Standard of Review section, regarding appropriate circumstances for submission of evidence in support of a motion to dismiss.

completed in 2008 for above ground storage tanks identified in the Work Plan. (As required by the Consent Decree (Exh. 1) at pp. 15-17 and Attach. F).

- Full-scale pilot testing and evaluation of technologies have been completed for recycle of blast furnace gas cleaning slurry solids/filter cake. A full-scale pilot hydrocyclone facility was constructed and run successfully during the 2nd to 4th quarter of 2002. The patented hydrocyclone process was shown to effectively remove zinc producing a suitable iron and carbon rich revert (hydrocyclone underflow) for recycling to the Sinter Plant. (As required by the Consent Decree (Exh. 1) at pp. 18-19 and Attach. F).

- Maintenance dredging operations are periodically conducted to remove material from a location in Tin Mill Canal near the sewer outlet of the Hot Strip Mill. A specifically constructed storage pad is used to temporarily store the material while characterization testing is conducted in accordance with requirements of the Consent Decree. (As required by the Consent Decree (Exh. 1) at p. 20 and Attach. F).

## 2.    Corrective Action Work Since 2008

Over the past two years, since the facility was renamed Severstal Sparrows in May of 2008, Severstal Sparrows has been engaged in an extensive amount of work implementing various elements of the corrective action required by the Consent Decree, including:

- Operation of the groundwater pump and treat interim measures at the former rod and wire mill sludge bin storage area has continued in accordance with the approved work plan for this area. *See* Exh. 8.

- In 2009, Severstal Sparrows conducted analytic sampling of ponds in the county land parcel 1B to supplement the on-site risk assessment completed in January of 2009 and submitted a final report titled: A Supplemental Report for County Land Parcel 1B Ponds. *See* Exhs. 9 and 10.

- Also in 2009, Severstal Sparrows completed work that provided for the submittal of a final report titled:  Screening Level Ecological Risk Assessment for On-Site Areas per EPA's approved Work Plan for Ecological Risk Assessment for on-site areas. *See* Exh. 11.

- In April 2010, Severstal Sparrows submitted a work plan to investigate impacts to offshore environments from current offsite releases at EPA and MDE's request. *See* Exhs. 12, 13, 14 and 15. The investigation of offsite releases is currently the subject of a dispute resolution Petition filed by Severstal Sparrows with this Court in July, 2010.

- Throughout 2010, work was conducted to complete a Baseline Ecological Risk Assessment for On-Site Areas (BERA). This tier of the ecological risk

assessment process follows a Screening Level Ecological Risk Assessment
(SLERA) Report and a SLERA Supplemental Report that were originally
submitted to EPA in April 2008 and January 2009, respectively.  These reports
were subsequently revised and re-submitted to EPA in April and May 2009, with
final revisions being completed in August 2009.  The overall objective of the
BERA is to provide a more realistic and focused assessment of potential
exposures and risks incurred by Site-related ecological receptors associated with
on-Site surface soil, sediment, and surface water exposure pathways.  This report
was submitted to EPA and the MDE on August 31, 2010.  *See* Exh. 16.

### 3.    Interim Measures

EPA and MDE have sought interim measures at several locations at the facility, such as

the Coke Oven Area.  *See* Exh. 17.  After a process of development of an appropriate interim

measure response, Severstal Sparrows has implemented interim measures at the Coke Oven Area

to address current releases, with the latest of several approvals having been received from EPA

on September 2, 2010.[9]  *See* Exhs 18 - 23.  MDE also issued Severstal Sparrows a request for

interim measures at Coke Point Landfill.  *See* Exh. 24.  Additionally, EPA has requested

expedited a partial corrective measures study for the Former Sludge Bin Storage Area,

Humphreys Impoundment, and Greys Landfill.  *See* Exh.  25.

### E.    The Shipyard Property

The Shipyard Site allegedly owned by Plaintiffs was purchased by Baltimore Marine

Industries, Inc. from Bethlehem Steel in 1997.  *See* Complaint, ¶ 16.  As part of Bethlehem

Steel's operations at Sparrows Point, the Shipyard Site was included in the property that was

originally subject to the Consent Decree.  *See* Exhs. 1 and 5.  The Consent Decree was lodged in

---

[9]  In April of 2009, Severstal Sparrows submitted a work plan to conduct pilot testing for soil vapor extraction and
air sparging for recovery of hydrocarbons from groundwater in the Coke Oven Area.  This work plan was revised
pursuant to EPA comments to include evaluation of dual phase Interim Measures systems, re-submitted in July of
2009, and subsequently approved by EPA on August 24, 2009.  Pilot testing pursuant to this work plan was
conducted in October and November of 2009.  In January of 2010, Severstal Sparrows submitted the Coke Oven
Area Interim Measures Pilot Test Results and Prototype Systems Plan for approval by EPA and the MDE.  This
Work Plan received partial approval by EPA on March 2, 2010.  In response to EPA's comments, Severstal
Sparrows submitted a revised Coke Oven Area Interim Measures Work Plan on April 2, 2010 and a Supplemental
Work Plan on June 18, 2010.   EPA approved the work plan by letter dated September 2, 2010.  *See* Exh. 23.
Severstal Sparrows submitted a notice of dispute of certain aspects of the approval letter on September 30, 2010.

February 1997, and the sale of the Shipyard Site to Baltimore Marine took place on September

30, 1997.  A copy of the deed from Bethlehem Steel to Baltimore Marine, which is a public

record, is attached as Exhibit 26.  The deed contains specific notice and recognition of the

corrective action being undertaken by Bethlehem Steel:

> The Grantee recognizes that the implementation of corrective action or response actions under a consent decree lodged on February 25, 1997 in the cases of United States v. Bethlehem Steel Corporation, Defendant, Civil Action No. JFM-97-559 and Maryland v. Bethlehem Steel Corporation, Civil Action No. JFM-97-558, in the United States District Court for the District of Maryland, ("the Consent Decree") at the above-described tract of land may interfere with the Grantee's use of the above-described tract of land, and may require closure of its operations or a part thereof.  The Grantee agrees to cooperate fully with the United States Environmental Protection Agency, the Maryland Department of the Environment and Bethlehem in the implementation of corrective action or response actions at the above-described tract of land and further agrees not to interfere with such corrective action or response action.

Exh. 26 at p. 10, Section 2.

The Shipyard Site was later acquired by Plaintiff SPS LLLP in 2004, and the deed to SPS

LLLP also put Plaintiffs on notice of the potential for contamination at the Shipyard Site.  A

copy of the deed to SPS LLLP, which is a public record, is attached as Exhibit 27.  The deed to

SPS LLLP expressly states that EPA or MDE could require remedial work to be done at the

Shipyard Site under the 1997 Consent Decree, which is a clear reference to the potential for

contamination at the Shipyard Site.  *See* Exh. 27, at p. 5-6.

Shortly before purchasing the Shipyard Site, SPS LLLP submitted an application to MDE

under Maryland's Voluntary Cleanup Program ("VCP"), which is Maryland's program to allow

owners of contaminated property to cleanup property under the supervision of the state and

receive limited liability protection upon the completion of the cleanup effort.  A copy of the 2004

VCP application, which is a matter of public record, is attached as Exhibit 28.  The 2004 VCP

application packet submitted by SPS LLLP included a Phase I Environmental Assessment of the

Shipyard Site that noted that contamination from Bethlehem Steel's Coke Ovens Area could be impacting the Shipyard Site. *See* Exhibit 28, at p. III-23.

## STANDARD OF REVIEW

Fed. R. Civ. P. 12(b)(6) mandates that a plaintiff set forth facts sufficient to allege each element of his claim. *Bass v. E.I. DuPont de Nemours & Co.,* 324 F.3d 761, 765 (4th Cir. 2003); *see also* Fed. R. Civ. P. 12(b)(6). "For purposes of granting a motion to dismiss, the complaint is construed in the light most favorable to plaintiff and its allegations are taken as true. However, more detail often is required than the bold statement by plaintiff that he has a valid claim of some type against defendant." *Davis v. City of Portsmouth,* 579 F. Supp. 1205, 1209-10 (E.D. Va. 1983), *aff'd,* 742 F.2d 1448 (4th Cir. 1984). While the allegations of the complaint are generally accepted as true, the complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007). "[A] plaintiff's obligation to provide grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id*. at 1964-65 (internal quotations omitted). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (internal quotations omitted). As such, legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement fail to constitute well-pled facts for Rule 12(b)(6) purposes. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.,* 591 F.3d 250, 255 (4th Cir. 2009); *see also Iqbal,* 129 S. Ct. at 1951-52.

With regard to a motion to dismiss under Fed. R. Civ. P. 12(b)(1) challenging subject matter jurisdiction the burden is on plaintiff, as the party asserting jurisdiction, to prove that federal jurisdiction is proper. *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 189

(1936); *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982). Where the motion presents a facial challenge to the court's jurisdiction, or one based purely on the allegations in the complaint, the court must accept those allegations as true and may consider only the complaint and any documents upon which it is based. *See Adams*, 697 F.2d at 1219.

If, however, a motion to dismiss challenges the factual nature of subject matter jurisdiction, *i.e.*, where the challenge is based on the sufficiency of jurisdictional fact, a court is not required to attach any presumptive truthfulness to the allegations in the complaint and may consider matters outside the pleadings to satisfy itself that it has jurisdiction. *See Williams v. United States*, 50 F.3d 299, 304 (4th Cir. 1995) (citing *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)); *Beckham v. AMTRAK*, 569 F. Supp.2d 542, 548 n.4 (D. Md. 2008); *White v. CMA Constr. Co.*, 947 F. Supp. 231, 233 (E.D. Va. 1996). Under these circumstances, a plaintiff bears the burden of establishing subject matter jurisdiction. *Beckham*, 569 F. Supp.2d at 548, n.4.

In this case, resolution of the motion to dismiss Count III turns on the determination of whether the EPA and MDE suits, and the Consent Decree, constitute the type of actions that preclude a citizen suit under RCRA, and therefore present a factual challenge to the Court's jurisdiction. *See Pennenvironment v. RRI Energy Northeast Mgmt. Co.*, 2009 U.S. Dist. LEXIS 118955 *6-8 (W.D. Pa. Dec. 22, 2009). Thus, "the Court need not presume the truth of the allegations in the complaint and may consider matters outside the pleadings." *Id*. at *8.

Accordingly, this Court may consider evidence, such as matters of public record and documents subject to judicial notice, without converting this motion to dismiss into a summary judgment motion. *See CACI Int'l., Inc. v. St. Paul Fire and Marine Ins. Co.*, 566 F.3d 150, 154 (4th Cir. 2009) ("This circuit has also held that courts may consider a document that the

13

defendant attaches to a motion to dismiss if the document was integral to and explicitly relied on in the complaint and the plaintiffs do not challenge the authenticity."); *see also, Little Gem Life Sci. LLC v. Orphan Med., Inc.*, 537 F.3d 913, 916 (8th Cir. 2008) (court could consider public records without converting motion under Fed. R. Civ. P. 12(d) when records were background facts, did not contradict the complaint, and were not critical to the outcome of the motion); *Pryor v. NCAA*, 288 F.3d 548, 559-60 (3d Cir. 2002) (documents attached to motion, referred to in complaint, and central to the claim can be considered).

    As noted recently by this Court:  "When a defendant attaches documents to a motion to dismiss, a court has three options.  First, if the document meets certain requirements, the court may consider them in evaluating the motion to dismiss.  If the documents do not qualify for consideration at the motion to dismiss stage, the court has two alternatives: (1) it can either entirely disregard the attached documents; or (2) under limited circumstances, it may convert the motion into a motion for summary judgment and consider all the documents."  *Fisher v. Md. Dep't of Pub. Safety & Corr. Servs.*, 2010 U.S. Dist. LEXIS 68772 *6 (D. Md. July 8, 2010). This Court has explained "[u]nder the first approach, documents attached to the motion to dismiss may be considered 'so long as they are integral to the complaint and authentic.'"  *Id.*  To be considered, an attached document must "be central or integral to the claim in the sense that its very existence, and not the mere information it contains, gives rise to the legal rights asserted." *Id.* at *7 (quoting *Walker v. S.W.I.F.T. SCRL,* 517 F. Supp.2d 801, 806 (E.D. Va. 2007)). In the present case, all of the supporting documents attached hereto and discussed herein are documents of public record, either court records or documents issued by or submitted to governmental agencies.  There is no question as to the authenticity of any of these documents. Further, all of the documents are integral to the claims asserted in the Complaint.  As to the

corrective action documents, their very existence is central to the claims asserted in the Complaint, and they are not being submitted for the truth of any information contained therein.

## **ARGUMENT**

**I.**    **Plaintiffs' Claims are Barred by the Bankruptcy Court Sale Order Because They Seek to Impose Liability for Historic, Off-Site Contamination Due to Bethlehem Steel's Operations**

In its Motion to Dismiss the Complaint filed by defendant ArcelorMittal USA Inc. ("ArcelorMittal") on November 29, 2010, ArcelorMittal moved for dismissal of the Complaint because the Plaintiffs' claims are barred by the Bankruptcy Court Sale Order.  Severstal Sparrows joins in and incorporates by reference the arguments made by ArcelorMittal in Sections I and II of its Memorandum of Law in Support of its Motion to Dismiss.  *See* ArcelorMittal Mem., at pp. 1-14. [Docket No. 21].

**II.**    **Counts I, II and III of the Complaint Fail to State a Claim under the *Twombly* Standard**

The allegations in Counts I and II, Plaintiffs' claim under the Comprehensive Environmental Responsibility, Compensation and Liability Act ("CERCLA"), and Count III, Plaintiffs' RCRA citizen suit claim, all fail to state a claim.  In all three counts, Plaintiffs have failed to plead sufficient facts necessary to state a valid claim.  ArcelorMittal has filed a Motion to Dismiss Counts I, II and III on this basis, and Severstal Sparrows joins in and incorporates by reference ArcelorMittal's Motion to Dismiss.  Specifically, with respect to the CERCLA claims in Counts I and II, Severstal Sparrows joins in and incorporates ArcelorMittal's arguments in Section II.B, pages 19-20 of its Memorandum of Law regarding the Complaint's failure to allege any well-pleaded facts demonstrating compliance with the National Contingency Plan.  With respect to the RCRA claims in Count III, Severstal Sparrows joins and incorporates by reference ArcelorMittal's arguments in Section II.C, pages 21-22 of its Memorandum of Law regarding the

15

Complaint's failure to plead a case under RCRA against either defendant for alleged wastes associated with the operation of the coke ovens where it is clear that the coke ovens ceased operation in 1991, long before Severstal Sparrows acquired the Sparrows Point Facility.

**III.     Count III of the Complaint Must be Dismissed for Lack of Subject Matter Jurisdiction Because EPA and MDE Have Commenced and Are Diligently Prosecuting An Action Against Severstal Sparrows through the Consent Decree**

**A.     EPA and State Environmental Agencies Retain Primary Enforcement Authority under RCRA**

In Count III, Plaintiffs attempt to use the citizen suit provisions of RCRA to assert claims for an alleged imminent and substantial endangerment and for violation of RCRA requirements. However, the purpose of the citizen's suit provision is to permit "citizens to abate pollution when the government cannot or will not command compliance." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found.*, 484 U.S. 49, 62 (1987). Accordingly, citizen suits are only allowed under certain circumstances. They are not authorized when enforcement agencies, which have primacy in enforcement of RCRA, have commenced and are diligently prosecuting an action. This ensures EPA's and the State's primacy in enforcement of RCRA and other environmental laws and avoids burdening the courts with unnecessary lawsuits.

In pertinent part, RCRA provides:

(b)  Actions prohibited

(1)(B) No action may be commenced under subsection (a)(1)(A) of this section. . .*if the Administrator or State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States* or a State to require compliance with such permit, standard, regulation, condition, requirement, prohibition, or order.

(2)(C)(i)  No action may be commenced under subsection (a)(1)(B) of this section if the State, in order to restrain or abate acts or conditions which may have contributed or are contributing to the activities which may present the alleged endangerment – *has commenced and is diligently prosecuting an action* under subsection (a)(1)(B) of this section.

16

42 U.S.C. § 6972(b) (emphasis added).  Thus, RCRA citizen suits are only permitted where they

do not interfere or duplicate corrective action that is underway.  As stated by one court:

> The congressional intent in enacting these restrictions on private actions was to prevent multiple and numerous instances of litigation involving private citizens, the states, and the federal government.  Instead, Congress determined that the desired result of remedying the environmental hazard could be best handled by avoiding conflicting litigation and having either the Administrator of the EPA or the State bring the suit on behalf of the public.  ***Only when the federal and state governments fail to act to remedy the situation or file suit in either State or federal courts due to inadequate public resources did Congress envision the need for private citizens to commence actions to correct environmental hazards.***

*McGregor v. Industrial Excess Landfill, Inc.*, 709 F. Supp. 1401, 1407 (N.D. Ohio 1987)

(emphasis added); *accord Organic Chems. Site PRP Group v. Total Petroleum, Inc.*, 6 F. Supp.

2d 660, 664 (W.D. Mich. 1998); *R.E. Goodson Constr. Co. v. Int'l Paper Co.*, 2005 U.S. Dist.

LEXIS 42909, 87-88 (D.S.C. Oct. 13, 2005); *Carrier Corp. v. Piper*, 460 F. Supp.2d 853, 856

(W.D. Tenn. 2006); *Incorporated Village of Garden City v. Genesco, Inc.*, 2009 U.S. Dist.

LEXIS 87354 (E.D.N.Y. Sept. 23, 2009).  Citizen suits under RCRA are limited because the

"chief responsibility for the implementation and enforcement of RCRA rests with the

Administrator of the [EPA]."  *Voss v. Waste Management of Illinois, Inc.*, 2006 U.S. Dist.

LEXIS 4302, at *7 (N.D. Ill. Feb. 2, 2006)  (quoting *Meghrig v. KFC Western, Inc.*, 516 U.S.

479, 483-84 (1996)).

As explained more fully below, Count III of Plaintiffs' Complaint must be dismissed

pursuant to 42 U.S.C. § 6972(b) because EPA and MDE have (1) commenced a civil action that

fully covers the scope of Plaintiffs' claims in these counts and (2) are diligently prosecuting such

actions through implementation of the Consent Decree.

1.    **EPA and MDE Have Commenced a Civil Action that Meets the Requirements of 42 U.S.C. § 6972(b) Resulting in the Consent Decree that Fully Covers Plaintiffs' Allegations in Count III**

EPA and MDE clearly commenced civil actions under RCRA regarding the Sparrows Point Facility, and pursuant to 42 U.S.C. § 6972(b) these actions preclude RCRA citizen suits. Specifically, as described above, in 1997 EPA filed a complaint against Bethlehem Steel, as the owner of the Sparrows Point Facility, alleging improper treatment, storage and disposal of hazardous waste and violations of interim status requirements that resulted in releases requiring corrective action under RCRA Section 3008(h), 42 U.S.C. § 6928(h). *See* Exh. 3. MDE also filed a complaint against Bethlehem Steel in 1997 under RCRA's citizen suit provision at 42 U.S.C. § 6972(a)(1)(B) alleging, among other claims: (1) an imminent and substantial endangerment from the releases of hazardous waste and violations of hazardous waste law; (2) unlawful discharges of hazardous waste; (3) the incompetent supervision or inefficient operation of Greys Landfill and Coke Point Landfill that had endangered the public and caused discharges to the waters of the State; and (4) unlawful discharges of pollutants to groundwater and to the waters of the state. *See* Exh. 4.

Plaintiffs' RCRA claim is brought pursuant to Section 6972(a)(1)(B) of RCRA. However, by filing civil complaints with this Court, EPA and MDE each "commenced" a civil "action" within the meaning of 42 U.S.C. § 6972(b). Both actions were expressly brought in order to require compliance with RCRA requirements and prohibitions, and MDE's complaint clearly states that it was brought as a RCRA citizen suit action under Section 6972(a)(1)(B) to abate the conditions resulting in an imminent and substantial endangerment. Thus, pursuant to Section 6972(b)(2)(C)(i), MDE's complaint satisfies the requirements for an action that precludes a citizen suit brought under Section 6972(a)(1)(B) as a matter of law.

Moreover, the Consent Decree negotiated by EPA, MDE, and Bethlehem Steel to resolve these complaints, and entered by this Court in 1997, encompasses Plaintiffs' RCRA claims. The Consent Decree speaks for itself, and as stated therein, its purpose was "1) to comprehensively address issues at Bethlehem Steel – Sparrows Point Facilities through prioritizing actions, with schedules . . . 2) to protect the public health, welfare and the environment" and "3) to employ certain pollution prevention measures at the Facility and to minimize to the extent practicable the generation and/or disposal of solid wastes including hazardous wastes and/or hazardous constituents." *See* Exh. 1, p. 4. More specifically, Section V of the Consent Decree requires that corrective measures, including interim measures, be undertaken in order to remedy any releases at or from the Sparrows Point Facility that pose a threat to human health or the environment. *See* Exh. 1, pp. 8-15.

### 2.    EPA and MDE Have Been and Are Engaged in Diligent Prosecution

The diligent prosecution bar to a citizen's suit requires both commencement of an action and diligent prosecution of that action. *See* 42 U.S.C. § 6972(b).[10] If the agency is diligently prosecuting the action, a court does not have subject matter jurisdiction over the citizen's claims and must dismiss such claims if challenged in a Rule 12(b) motion. *See Envtl. Integrity Project*

---

[10] RCRA contains the same "diligent prosecution" language as a bar to citizen suits as the CWA. Courts have found that due to the similarity of language in the two citizen suit provisions, that it is appropriate to interpret the citizen suit provisions in RCRA and CWA in the same manner. *See Supporters to Oppose Pollution v. Heritage Group*, 973 F.2d 1320, 1324 (7th Cir. 1992) (citing to a CWA citizen suit case to determine standard for diligent prosecution in a RCRA citizen suit); *Cox v. City of Dallas*, 256 F.3d 281, 308 (5th Cir. 2001) ("We are persuaded that the similarity of the citizen suit provisions of the CWA and the RCRA requires like interpretation.") (citing *United States. Dep't of Energy v. Ohio*, 503 U.S. 607, 615-16 (1992)); *Ailor v. City of Maynardville*, 368 F.3d 587, 601 (6th Cir. 2004) ("Under 42 U.S.C. § 6972 of the RCRA, citizens are authorized to bring suit in substantially the same capacity as provided for in the CWA."); *United States v. Hooker Chems. & Plastics Corp.*, 749 F.2d 968, 977-78 (2d Cir. 1984) ("The structure of the citizen suits provisions is the same in all three of these acts [RCRA, CWA, SDWA]. There is first the establishment of a private right of action in certain types of cases, then a prohibition against private suits if the responsible governmental official has commenced and is diligently prosecuting a suit for the same purpose. . ."); *Burnette v. Rowland*, 1998 U.S. Dist. LEXIS 11710, at *6 (D. Conn. May 4, 1998) ("The CWA, RCRA and CERCLA each contain virtually identical pertinent provisions permitting citizens to sue as private attorneys general in situations where federal and/or state authorities have, after notice, failed to take action to remediate particular environmental problems.").

*v. Mirant Corp.*, 2007 U.S. Dist. LEXIS 1219 (D. Md. Jan. 3, 2007) (dismissing citizen group's Clean Air Act claims because the MDE was diligently prosecuting through a consent decree); *Community of Cambridge Envtl. Health and Cmty. Dev. Group  v. City of Cambridge*, 115 F. Supp.2d 550 (D. Md. 2000) (dismissing citizen group's CWA claims for lack of subject matter jurisdiction under 12(b)(6) where the MDE was diligently prosecuting).

As discussed below, diligence is presumed, and Plaintiffs have a heavy burden to show otherwise.  In the present case, the enforcement was not only prosecuted diligently but brought to a successful conclusion by EPA and MDE through the execution and entry of the Consent Decree, which is subject to the continuing jurisdiction of this Court.  As such, the diligent prosecution bar is firmly in place, and Plaintiffs' RCRA claims should be dismissed.

To the extent there is any obligation that continuing implementation of the Consent Decree need also be shown to be diligent, the extensive work done under the Consent Decree, which is a matter of public record, clearly demonstrates ongoing diligence. The Fourth Circuit has determined that under the CWA (which, as noted, has a parallel citizen suit provision and diligent prosecution bar), a prosecution is "diligent" where the action is "capable of requiring compliance with the Act and is in good faith calculated to do so."  *Piney Run Preservation Ass'n v. County Comm'rs*, 523 F.3d 453, 459 (4th Cir. 2008).  Moreover, diligent prosecution does not require the agency prosecution to go to extremes; the prosecution need not be "far-reaching or zealous.  It requires only diligence."  *Karr v. Hefner,* 475 F.3d 1192, 1197 (10th Cir. 2007).  As explained in detail below, implementation of the Consent Decree by the agencies clearly meets this requisite standard of diligence.

In fact, diligence on the part of the government is presumed, and Plaintiffs have a heavy burden of showing lack of diligence on the part of an enforcement agency in order to establish

the Court's jurisdiction.  *See, e.g. Piney Run*, 523 F.3d at 459; *Karr*, 475 F.3d at 1198 ("Citizen-plaintiffs must meet a high standard to demonstrate that [a government agency] has failed to prosecute a violation diligently."); *Community of Cambridge*, 115 F. Supp.2d at 554 ("The court must presume the diligence of the state's prosecution of defendant absent persuasive evidence that the state has engaged in a pattern of conduct that could be considered dilatory, collusive, or otherwise in bad faith.") (quoting *Connecticut Coastal Fishermen's Ass'n v. Remington Arms Co.*, 777 F. Supp. 173, 183 (D. Conn. 1991)); *Supporters to Oppose Pollution v. Heritage Group*, 973 F.2d 1320, 1324 (7th Cir. 1992) (RCRA Section 6972 "does not authorize a collateral attack on the agency's strategy or tactics"); *Envtl. Integrity Project,* 2007 U.S. Dist. LEXIS 1219, at *3 ("In general, courts undertake a deferential review of a state's enforcement action and presume that the earlier prosecution was diligent.").

The presumption of diligence cannot be overcome by Plaintiffs' contention that the prosecution by the enforcement agencies has been inadequate or too slow.  As recognized by this Court, "[a] plaintiff's mere unhappiness with a state prosecution and settlement does not overcome the presumption."  *Envtl. Integrity Project*, 2007 U.S. Dist. LEXIS 1219, at *3. Likewise, it has been held that there is no lack of diligent prosecution "[m]erely because the State may not be taking the precise action Appellant wants it to or moving with the alacrity Appellant desires."  *North & South Rivers Watershed Ass'n v. Town of Scituate,* 949 F.2d 552, 558 (1st Cir. 1991).  Further, "an unsatisfactory result does not necessarily imply lack of diligence."  *Karr v. Hefner*, 475 F.3d at 1197; *see also City of Cambridge*, 115 F. Supp.2d at 554; *Supporters to Oppose Pollution*, 973 F.2d at 1324  (RCRA Section 6972 "does not require that the EPA succeed; it requires only that the EPA *try,* diligently") (emphasis in original); *Connecticut Fund for Env't v. Contract Plating Co.*, 631 F. Supp. 1291, 1294 (D. Conn. 1986)

("[M]ere fact that the settlement reached in the state action was less burdensome to the defendant than the remedy sought in the [citizen suit] is not sufficient in itself to overcome the presumption that the state action was diligently prosecuted."); *Ellis v. Gallatin Steel*, 390 F.3d 461, 477 (6th Cir. 2004) ("[S]econd guessing of the EPA's assessment of an appropriate remedy. . . fails to respect the statute's careful distribution of enforcement authority among the federal EPA, the States and private citizens, all of which permit citizens to act where the EPA has 'failed' to do so, not where the EPA has acted but has not acted aggressively enough in the citizens' view.").

Regarding consent decree implementation, deference to administrative decisions is important because the court "must be particularly deferential to the agency's expertise" and should not interpret the scope of the "diligent prosecution" bar "in a manner that would undermine the [government's] ability to reach voluntary settlements with defendants." *Piney Run*, 523 F.3d at 459 (internal quotation omitted; quoting *Karr*, 475 F.3d at 1198); *see also Karr*, 475 F.3d at 1197 ("If a defendant is exposed to a citizen suit whenever the EPA grants a concession, defendants will have little incentive to negotiate consent decrees."); *Arkansas Wildlife Fed'n v. ICI Americas Inc.*, 842 F. Supp. 1140, 1147 (E.D. Ark. 1993) ("It would be unreasonable and inappropriate to find failure to diligently prosecute simply because [defendants] prevailed in some fashion or because a compromise was reached.").

Given this particularly deferential review of voluntary settlements, it is not surprising that numerous courts have found that a consent decree and its implementation amounts to ongoing diligent prosecution provided that it is a good faith attempt to require compliance with the statute in question. *See, e.g. Piney Run*, 523 F.3d at 460 (noting that an enforcement action (and subsequent consent decree) "will be considered diligent if it is capable of requiring compliance with the Act and is in good faith calculated to do so."); *Envtl. Integrity Project*, 2007 U.S. Dist.

LEXIS 1219 at, *13 ("the inquiry into whether a consent decree is reasonably designed to require a polluter's compliance with applicable standards is part and parcel of the inquiry into whether state regulatory authorities have diligently prosecuted an action against the polluter."); *Community of Cambridge*, 115 F. Supp.2d at 556; *Karr*, 475 F.3d at 1197-99; *Clean Air Council v. Sunoco*, 2003 U.S. Dist. LEXIS 5346 (D. Del. Apr. 2, 2003).

Applying these principles, EPA and MDE's prosecution of the Consent Decree has been diligent as a matter of law. EPA and MDE negotiated and are currently implementing a Consent Decree that is a good faith and successful attempt to require the owner of the site to comply with RCRA requirements, including corrective action, as well as state requirements for solid waste landfill operations. *See* Exh 1. The Consent Decree was filed and lodged with this Court.

EPA, MDE and Severstal Sparrows have been and are currently actively engaged in implementing corrective action under the Consent Decree to address the very concerns identified in Plaintiffs' Count III. Severstal Sparrows is working to investigate, assess, and implement interim measures to address the onsite contamination at EPA and MDE's behest. For example, Severstal Sparrows is undertaking extensive interim measures to reduce the environmental impact from the Coke Oven Area as directed by EPA and MDE. *See* Exhs. 17-23. MDE has issued Severstal Sparrows a request for interim measures at Coke Point Landfill. *See* Exh. 24. Severstal Sparrows has also submitted a work plan to investigate impacts to offshore environments from current releases. *See* Exh. 14. Additionally, Severstal Sparrows has continued to operate the groundwater pump and treat interim measures at the former rod and wire mill sludge bin storage area in accordance with the approved work plan for this area. *See* Exh. 8.

There can be no legitimate question whether EPA and MDE have and are diligently prosecuting the requirements of RCRA through the Consent Decree and its implementation. Plaintiffs cannot bring a citizen's suit merely because they are unhappy with the progress of work or believe the implementation of the Consent Decree is not a "success". *See* Exh. 2. Further, allowing this citizen suit to proceed and granting Plaintiffs' requested relief would impose dual, and potentially conflicting, requirements thereby inhibiting the progress of current and ongoing corrective action activities by diluting and diverting necessary resources. This Court should not permit such a result. Count III of the Complaint should be dismissed.

### B. The Court Should Abstain from Entertaining Count III Based on the Doctrine of Primary Jurisdiction Because of EPA's and MDE's Continuing Jurisdiction Over, and Expertise at, Enforcement of the Consent Decree

Even though diligent prosecution by the enforcement agencies bars Plaintiffs' RCRA citizen suit in Count III, this Court should also abstain from considering these claims based on the doctrine of primary jurisdiction due to EPA and MDE's expertise and continuing jurisdiction over remediation matters at the Sparrows Point Facility. The doctrine of primary jurisdiction "provides courts with flexible discretion to refer certain matters to the specialized competence of an administrative agency which . . . is exercising continuing jurisdiction over those matters." *Friends of Santa Fe County v. LAC Minerals*, 892 F. Supp. 1333, 1349 (D.N.M. 1995).

The doctrine applies "to claims properly cognizable in court that contain some issue within the special competence of an administrative agency." *Reiter v. Cooper*, 507 U.S. 258, 268 (1993). Primary jurisdiction abstention is appropriate where "the matter involves technical or policy considerations which are beyond the court's ordinary competence and within the agency's field of expertise." *MCI Commc'n Corp. v. Am. Tel. & Tel. Co.*, 496 F.2d 214, 220 (3d Cir. 1974). Additionally, several courts have found that abstention is warranted for claims

involving RCRA where cleanup activities are ongoing at the direction of environmental agencies at a site.  *See Raritan Baykeeper, Inc. v. NL Indus., Inc.*, 2010 U.S. Dist. LEXIS 52542 (D.N.J. May 26, 2010) (dismissing citizen's suit RCRA and CWA claims under the primary jurisdiction doctrine where defendant was undertaking environmental investigation and remediation under the direction of NJDEP); *Friends of Santa Fe County*, 892 F. Supp. at 1349 (dismissing RCRA citizen's suit where defendants were operating under an administrative consent order and at the direction of the state agency to address contamination at a mining site); *Davies v. Nat'l Co-op Refinery Ass'n,* 963 F. Supp. 990, 998 (D. Kan. 1997) (dismissing RCRA citizen suit on the basis of the primary jurisdiction doctrine where the state agency was conducting a review of ground water contamination caused by the defendant and was on the verge of addressing remediation).

Courts have identified several factors governing application of the doctrine: (1) whether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise; (2) whether the question at issue is particularly within the agency's discretion; (3) whether there exists a substantial danger of inconsistent rulings; and (4) whether a prior application to the agency has been made.  *See National Communications Ass'n v. American Tel. and Tel. Co.*, 46 F.3d 220, 223 (2d Cir. 1995); *AT&T Corp. v. PAB, Inc.,* 935 F. Supp. 584, 589-90 (E.D. Pa. 1996)*; Raritan Baykeeper, Inc.*, 2010 U.S. Dist. LEXIS 52542, at *17-18.

This Court should abstain from entertaining Plaintiffs' claims, including those asserted in Count  III, because the factors are met in the present case.  The first factor, whether there are technical or policy considerations within the agency's particular field of expertise, supports application of the primary jurisdiction doctrine.  In this case, EPA and MDE are charged with the implementation of the environmental laws and have specialized technical knowledge.  The

second factor is clearly met as EPA and MDE are charged with the responsibility to implement RCRA and have the ability to oversee the corrective action at the site.

The third factor, whether there exists a substantial danger of inconsistent rulings, also supports application of the primary jurisdiction doctrine in this case.  Plaintiffs have requested that this Court order Defendants to undertake various measures to address the contamination at the Sparrows Point Facility.  *See* Complaint, Count III.  However, such actions could hinder the ongoing investigative and corrective action efforts.  The Court should not impose dual and/or conflicting requirements as requested by the Plaintiffs.

Finally, the fourth factor, whether a prior application to the agency has been made, also supports abstention based on primary jurisdiction.  Under this factor, it is not necessary that the plaintiff initiate proceedings before the agency.  *Raritan Baykeeper, Inc.*, 2010 U.S. Dist. LEXIS 52542, at *23.  Rather, "it is sufficient that the issue in dispute is before the agency."  *Id.*  Because EPA and MDE are actively involved in the remediation of the site through the implementation of the Consent Decree, this factor is also satisfied.  *See id.* (finding that NJDEP's long-term oversight of remediation at a site satisfied this fourth factor).  Accordingly, the primary jurisdiction doctrine provides an additional basis to dismiss Count III.

## IV.    Counts IV, V, VI and VII Are Barred by the Maryland's Three Year Statute of Limitations

The statute of limitations for civil claims in Maryland is three years from the date it accrues.  Md. Code, Courts and Judicial Proceedings, § 5-101.  As explained more fully below, Plaintiffs' common law claims in Counts IV (negligence), V (trespass), VI (nuisance) and VII (strict liability) accrued in 2004 when SPS LLLP acquired the property.  Thus, pursuant to Maryland's three year statute of limitations, Plaintiffs are barred from bringing such claims six years later.  Accordingly, the Court should dismiss Counts VI, V, VI and VII pursuant to Fed. R.

Civ. P. 12(b)(6).  *See Brooks v. City of Winston-Salem, N.C.*, 85 F.3d 178, 181 (4th Cir. 1996)

("Although a motion pursuant to Rule 12(b)(6) invites an inquiry into the legal sufficiency of the

complaint, not an analysis of potential defenses to the claims set forth therein, dismissal

nevertheless is appropriate when the face of the complaint clearly reveals the existence of a

meritorious affirmative defense. . .  'A complaint showing that the statute of limitations has run

on the claims is the most common situation in which the affirmative defense appears on the face

of the pleading,' rendering dismissal appropriate.") (citations omitted).

      In Maryland, a cause of action accrues under the statute of limitations "at the time the

plaintiff had actual knowledge *or* implied knowledge of the existence of a cause of action."

*Weyerhaeuser Corp. v. Koppers Co., Inc.*, 771 F. Supp. 1406, 1415 (D. Md. 1991) (citing to

*Poffenberger v. Risser*, 431 A.2d 677 (Md. 1981) (other citations omitted).  Implied knowledge

arises from "'knowledge of circumstances which ought to have put a person of ordinary

prudence on inquiry [such that plaintiff is charged] with notice of all facts which such an

investigations would in all probability have disclosed if it had been properly pursued.'" *Id.*

(quoting *Poffenberger v. Risser*, 431 A.2d 677 (Md. 1981)).  Further, it is not necessary that

plaintiff have notice of actual harm; rather, only notice of potential or possible harm is required.

*See Russo v. Ascher*, 545 A.2d 714, 717 (1988) ("[A] claimant is held to be 'on notice' when he

has actual knowledge (express or implied) of a possible harm."); *see also Hess v. Firestone

Plastics Co.*, 872 F.2d 417, 1989 WL 27489  (4th Cir. 1989) (unpublished) (holding the three-

year Maryland statute of limitations period barred plaintiffs' claims for contamination from

nearby landfill where the plaintiffs were on notice "of the potential health hazards and economic

damages resulting from their proximity to the landfill" more than three years before suit was

filed.).  Accordingly, in the context of state environmental common law claims, the courts have

held that the statute of limitations begins to run (i.e. the claim "accrues") when the plaintiff

property owner knows or should have know about the contamination.  *See Weyerhaeuser Corp.*,

771 F. Supp. 1406; *Sherwin-Williams Co. v. ATRA Group, Inc.*, 125 F. Supp.2d 739 (D. Md.

2001).

In this case, Plaintiffs' common law claims accrued in 2004 when the Shipyard Site was

acquired because there was both notice and actual knowledge of the underlying circumstances on

which the common law claims against Defendants are based.[11]  As acknowledged in the

Complaint, the United States and State of Maryland filed complaints against Bethlehem Steel in

1997 for contamination at and around the Bethlehem Steel's Sparrows Point operations.

Complaint, ¶ 19.  Those complaints resulted in the 1997 Consent Decree.  *See* Complaint, ¶ 20.

The Consent Decree was subject to public notice.  *See* Exh. 1, Section XXIV and 62 Fed. Reg.

11917 (Mar. 13, 1997).  As further acknowledged in the Complaint, SPS LLLP acquired the

Shipyard Site on or about March 4, 2004.  Complaint ¶ 16.  As such, it is clear from the face of

the Complaint that Plaintiffs were on notice of the potential for contamination by Bethlehem

Steel of the Shipyard Site at the time the Shipyard Site was acquired.

Further, it is clear from public records that SPS LLLP was on notice of potential

contamination from the Steel Mill Site to the Shipyard Property based on the deeds through

which Bethlehem Steel transferred the property to Baltimore Marine, and Baltimore Marine later

transferred the property to SPS LLLP.  *See* Exhs. 26 and 27.  Both deeds expressly reference the

---

[11]  Counts IV, V, VI and VII each relate to a state common law claims based on allegations of hazardous substances
from the Steel Mill Site contaminating the Shipyard Site.  Count IV, Negligence, alleges that Defendants breached a
duty of care in failing to prevent the discharge of hazardous substances onto the Shipyard Site.  *See* Complaint, ¶¶
58-65.  Count V, Trespass, alleges that Defendants allowed benzene and other hazardous substances to migrate from
the Sparrows Point Facility to the Shipyard Site.  *See* Complaint, ¶¶ 66-70.  Count VI, Nuisance, alleges that
Defendants unreasonably failed to contain benzene and other hazardous substances to the Sparrows Point Facility
allowing it to migrate and interfere with the Shipyard Site.  *See* Complaint, ¶¶ 71-73.  Finally, Count VII, Strict
Liability, alleges that any contamination resulted from the conduct of an abnormally dangerous activity at the
Sparrows Point Facility.  *See* Complaint, ¶¶ 74-80.

Consent Decree and the potential for contamination at the Shipyard Site resulting from the historic operations of Bethlehem Steel. *See* Exh. 26 at p. 10 and Exh. 27 at p. 5-6.

Finally, it is also clear from other public records that SPS LLLP had actual knowledge that the Shipyard Site was contaminated prior to acquiring the Shipyard Site. In February 2004, SPS LLLP submitted an application under Maryland's Voluntary Cleanup Program ("VCP"). *See* Exh. 28, February 22, 2004 Letter from M. Cohen (counsel for SPS LLLP) to K. Kalbacher (MDE) (enclosing the VCP Application and related reports and stating that VCP is intended to apply to those portions of the site requiring government-directed remediation).

Accordingly, the limitations period began to run in 2004 when the Shipyard Site was first acquired by Plaintiffs because there was notice and actual knowledge of potential contamination of the Shipyard Site. As a result, Plaintiffs' state common law claims are time barred because they were not brought within three years from 2004 as required by Section 5-101 of the Maryland Code, Courts and Judicial Proceedings.[12]

## V.    The Complaint Fails to State a Valid Claim for Strict Liability (Count VII)

Plaintiffs fail to state a claim for strict liability upon which relief can be granted, under the facts as pled in paragraphs 74-80 of the Complaint (Count VII). Plaintiffs contend that Severstal Sparrows' business operations constitute strict liability. This claim is without legal footing and contrary to the application of the strict liability doctrine under Maryland law. Specifically, Plaintiffs' Complaint states that:

- Defendants' storage of hazardous materials underground at the Steel Mill Site without containment constitutes an abnormally dangerous activity, with a high risk of harm to Plaintiffs and the Shipyard Site;

---

[12]  Severstal Sparrows did sign a tolling agreement with SPS LLLP on or about September 5, 2008 for claims to the extent not already barred. However, SPS LLLP's claims are still time-barred by Maryland's statute of limitations because the tolling agreement was entered into after the limitations period had already run in 2007, and nothing in the tolling agreement is alleged to have tolled the running of the limitations period retroactive to 2007. Therefore, SPS LLLP's Counts IV through VII against Defendants must be dismissed as time-barred.

- The risk of harm resulting from the failure to remediate and/or contain benzene and other materials is substantial;

- Given the topography, the proximity of the coke ovens and associated operations to subsurface aquifers, and the close proximity of the Steel Mill Site to the Patapsco River, Defendants' subsurface, uncontained, and nonpermitted storage of hazardous substances at the Steel Mill Site is inappropriate for its locale; and

- The subsurface, uncontained and nonpermitted storage of hazardous substances is not a matter of common usage and the value of such activity was and is outweighed by the substance's dangerous propensity.

*See* Complaint ¶¶ 75-78.  While these contentions may relate to some of the site-wide corrective action activities as the result of the implementation the 1997 Consent Decree entered by this Court, these facts as pled fail to specify a legal basis for Plaintiffs' strict liability claim. Accordingly, Count VII should be dismissed as a matter of law.

Plaintiffs' allegations in Count VII do not fall under a cognizable common law tort cause of action.  In Maryland, strict liability torts are limited to the following cases: cases of abnormally dangerous activities, *see e.g. Gallagher v. H.V. Pierhomes, LLC,* 957 A.2d 628 (2008); abnormally dangerous animals, *see e.g. Matthews v. Amberwood Associates Ltd. Partnership, Inc.,* 719 A.2d 119 (Md. 1998); and products liability, *see e.g. Blackwell v. Wyeth,* 971 A.2d 235 (Md. 2009).  Plaintiffs' allegations do not amount to abnormally dangerous activities as defined under Maryland law and therefore, Count VII should be dismissed.

### A.    Plaintiffs Cannot Establish that Defendant Severstal Sparrows Engaged in an Abnormally Dangerous Activity

In order for Plaintiffs to maintain a strict liability claim, Plaintiffs need to contend that Defendant Severstal Sparrows engaged in an abnormally dangerous activity by virtue of its business operations at the Sparrows Point Facility.  However, such claims cannot succeed

because Plaintiffs have failed to allege sufficient facts to support the requisite factors under

Maryland law for application of the strict liability doctrine.

Maryland adheres to a multi-factor test to determine what constitutes an abnormally

dangerous activity.  Specifically, Maryland adopts the definition of an abnormally dangerous

activity pursuant to Restatement (Second) Torts §§ 519 and 520, employing the six factor

analysis as set forth in § 520.  *See Yommer v. McKenzie,* 257 A.2d 138, 140 (1969); *Gallagher,*

957 A.2d at 633; Restatement (Second) Torts, §520.  In determining whether an activity is

abnormally dangerous, Maryland courts consider:

> (a)     Whether the activity involves a high degree of risk of some harm to the person, land or chattels of others;
>
> (b)     Whether the gravity of the harm which may result from it is likely to be great;
>
> (c)     Whether the risk cannot be eliminated by the exercise of reasonable care;
>
> (d)     Whether the activity is not a matter of common usage;
>
> (e)     Whether the activity is inappropriate to the place where it is carried on; and
>
> (f)     The value of the activity to the community.

*Yommer* 257 A.2d at 140 (1969).  Plaintiffs have not alleged facts to support these factors to

maintain a strict liability claim against Defendant Severstal Sparrows.  For this reason, Count

Seven should be dismissed.

**B.     Risks Associated with Severstal Sparrows' Operations Can be Eliminated by the Exercise of Reasonable Care Thereby Defeating Plaintiffs' Strict Liability Claim**

To support a claim for strict liability, there must be some basis to conclude that there is

an inability to eliminate the risks through the exercise of reasonable care.  "If an activity can be

performed safely with ordinary care, negligence serves both as an adequate remedy for injury

and a sufficient deterrent to carelessness and the imposition of strict liability is unnecessary."

*Gallagher,* 957 A.2d at 638. "'Due care' is a negligence concept, and therefore inconsistent with the genre of strict liability or liability without fault…[l]iability for failure to exercise due care is not strict liability, but liability for damages proximately resulting from the wrongful breach of a legally cognizable duty, i.e. negligence." *Board of County Comm'rs v. Bell-Atlantic Maryland,* 695 A.2d 171, 179-180 (1997) (internal citations omitted). While all the factors are important and often interrelated "[c]entral to the determination of whether an activity is abnormally dangerous is whether it could be made safe through the exercise of reasonable care." *Arlington Forest Assoc. v. Exxon Corp.,* 774 F. Supp. 387, 390 (E.D. Va. 1991). Here, Plaintiffs have pled no such facts to support such a proposition. Plaintiffs' allegations do not provide a basis for concluding that there is an inability to eliminate the alleged risks through the exercise of ordinary care, thus warranting the dismissal of Count VII.

The crux of Plaintiffs' strict liability cause of action is that "storage of hazardous materials underground" "without containment" is an abnormally dangerous activity. Complaint, ¶ 75. Initially, this is a deliberately confusing method of referring to the historic contamination left behind by Bethlehem Steel at the Sparrows Point Facility. To characterize the residual contamination, and alleged presence of released hazardous materials in the underground environment, as "storage" is without any basis in law or fact. As reference to most any dictionary demonstrates, "storage" is the act of deliberately placing an object or material in a location for later use. Here, however, the Complaint is devoid of any facts that support the allegation, let alone the conclusion, that Severstal Sparrows is "storing" any hazardous materials underground, and instead is rife with allegations that releases of hazardous materials have caused underground contamination. *See* Complaint, ¶¶ 19, 23-27.

Even if one overlooks the unsupportable characterization of historic contamination as "storage", Plaintiffs' strict liability claim still fails. In *National Telephone,* for example, with respect to storage of hazardous material underground, specifically gasoline, the court stated that "[u]nlike archetypical abnormally dangerous activities such as blasting, there is no evidence to suggest 'that the risk of seepage [from USTs] cannot be eliminated by the exercise of reasonable care, or that the harm to be anticipated from the underground seepage of gasoline is 'grave.'" *National Telephone Coop. Ass'n v. Exxon Corp.,* 38 F. Supp.2d 1, 8-9 (D.D.C. 1998) (applying the strict liability analysis as set forth in Restatement (Second) Torts § 520). In this case, Plaintiffs have not pled sufficient facts to establish that potential risks associated with Defendant Severstal Sparrows' alleged "storage" of hazardous materials underground cannot be eliminated through the exercise of reasonable care.

Plaintiffs have pled negligence (Count IV) and are not entitled to proceed with a strict liability claim based upon a mere allegation of negligent containment. Noticeably, many of the allegations pled in Plaintiffs' negligence count (Count IV) parallel the strict liability count (Count VII). Plaintiffs contend that Severstal Sparrows negligently contained and/or failed to prevent the migration of hazardous substances from the Steel Mill Site onto/into the Shipyard Site. *See Complaint* ¶ 59 (referencing duty of care owed by Defendants in the containment of hazardous substances generated as a result of operations at the Steel Mill Site); ¶ 60 (referencing duty of care to prevent "migration" of contaminants from Steel Mill Site to the Shipyard Site); ¶ 63 (referencing duty of care/failure to reasonably contain hazardous substances at the Steel Mill Site). Severstal Sparrows denies that it was negligent in any way and maintains that it exercised reasonable care at all times. Notwithstanding, Plaintiffs' strict liability allegations are nothing more than repeated allegations that Severstal Sparrows was negligent in its containment of

33

hazardous substances – an issue which can be minimized by the exercise of reasonable care.

Simply stated, allegations of negligent containment of hazardous materials do not give rise to

strict liability.  Therefore, Plaintiffs' strict liability count should be dismissed as a matter of law.

### C.    Severstal Sparrows' Operations are Appropriate to the Locale

A crucial factor in the strict liability standard is the appropriateness of the activity to the

locale.  *See Yommer*, 257 A.2d at 140.  Whether an activity is considered abnormally dangerous

is affected by the place where the activity is carried on.  For example, in *Yommer*, the strict

liability analysis did not turn on the operation of the gas station or the placement of gasoline

tanks containing hazardous material underground, but rather the proximity of the underground

gasoline tanks to personal residences.  *Id.*  In *National Tel. Coop. Ass'n v. Exxon Corp.,* the

plaintiff sought compensatory and punitive damages from Exxon Corp. for gasoline

contamination that allegedly migrated from Exxon's underground storage tanks to plaintiff's

adjacent property.  Regarding the locale analysis, which was integral, the Court stated that "[t]he

tanks are not located near any potable-water supply, nor are they situated in such a manner that

they will likely wrought a public nuisance…[further] the USTs on Exxon's property rest within a

commercial area of the city in which eleven other gas stations operate…"  38 F. Supp.2d at 7-8.

The Court further explained that "[w]here USTs are buried beneath gasoline stations located in

commercial settings, the overwhelming majority of courts have concluded  that such conduct is

not 'abnormally dangerous'."  *Id.* at 8-9.

In this case, the Steel Mill Site has operated in the same location in excess of 100 years

on real property consisting of approximately 3500 acres.  Its business operations do not occur in

a residential area and are certainly appropriate to the locale.  Moreover, Plaintiffs' own property

is commercial in nature – the Shipyard operations include but are not limited to, the repair,

modification, dismantling and construction of ships.  Complaint, ¶ 5.  Indeed, the Shipyard Site was once part of the operations of Bethlehem Steel.  *See* Exhs. 1 and 5.  Further, activities in support of Plaintiffs' operations have included metal machining, metal fabrication, grit blasting, painting, electrical repair, heat treatment of sheet metal and ship breaking.  *Id.*   In sum, Plaintiffs' allegations do not support a contention that Severstal Sparrows' activities and operation of its business are inappropriate to the locale, as required per Maryland law.

### D.    Plaintiffs Have Not Sufficiently Alleged a High Degree of Harm

Plaintiffs also fail to allege sufficient facts to establish a high degree of harm.  The theory behind the doctrine of strict liability is that certain activities, such as the use of atomic energy, involve major risks of harm to persons, land, or chattel, no matter where or how they are carried on.  *See* Restatement (Second) of Torts § 520, comment (g).  Neither ownership of historically contaminated property, nor operation of a steel mill, let alone the alleged "storage" of hazardous materials underground, are such activities.  Even circumstances that *might* fit the definition of an abnormally dangerous activity are insufficient according to Maryland law to support a strict liability claim.   For example, operation of a gas station and the storage of gasoline underground does not of itself involve a high degree of risk of harm to a person, land or chattels.  *Yommer,* 257 A.2d at 140.  Similarly, Severstal Sparrows' operation of the largest and oldest active integrated steel facility on the east coast without facts to support a strict liability claim is also insufficient to meet the Maryland strict liability standard.

Application of the strict liability doctrine requires that "[t]he harm threatened must be major in degree, and sufficiently serious in its possible consequences to justify holding the defendant strictly responsible for subjecting others to an unusual risk."  Restatement (Second) Torts §520, comment (g).  In *Gallagher*, the Court was asked to extend the doctrine of strict

35

liability for abnormally dangerous activities as expressed in Restatement (Second) of Torts §§ 519 and 520 to pile driving operations at the Inner Harbor in Baltimore that resulted in damage to a personal residence located approximately 325 feet from the construction site. *Gallagher,* 957 A.2d at 637. Ultimately, the Court found that the harm was simply not a high degree of risk requiring application of strict liability. *Id.* Determinative facts included that the Baltimore waterfront was an appropriate place to conduct pile driving, to build piers, and to construct buildings overlooking the water and that such activities had occurred on the Inner Harbor for decades. *Id.* at 638. Similarly, in the instant case, the harm threatened is not sufficiently serious to hold Severstal Sparrows liable without fault because its operations are appropriate to the locale and any risks associated with its business operations can be eliminated by the exercise of reasonable care.

Thus, for all of these reasons, the Court should dismiss Count Seven of Plaintiffs' Complaint as a matter of law.

## RELIEF REQUESTED

For the foregoing reasons, Plaintiffs' Complaint should be dismissed with prejudice in its entirety pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

## ORAL ARGUMENT REQUESTED

Pursuant to Local Rule 105.6, Severstal Sparrows hereby requests Oral Argument on all issues presented in this Motion.

Respectfully submitted,

**ECKERT SEAMANS CHERIN
   & MELLOTT, LLC**

_____/s/ Edward J. Longosz, II_____
Edward J. Longosz, II (#07509)
Mark A. Johnston (#15973)
Gabriella V. Cellarosi (#28292)
1717 Pennsylvania Avenue, NW
Suite 1200
Washington, DC  20006
(202) 659-6600
elongosz@eckertseamans.com
mjohnston@eckertseamans.com
gcellarosi@eckertseamans.com

*Attorneys for Defendant, Severstal
Sparrows Point, LLC*

Of Counsel:
Scott R. Dismukes, Esq.
David A. Rockman, Esq.
Jessica L. Sharrow, Esq.
Eckert Seamans Cherin & Mellott, LLC
600 Grant Street, 44th Floor
Pittsburgh, PA 15219
412-566-6000
sdismukes@eckertseamans.com
drockman@eckertseamans.com
jsharrow@eckertseamans.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that copies of the foregoing **Motion to Dismiss, Memorandum of Points and Authorities and Proposed Order** were electronically filed and served, this 3rd day of December 2010, to:

Catherine A Bledsoe, Esq.
Margaret M Witherup, Esq.
GORDON FEINBLATT ROTHMAN
  HOFFBERGER AND HOLLANDER LLC
233 E Redwood St
Baltimore, MD  21202

Amy L Brown , Esq.
SQUIRE SANDERS AND DEMPSEY LLP
1201 Pennsylvania Avenue, NW
Suite 500
Washington, DC  20004

Andrew Etter, Esq.
Vincent Atriano, Esq.
SQUIRE SANDERS AND DEMPSEY LLP
41 S High Street
Columbus, OH  43215

Dale E Papajcik, Esq.
William Vere Shaklee, Esq.
SQUIRE SANDERS AND DEMPSEY LLP
127 Public Square, Ste 4900
Cleveland, OH  44114


_____/s/ Edward J. Longosz, II_____
Edward J. Longosz, II