**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
BALTIMORE DIVISION**

| | |
|---|---|
| **SPS LIMITED PARTNERSHIP, LLLP,** et al., ) ) ) **Plaintiffs,** ) ) **v.** ) ) **SEVERSTAL SPARROWS POINT, LLC,** et al., ) ) ) **Defendants.** ) | **Case No. 1:10-cv-02579** **Judge J. Frederick Motz** |

**REPLY MEMORANDUM IN SUPPORT OF
DEFENDANT ARCELORMITTAL USA LLC'S[1] MOTION TO DISMISS**

As Plaintiffs SPS Limited Partnership, LLLP and SPS 35, LLC concede in their Combined Opposition, this case is nothing more than an action to recover the costs of a "wastewater treatment system to treat benzene in groundwater" which *Plaintiffs* pump from their Shipyard graving dock as part of their shipbuilding operations. Doc. #29 at p. 11/60. Plaintiffs concede that they "had to install a wastewater treatment system designed to remove benzene at the graving dock in order to comply with [their own] revised NPDES permit." *Id.* at p. 15/60. Were it not for *Plaintiffs'* regulated activity of discharging groundwater pumped from their graving dock into adjacent surface waters, these NPDES compliance costs would not have been incurred at all. Thus, despite their grandiose rhetoric concerning "imminent and substantial endangerment," Plaintiffs' entire case is nothing more than an attempt to shift the compliance costs of their shipbuilding operation to the neighboring steel facility ("the Facility") that has been

---

[1]  Please be advised that as of December 21, 2010, Defendant ArcelorMittal USA Inc. has been converted to a limited liability company and is now known as "ArcelorMittal USA LLC" (hereinafter "ArcelorMittal").

owned and operated since 2003 by the entity now known as Defendant Severstal Sparrows Point, LLC ("Severstal").

Plaintiffs acknowledge that the neighboring "steel mill has operated for over 100 years" (*id*. at p. 11/60), and candidly note that their claims seek to hold Defendants liable for the off-site impacts from these historic conditions as "the **successor** owners and operators to Bethlehem Steel [Corporation ('BSC')]".  *Id*. at p. 12/60 (emphasis added).  Unfortunately for Plaintiffs, however, they have been *enjoined* from asserting such BSC successorship claims against Defendants under the express terms of the April 23, 2003, Sale Order[2] entered by the U.S. Bankruptcy Court for the Southern District of New York in *In re Bethlehem Steel Corp., et al.*, Ch. 11 Case Nos. 01-15288 through -15302, 01-15308 through -1531, which states:

> **<u>Under no circumstances shall ISG be deemed a successor of or to the Sellers for any Interest against or in the Sellers or the Acquired Assets of any kind or nature whatsoever</u>.... Except for the Assumed Liabilities, all persons holding Interests against or in the Sellers or the Acquired Assets of any kind or nature whatsoever** (including but not limited to … administrative agencies, governmental units, … federal, state and local officials, **maintaining any authority relating to any environmental, health and safety laws**, and their respective successors or assigns) **<u>shall be, and hereby are, forever barred, estopped, and permanently enjoined from asserting, prosecuting, or otherwise pursuing such Interests of any kind or nature whatsoever against ISG, its property, its successors and assigns, or the Acquired Assets, as an alleged successor or otherwise</u>, with respect to any Interest of any kind or nature whatsoever such person or entity had, has, or may have against or in a Seller** … **or the Acquired Assets.**

Sale Order, ¶34 (Doc. #23-8 at p. 21/30; emphasis added).  This Sale Order approved and authorized BSC's sale of the Facility (minus, of course, the Shipyard), to the entity now known as Defendant Severstal Sparrows Point, LLC pursuant to Sections 105(a) and 363(f) of the

---

[2]  "Order Authorizing (I) Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims and Encumbrances, (II) Assumption and Assignment of Certain Executory Contracts, and (III) Assumption of Certain Liabilities" (referred to herein simply as "Sale Order"; Doc. #23-8).

Bankruptcy Code "free and clear of all Interests of any kind or nature whatsoever," except for certain specified Assumed Liabilities. *Id.*, ¶7. Plaintiffs' Combined Opposition simply tries to ignore the express language in the Sale Order, and makes no attempt to counter it in any way.

Nor can Plaintiffs' Combined Opposition overcome their Complaint's failure to allege any well-pleaded facts plausibly demonstrating that ArcelorMittal ever "owned or operated" the Facility under CERCLA or actively "contributed" to the alleged wastes at the Facility's former coke ovens (which ceased operations in December 1991, years before the Facility was sold by BSC in 2003) under RCRA. To the contrary, Plaintiffs concede that "ISG Sparrows Point LLC acquired the Steel Mill Site from Bethlehem Steel on or about April 30, 2003".[3] *Id.* at p. 12/60. ISG Sparrows Point LLC is the same entity now known as Defendant Severstal Sparrows Point, LLC. *See* certified Delaware Sec'y of State records (Doc. #21-7). Consequently, there can be no genuine dispute that the one and only owner and operator of the Facility since 2003 has been Defendant Severstal Sparrows Point, LLC.[4]

---

[3] Plaintiffs also argue that "ISG Sparrows Point LLC … replaced Bethlehem Steel as the party responsible for complying with the Consent Decree." *Id.* Under this Court's August 1, 2005 Stipulated Order Implementing Modifications to Consent Decree (Doc. #29-5), the signee, "ISG SPARROWS POINT", was substituted for BSC under the 1997 Consent Decree "as amended" by the March 12, 2003 Asset Purchase Agreement approved by the Sale Order. ISG Sparrows Point Inc. is the same entity now known as Defendant Severstal Sparrows Point, LLC. Thus, the Stipulation refutes Plaintiffs' misleading reference to "***Defendants***' assumption of Bethlehem Steel's obligations under the Consent Decree". Doc. #29 at p. 21/60 (emphasis added).

[4] This has been acknowledged by both the United States and the State of Maryland in the October 16, 2010 "United States' Response to Petition of Severstal Sparrows Point, LLC for Resolution of Dispute" (Doc. # 22) filed in *Severstal Sparrows Point, LLC v. United States Envt'l Pro. Agency and State of Maryland Dept. of Envt.*, Case Nos. 97-cv-00558-JFM & 97-cv-00559-JFM (D. Md.), which confirms that: "In 2003 [the Facility] was sold to Petitioner Severstal Sparrows Point, LLC", (p. 1); that "Severstal (in one corporate form or another) has been operating the steel mill for over seven years" (p. 6), and that **"[f]rom April, 2003 to this day it appears that one entity—ISG Sparrows Point, LLC—has actually owned the Facility, which is today named Severstal Sparrows Point, LLC.**" (p. 14; emphasis added).

However, Plaintiffs stubbornly refuse to acknowledge these obvious facts.  Instead, the Combined Opposition simply repeats the unfounded allegations in the Complaint—namely, that "Mittal Steel USA, Inc. … *acquired the Steel Mill Site*" in 2005 and that "ArcelorMittal *acquired the Steel Mill Site*" in 2006.  Doc. #29 at p. 12/60 (emphasis added).  These inaccurate statements are plainly refuted by the 2003 Special Warranty Deed (Docs. ##21-5 & -6), which Plaintiffs conveniently choose to ignore.

But Plaintiffs' misstatements do not end there.   Remarkably, Plaintiffs misleadingly claim that "*the parties* entered into a Tolling Agreement which tolled and suspended any limitations period … applicable to any claims Plaintiffs possessed *against Defendants*."  Doc. #29 at p. 15/60 (emphasis added).  This is simply not true.  As discussed below, only Severstal entered into a tolling agreement with Plaintiffs—ArcelorMittal most certainly did not.  *See* Doc. #29-4.

In a desperate attempt to avoid the effect of the 2003 Bankruptcy Court Sale Order, Plaintiffs argue that their claims are based upon "hazardous materials *on the Steel Mill Site*." Doc. #29 at p. 21/60 (emphasis in original).  If this is so, then Plaintiffs' claims clearly are barred by U.S. EPA's and MDE's prior diligent prosecution under the existing 1997 Consent Decree.[5] On the other hand, to the extent Plaintiffs' claims are based upon conditions *at the Shipyard itself*, then they are barred and enjoined by the Bankruptcy Sale Order because, as further discussed below, the public record demonstrates that the Shipyard was already contaminated by BSC's historic operations when the Sale Order was entered in 2003.

---

[5]   To avoid redundancy, ArcelorMittal incorporates by reference the arguments made by Severstal on this issue in its Motion to Dismiss and Reply in Support thereof.

Moreover, Plaintiffs do not deny, as detailed in ArcelorMittal's Memorandum of Law in Support of its Motion to Dismiss (Doc. #21-1 at pp. 7-8), that they *voluntarily assumed responsibility* for all environmental conditions at the Shipyard in 2006. This is the reason why the U.S. and Maryland agreed to remove the Shipyard from the scope of the 1997 Consent Decree: "On or about June 15, 2006, the Shipyard Site was removed from the Consent Decree pursuant to approval and direction of the USEPA ***on the condition*** **that the Shipyard Parties [*i.e.*, Plaintiffs SPS LP and SPS 35] address environmental issues at the Shipyard Site pursuant to Maryland environmental law.**" Pltffs' May 10, 2010 Notice of Intent to Sue (Doc. #21-4) at p. 4/5 (emphasis added). Consequently, Plaintiffs have no legal or equitable right to try to foist these assumed obligations upon Defendants in this action.

### A. ArcelorMittal's Exhibits Are "Integral" to the Complaint and Appropriate for Consideration in Connection with its Motion to Dismiss.

As Plaintiffs concede, "[i]n ruling on a Rule 12(b) motion to dismiss, a court may consider documents outside the four corners of the complaint so long as they are 'integral to and explicitly relied on in the complaint and if the plaintiffs do not challenge [their] authenticity.' *CACI Int'l Inc. v. St. Paul Fire and Marine Ins. Co.*, 566 F.3d 150, 154 (4th Cir. 2009)." Doc. #29 at p. 18/60. *Accord*, *Secretary of State for Defence v. Trimble Navig. Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007); *Blankenship v. Manchin*, 471 F.3d 523, 526 n.1 (4th Cir. 2006); *Adam v. Wells Fargo Bank*, 2010 WL 3001160, *2 (D. Md. July 28, 2010). Moreover, in reviewing a motion to dismiss, the Court may "properly take judicial notice of matters of public record." *Secretary of State for Defence, supra,* 484 F.3d at 705 (*citing Hall v. Virginia*, 385 F.3d 421, 424 (4th Cir. 2004)).

There can be no serious dispute that the ArcelorMittal's exhibits demonstrating who has held legal title to the Facility and the Shipyard property—namely, the 1997 Deed by which BSC

conveyed title to the Shipyard to Baltimore Marine Industries, Inc. ("BMI") (Ex. A, Doc. #21-2); the 2004 Deed by which BMI conveyed title to the Shipyard to Plaintiff SPS Limited Partnership, LLLP (Ex. B, Doc. #21-3); the 2003 Special Warranty Deed between BSC and ISG Sparrows Point Inc. (Ex. D, Docs. ##21-5 & 21-6); and the certified Delaware Secretary of State records demonstrating that ISG Sparrows Point Inc. is the same entity now known as Defendant Severstal Sparrows Point, LLC (Ex. E, Doc. #21-7)[6]—are indeed "integral" to the Complaint's numerous allegations concerning which entities currently or formerly "owned" the Facility and the Shipyard.

It is axiomatic that an entity cannot be the "owner" of real property unless it holds legal title to such property. Plaintiffs bear the burden of plausibly alleging—through well-pleaded facts rather than mere unsubstantiated labels and legal conclusions—who holds or held legal title to these properties both in order to show standing (in the case of ownership of the Shipyard) and as an element of their claims against Defendants (in the case of the Facility). Plaintiffs understandably hope to bury their heads in the sand and ignore the existence of these authenticated[7] public records, which refute the plausibility of the Complaint's conclusory allegations that ArcelorMittal formerly owned or operated the Facility, but this will not make them go away. Indeed, Plaintiffs make no response at all to the authenticated deeds or the

---

[6] Plaintiffs grudgingly concede that all of the remaining ArcelorMittal exhibits are "arguably integral to the Complaint." Doc. 29 at p. 18/60.

[7] Each of the deeds bears the certification and seal of the Circuit Court of Baltimore County, Maryland and the signature of the Court Clerk on the last page (*see* Docs. #21-2 at p. 23/23, #21-3 at p. 19/19 & #21-6 at p. 33/33), and the Delaware Secretary of State records are preceded by an August 31, 2010 certification signed by Secretary of State. *See* Doc. #21-7 at p. 2/10. R. Evid. 902(4) provides that "a copy of an official record … or of a document authorized by law to be recorded or filed and actually recorded or filed in a public office, … certified as correct by the custodian or other person authorized to make the certification" is self-authenticating and does not require extrinsic evidence of authenticity as a condition to admissibility before a federal court.

certified Delaware Secretary of State corporate records.  Nor are they able to present any other deed or instrument showing that title to the Facility has been held by anyone other than Severstal Sparrows Point, LLC since it was sold by BSC in 2003.

Federal courts routinely take judicial notice of publicly recorded deeds where property ownership is at issue.  *See, e.g.*, *Gagliardi v. Kratzenberg*, 2006 WL 1525380, at **1 n. 3 (3rd Cir. 2006) (per curiam; unpublished) ("We may take judicial notice of public records, such as the publicly recorded deeds that support [plaintiff's] claim of ownership."); *Pratt v. Kelly*, 585 F.2d 692, 696 (4th Cir. 1978) (taking judicial notice of a publicly recorded deed); *Weaver v. Conrail*, 2010 WL 2773382, at *8 (E.D. Pa. 2010) ("A court may take judicial notice of a public record, including a publicly recorded deed, and may accept the deed as establishing the record ownership of the property.").  Because the recorded deeds are public records, there is no risk of lack of notice to Plaintiffs.  *See*, *e.g.*, *American Chiropractic Ass'n, Inc. v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004).  Consequently, there is no reason for this Court not to take judicial notice of the deeds relating to the Shipyard and the Facility.

Furthermore, this Court may and should take into account matters of public record in determining whether the allegations made in Plaintiffs' Complaint are plausible under Rule 8(a) for purposes of a motion to dismiss under Rule 12(b)(6).  *See, e.g., In re Washington Mutual, Inc.*, 2010 WL 3238903, *14 (Bankr. D. Del. 2010) (granting parent company's Rule 12(b)(6) motion to dismiss due to plaintiff's failure to meet the pleading standards of *Twombly* and *Iqbal* where complaint's allegations against parent "were not plausible in light of public record.") (*citing Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001) (holding that the court need not accept as true anything in the complaint which contradicts facts of which the court may take judicial notice)); *see also Environmental Integrity Project v. Mirant Corp.*, 2007 WL

62619, at *1, n.1 (D. Md. 2007) (Motz, J.) (dismissing plaintiff's citizen suit claims against parent based upon MDE's prior diligent prosecution, but noting that "the record appears clear that [parent] does not own or operate the [facility].").  In this case, the deeds and Delaware Secretary of State public records by themselves establish that the Complaint's conclusory labels and allegations against ArcelorMittal are not supported plausible, well-pleaded facts.

Moreover, the Fourth Circuit has noted that "Rule 12(b)(6) does not mandate that a district court treat a motion to dismiss as a motion for summary judgment simply because the moving party includes exhibits with its motion."  *Pueschel v. United States*, 369 F.3d 345, 354 n. 3 (4th Cir. 2004); *accord, Harrison v. United States Postal Serv*., 840 F.2d 1149, 1152 n. 7 (4th Cir. 1988) ("even though the district court cited to exhibits submitted by the defendants, the facts to which the court so referred were either alleged in the amended complaint or contained in the exhibits thereto. [Plaintiff] has therefore in no way been prejudiced …").[8]

### B.     There Are No "Inextricably Intertwined" Jurisdictional and Merit Facts With Respect to the 2003 Bankruptcy Court Sale Order.

ArcelorMittal's Motion to Dismiss seeks dismissal of the Complaint under Rule 12(b)(1)[9] on the grounds that Plaintiffs cannot prove[10] this Court has subject matter jurisdiction over their

---

[8]  Of course, *Plaintiffs* cannot convert Defendants' Motions to Dismiss into motions for summary judgment by adducing affidavits and other evidence in response, as they have attempted to do. *See, e.g., Bardes v. Magera*, 2009 WL 1210479, *1 (D. S.C. 2009) (ruling it is improper to "convert Plaintiff's Response in Opposition into a motion for summary judgment" because "jurisdictional grounds raised by Defendants do not present matters beyond the pleadings"; therefore, court "should exclude any matters raised by Plaintiff that go beyond the pleadings and address Defendants' Motions to Dismiss before they are further burdened with discovery requests.").

[9]  ArcelorMittal's Motion to Dismiss also seeks dismissal under Rule 12(b)(6) for failure to state a claim upon which relief can be granted on several grounds, as further discussed herein.

[10]  The Combined Response admits that "plaintiff bears the burden of proving that subject matter jurisdiction exists".  Doc. #29 at p. 16/60.

claims because the April 23, 2003 Bankruptcy Court Sale Order (Doc. #23-8)[11] expressly enjoins Plaintiffs from asserting any such successorship environmental claims against Defendants with respect to contamination at the Shipyard arising out of BSC's historic operation of the Facility's former coke ovens, which was discontinued in 1991.

Plaintiffs' Combined Response argues that ArcelorMittal's Rule 12(b)(1) motion amounts to an "indirect attack on the merits" based upon the holdings in *Kerns v. United States*, 585 F.3d 187 (4th Cir. 2009), and *Frey v. EPA*, 270 F.3d 1129 (7th Cir. 2001). Doc. #29 at p. 19/60. However, these decisions have no applicability to ArcelorMittal's grounds for dismissal under Rule 12(b)(1). *Kerns* involved a claim under the Federal Tort Claims Act (FTCA), which both waives federal sovereign immunity and creates a cause of action for torts committed by federal employees acting within the scope of their Government employment. The Fourth Circuit noted that the issue of whether the Government employee was acting within the scope of her employment "is determinative of both jurisdiction and the underlying merits of an FTCA claim". *Id*. at 195. It ruled that "when the jurisdictional facts and the facts central to the tort claim are inextricably intertwined, the trial court should ordinarily assume jurisdiction and proceed to the intertwined merit issues", *unless* "the jurisdictional allegations are 'clearly … immaterial, made solely for the purpose of obtaining jurisdiction or where such a claim is wholly unsubstantial and frivolous.'" *Id*. at 193 (*citing Bell v. Hood*, 327 U.S. 678, 682 (1946)).

---

[11] "When a defendant challenges subject matter jurisdiction pursuant to Rule 12(b)(1), 'the district court is to regard the pleadings as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment.'" *Community of Cambridge Envt'l Health and Comm. Dev. Group v. City of Cambridge*, 115 F. Supp.2d 550, 553 (D. Md. 2000) (*quoting Richmond, Fredericksburg & Potomac R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir.1991)); *Piney Run Preserv. Assoc. v. County Commrs. of Carroll Cty.*, 523 F.3d 453, 459, n. 6 (4th Cir. 2008) ("When presented with a Rule 12(b)(1) motion, district courts are permitted to consider materials outside the pleadings."). Consequently, it is entirely appropriate for this Court to consider the Sale Order.

Similarly, in *Frey*, the Seventh Circuit noted that "'when the court's jurisdiction and the claim for relief are predicated on the _**same federal statute**_,'" the court should "'proceed as if jurisdiction exists and determine the merits of the claim under Rule 12(b)(6).'"  270 F.3d at 1132 (emphasis added; citation omitted).

By contrast, ArcelorMittal's grounds for dismissal under Rule 12(b)(1) are not predicated upon the "same federal statute" as are Plaintiffs' CERCLA, RCRA or State law claims.  Rather, the Sale Order was issued pursuant to Sections 105(a) and 363(f) of the U.S. Bankruptcy Code. *See* Doc. #23-8.  Moreover, the Sale Order is a matter of public record and its terms are not in dispute.  The elements which Plaintiffs must establish in connection with their CERCLA, RCRA or State law claims are issues separate and distinct from the Sale Order's terms.  There simply are no jurisdictional facts (*i.e.*, the existence and terms of the Sale Order) which are "inextricably intertwined" with the facts that Plaintiffs would have to establish in order to provide the merits of their claims.  Thus, ArcelorMittal's request for dismissal under Rule 12(b)(1) cannot be characterized as an "indirect attack on the merits" of Plaintiffs' claims, and the holdings in *Kerns* and *Frey* do not apply.[12]

---

[12] The same is true with respect to Severstal's request for dismissal of Plaintiffs' RCRA citizen suit claims pursuant to 42 U.S.C. §6972(b)(2) based upon U.S. EPA's and MDE's prior diligent prosecution under this Court's 1997 Consent Decree, in which ArcelorMittal joins.  The Fourth Circuit and Maryland District Courts have routinely dismissed similar citizen suits for lack of jurisdiction under Rule 12(b)(1) based upon prior diligent prosecution by U.S. EPA or the State, even after the rulings in *Kerns* and *Frey*.  *See, e.g., Piney Run Preserv'n Ass'n v. County Comm'rs*, 523 F.3d 453, 461 (4th Cir. 2008) (affirming district court's 12(b)(1) dismissal of Clean Water Act citizen suit because of MDE's diligent prosecution); *Dodge v. Mirant Mid-Atlantic, LLC*, 2010 WL 3221853, **9-10 (D. Md. Aug. 13, 2010) (dismissing Clean Air Act citizen suit for lack of subject matter jurisdiction due to MDE's diligent prosecution under a prior consent decree); *Environmental Integrity Proj. v. Mirant Corp.*, 2007 WL 62619, *5 (D. Md. Jan. 3, 2007) (Motz, J.) (dismissing Clean Air Act citizen suit claims for lack of subject matter jurisdiction where "MDE diligently prosecuted [defendant's] violations … when it negotiated and obtained approval of the consent decree"); *Community of Cambridge Envt'l Health and Comm. Dev. Group v. Cambridge*, 115 F. Supp. 2d 550, 557-8 (D. Md. 2000) (Blake,

**C.    Plaintiffs Concede That the Sale Order Bars Claims Based Upon Contamination of the Shipyard Due to BSC's Historic Coke Oven Operations.**

Both Plaintiffs' May 10, 2010 Notice of Intent to Sue ("NOI") Letter (Doc. #21-4) and the Complaint make clear that Plaintiffs' claims are based upon contamination of the Shipyard property due to BSC's pre-bankruptcy operations at the former Coke Oven Area of the Facility. The NOI Letter states that:

> Operation of the coke ovens and facilities associated with the coke ovens (including, without limitation, the structure known as the "litol/benzene plant") at the Steel Mill Site has resulted in releases of hazardous substances which … have migrated, and are migrating, to the Shipyard Site.

Doc. #21-4 at p. 4/5.  The Complaint plainly alleges that "the area of the coke oven operations is the 'source area' of contamination".  Doc. #1, ¶26.  It is uncontroverted and a matter of public record, however, that the "coke ovens ceased operations in December 1991", more than 12 years prior to entry of the Sale Order, and the coke batteries were since torn down.  *See* U.S. EPA Fact Sheet titled "Severstal Sparrows Point (Formerly: ISG Sparrows Point, Bethlehem Steel)."[13]

Nor do Plaintiffs deny that the Shipyard was already contaminated as a result of BSC's historic pre-1991 coke oven operations prior to entry of the Bankruptcy Court Sale Order in 2003, as the public record demonstrates.  The September 30, 1997 Deed (Doc. #21-2) by which BSC sold the Shipyard property to BMI expressly noted that implementation of anticipated "corrective action or response actions" *at the Shipyard* "may interfere with the Grantee's use of the above-

---

J.) (dismissing Clean Water Act citizen suit because "MDE is engaged in diligent prosecution" and noting that "the Supreme Court has recognized that the CWA citizen suit provision follows the same model as the RCRA.").

[13]  http://www.epa.gov/reg3wcmd/ca/md/pdf/mdd053945432.pdf.  As noted above, in reviewing a motion to dismiss, the Court may "properly take judicial notice of matters of public record." *Secretary of State for Defence, supra,* 484 F.3d at 705.

described tract of land, and may require closure of its operations or a part thereof."  p. 11/23. This was more than five years prior to entry of  the 2003 Sale Order.

The Sale Order approved all of the terms and conditions of an Asset Purchase Agreement ("APA") dated March 12, 2003, as amended (Doc. #23-7), which defined which BSC liabilities would be assumed by the Section 363(f) buyer (the "Assumed Liabilities") and which would not (the "Excluded Liabilities").  Section 1.4 of the APA expressly provided that the "Excluded Liabilities" <u>not</u> assumed by the Buyer included, without limitation:

> all liabilities and obligations of Sellers [BSC] for (i) **any environmental, health or safety matter** (including, without limitation, any liability or obligation arising under any Environmental Law) (A) **relating to any property or assets <u>other than the Acquired Assets</u>**; [and/or] (B) **resulting from the transport, disposal or treatment of any Hazardous Materials by any Seller on or prior to the Closing Date to or at any location other than the Real Property** ….

Doc. #23-7 at p. 6 (emphasis added.)

Thus, any liability for preexisting contamination arising at any location "other than the Acquired Assets" arising out of BSC's operation of the Facility was specifically *<u>excluded</u>* under the APA.  Plaintiffs do not dispute that the Shipyard had already been sold to BMI more than five years earlier, and therefore it was <u>not</u> part of the Acquired Assets in the bankruptcy sale. Because Plaintiffs' claims arise out of contamination that was already present at "property or assets other than the Acquired Assets" (*i.e.*, the Shipyard) arising out of BSC's operations, they are an "Excluded Liability" under Section 1.4 of the APA and are barred by the Sale Order.

Plaintiffs' attempt to overcome the Sale Order's bar by relying on case law relating to the discharge of a reorganized *debtor's* liabilities under Section 1141 of the Bankruptcy Code is misguided, because these decisions have no applicability to a bankruptcy buyer under Section 363(f).  *See, e.g., In re Industrial Salvage, Inc. v. Illinois*, 196 B.R. 784 (Bankr. S.D. Ill. 1996) (relating to discharge of debtor under Sec. 1141(d)); *AM Int'l, Inc. v. Datacard Corp.*, 106 F.3d

1342, (7th Cir. 1997) (discharge under Sec. 1141); *United States v. Apex Oil Co.*, 579 F.3d 734

(7th Cir. 2009) (discharge under Sec. 1141(d)); *In re Mark IV Indus., Inc.*, 438 B. R. 460 (Bankr.

S.D.N.Y. 2010) (discharge of reorganized debtor); *In re Torwico Electr., Inc.*, 8 F.3d 146 (3d Cir.

1993) (discharge of reorganized debtor).  The 2003 Sale Order clearly notes that it was issued

pursuant to Section 363(f), which authorizes the sale of property "free and clear of any interest in

such property."  *See* 11 U.S.C. §363(f).  Courts have held that "interests" under Section 363(f)

may include claims for injunctive relief.  *See, e.g., In re Heldor Industries, Inc.*, 131 B.R. 578,

(Bankr. D.N.J. 1991), *vacated on appeal as moot sub nom. State of New Jersey, Dept. of Envt'l

Pro. and Energy v. Heldor Indus., Inc.,* 989 F.2d 702 (3d Cir. 1993); *see also, In re Trans World

Airlines, Inc.*, 322 F.3d 283 (3d Cir. 2003) (noting cases adopting "expansive reading" of interest

"which 'encompasses other obligations that may flow from ownership of the property'"; citations

omitted).  Thus, Plaintiffs cannot avoid the Sale Order's plain terms on this basis.

### D.    Plaintiffs' Opposition Arguments Cannot Repair Their Pleading Deficiencies Against ArcelorMittal under CERCLA (Claims I & II).[14]

Plaintiffs concede that in order "[t]o survive a motion to dismiss, a complaint must

contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on

its face.'" Doc. #29 at p. 17/60 (*quoting Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (*quoting

Bell Atlantic v. Twombly*, 550 U.S. 544, 570 (2007)).  They also acknowledge that "legal

conclusions are not entitled to judicial deference".  *Id.* (*citing Twombly*, 550 U.S. at 570).

---

[14]   Moreover, Plaintiffs have conceded that their Complaint alleges the *wrong standard* for National Contingency Plan (NCP) compliance, which is one of the *prima facie* elements for a Section 107 claim under CERCLA.  The Complaint alleges only that Plaintiffs' actions were "not inconsistent" with the NCP (*see* Doc. #1, ¶45), which is the standard for governmental CERCLA claims.  The Combined Response admits "Defendants correctly point out that Plaintiffs must show consistency with the NCP, not merely that their actions were not inconsistent".  Doc. #29 at p. 29/60.  Nor does the Complaint allege any well-pleaded facts plausibly demonstrating such consistency with the NCP's requirements.  Thus, Plaintiffs' CERCLA claims (Counts I & II) clearly fail to meet Rule 8 pleading standards as a matter of law.

*Accord*, *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255, 260 (4th Cir. 2009) ("legal conclusions … and bare assertions devoid of further factual enhancement fail to constitute well-pled facts for Rule 12(b)(6) purposes" and "are not entitled to an assumption of truth."; *citing Iqbal*, 129 S. Ct. at 1949); *Secretary of State for Defence v. Trimble Navig. Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007) ("for purposes of Rule 12(b)(6), 'we are not required to accept as true the legal conclusions set forth in a plaintiff's complaint'"; citation omitted).

Yet Plaintiffs' claims against ArcelorMittal under Section 107 of CERCLA are based upon nothing more than the unsupported assertion and legal conclusion that it formerly "owned and operated" the Facility at the time of the alleged disposal. As demonstrated by the Special Warranty Deed (Docs. ##21-5 & -6), however, ArcelorMittal has never held legal title to the Facility. The only entity that has ever owned and operated the Facility since BSC is its current owner and operator—Severstal Sparrows Point, LLC. Plaintiffs' unsubstantiated labels and implausible bare assertions fall far short of the well-pleaded facts necessary to state a CERCLA claim against ArcelorMittal in accordance with the standards of Rule 8(a).

As the U.S. Supreme Court made clear in *United States v. Bestfoods*, 524 U.S. 51, 61-62 (1998), mere ownership of a subsidiary is not sufficient to impose environmental liability upon the parent:

> It is a general principle of corporate law deeply "ingrained in our economic and legal systems" that **a parent corporation** (so-called because of control through ownership of another corporation's stock) **is not liable for the acts of its subsidiaries**…. Thus it is horn-book law that "the exercise of the 'control' which stock ownership gives to the stockholders … will not create liability beyond the assets of the subsidiary. That 'control' includes the election of directors, the making of by-laws … and the doing of all other acts incident to the legal status of stockholders. Nor will a duplication of some or all of the

directors or executive officers be fatal." … **[N]othing in CERCLA[15] purports to reject this bedrock principle**…

(Emphasis added; citations omitted.)

As the Supreme Court explained, in order to establish a parent company's liability under the environmental laws for its subsidiary's operations, a plaintiff must allege either: (i) "derivative" liability based upon factors justifying piercing of the corporate veil (such as where the subsidiary is "misused to accomplish certain wrongful purposes, most notably fraud", *id.* at pp. 62-63); or (ii) "direct" operation of the facility by the parent (*id*. at 64-67).  The Court further explained what is necessary for "direct" operation of the facility: the parent must "manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations."  *Id.* at pp. 66-67.

However, Plaintiffs' Complaint contains no such well-pleaded factual allegations against ArcelorMittal.  Numerous federal court decisions have dismissed similar claims against a parent company due to the plaintiff's failure to plead sufficient facts to plausibly support a theory of parent liability under *Bestfoods*.  *See, e.g., Kriegel v. Bank of America, N.A.*, 2010 WL 3169579, *7–8 (D. Mass. 2010) (dismissal under Rule 12(b)(6) because plaintiff "failed to plead sufficient facts under either [direct or derivative] theory"); *Chubb Custom Ins. Co. v. Space Sys./Loral, Inc.*, 2010 WL 2573386, at *8 (N.D. Cal. 2010) ("under the *Iqbal* standard, [plaintiff] has failed to plead sufficient and specific facts that would support an inference that [parent] is liable as an

---

[15]   Although *Bestfoods* involved environmental liability under the CERCLA, its rationale has been applied to claims under RCRA as well.  *See, e.g., LeClercq v. Lockformer Co.*, 2002 WL 908037, *2 (N.D. Ill. 2002) (the *Bestfoods* analysis "applies equally to Plaintiffs['] CERCLA and RCRA claims.").

owner or operator through the actions of its subsidiary" under CERCLA); *In re Alper Holdings USA, Inc.*, 398 B.R. 736, 744, 750-54, 757-58 (S.D.N.Y. 2008) (affirming dismissal of proof of claim against parent company due to claimant's failure to plead "specific factual allegations" to support either direct or derivative liability under *Bestfoods*); *Mincey v. World Savings Bank, FSB*, 614 F.Supp.2d 610, 622-23 (D.S.C. 2008) (complaint "alleges very little against [parent corporations], other than their corporate relationship to [subsidiary], and the remaining allegations simply state legal conclusions without any factual allegations").

Nonetheless, Plaintiffs' Combined Response argues, for the first time, that ArcelorMittal "was really the alter ego" of its former subsidiary, and that "[t]here is also evidence of common management and control" between ArcelorMittal and its former subsidiary.  Doc. #29 at p. 27-28/60.  However, these new allegations appear nowhere in the Complaint.  It is black letter law that a plaintiff cannot cure a complaint's pleading deficiencies through later arguments in response to a motion to dismiss.  *See, e.g., Pennsylvania ex rel. Zimmerman v. Pepsico, Inc.*, 836 F.2d 173, 181 (3rd Cir. 1988) ("It is one thing to set forth theories in a brief; it is quite another to make proper allegations in a complaint ….  It is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss"); *accord, Mincey v. World Savings Bank, FSB*, 614 F. Supp. 2d 610, 625 (D. S.C. 2008) ("'A memorandum in opposition or response … cannot remedy the defects in a party's complaint'"; citation omitted); *Carswell v. Air Line Pilots Ass'n Int'l*, 540 F. Supp. 2d 107, 121 (D. D.C. 2008) ("factual allegations in briefs or memoranda of law … may never be considered when deciding a [Rule] 12(b)(6) motion"); *Glover v. DeLuca*, 2006 WL 2850448, *4 n. 10 (W.D. Pa. 2006) ("It is well-established that a plaintiff may not amend the complaint through statements contained in a brief in opposition to a motion to dismiss"; citations omitted).

Even if the Complaint had alleged that ArcelorMittal had controlled its former subsidiary, this would not be enough to pierce the corporate veil under the restrictive standards of Maryland law. For example, in *Sullivan v. General Helicopters, Int'l*, 564 F. Supp. 2d 496, 502 (Legg, C.J.) (D. Md. 2008), relied upon by Plaintiffs (*see* Doc. # 29 at p. 26/60), this Court held that the plaintiff's allegations that the parent corporation "regulates the financial [and] business components, [and also] directs the daily operations" of the subsidiary, even if true, "do not empower the Court to disregard the corporate form." *Id.* Even though the complaint alleged, "that [the parent] exercised a modicum of control over" the subsidiary, it "fails to raise the necessary inference of injustice or fundamental unfairness" and consequently granted the defendant's motion to dismiss. *Id.*; *accord*, *Harte-Hanks Direct Mktg./Balt.,Inc. v. Varilease Tech. Fin. Group*, 299 F. Supp. 2d 505, 514 (D. Md. 2004) ("Maryland courts will pierce the corporate veil only where necessary to prevent fraud or to enforce a paramount equity" and "Maryland generally is more restrictive than other jurisdictions in allowing a plaintiff to pierce the corporate veil").

Moreover, in order to properly plead a claim for "alter ego" liability, Plaintiffs must specifically allege that the corporate form was used to perpetrate a fraud or injustice upon third parties. *See, e.g., Baltimore Line Handling Co. v. Brophy*, 2010 WL 3928607, at *4 (D. Md. Oct. 4, 2010) (Gauvey, Mag. J.) ("Under Maryland law, … in order to pierce the corporate veil, plaintiff's well-pleaded allegations … must be tantamount to fraud or invoke a paramount equity"); *BFI Waste Sys. of N. Am., LLC v. Shaw Envt'l & Infr., Inc.*, 2010 U.S. Dist. LEXIS 77283, **16–17, 21 (E.D. Mo. July 30, 2010) (noting that Delaware law requires "an element of fraudulent intent in its alter ego test, as well as the traditional requirement that the corporation and its subsidiaries operated as a single economic entity" and dismissing CERCLA and common

17

law claims against apparent because "the allegations of a fraudulent effort to avoid liability for its involvement in the Site fails to satisfy the necessary pleading requirements under *Twombly* and *Iqbal*."); *Spagnola v. Chubb Corp*., 264 F.R.D. 76, 86-88 (S.D.N.Y. 2010) (noting that "courts routinely consider, and grant, motions to dismiss for failure adequately to allege facts sufficient to support the imputation of liability on an alleged alter-ego" and dismissing claims against parent despite complaint's allegations that Form 10-K indicated parent's financial capabilities were "dependent in large part on the dividend paying ability of its … subsidiaries" because complaint failed to allege "injustice caused to third parties when a corporation is itself operated as a constructive fraud or in an unjust manner"); *Key Items, Inc. v. Ultima Diamonds, Inc. et al.*, 2010 WL 3291582, **9-10 (S.D.N.Y. 2010) (noting that "courts routinely dismiss alter ego claims pursuant to FRCP 12(b)(6)," and dismissing alter ego claims against parent and denying leave to amend as futile despite "allegation that the corporate defendants are 'singularly controlled and dominated by'" the parent, because plaintiff has "not alleged any facts suggesting that [parent] used the corporate form to perpetrate a fraud or other tort"); *United States v. Universal Health Serv., Inc*., 2010 WL 4323082, *4 (W.D. Va. 2010) (rejecting Government's veil-piercing claim against parent and denying leave to amend as futile because "a well-pled veil-piercing action" must allege "that parental 'control is utilized to perpetuate a fraud or other wrong.'"); *In re Washington Mutual, Inc.*, 2010 WL 3238903, *13 (Bankr. D. Del. 2010) (dismissing claims against parent based upon "conclusory allegations of law, unreasonable inferences or deductions of fact, or threadbare recitals of the elements of alter ego" because "[u]nder the alter ego theory, a parent corporation will be found liable for acts of its subsidiary only if piercing the corporate veil is necessary to prevent fraud or injustice to third parties"). Of

course, the Complaint makes no allegation of fraud whatsoever against ArcelorMittal, which must be stated "with particularity" under Fed. R. Civ. P. 9(b).

Furthermore, because Plaintiffs have failed to allege a plausible claim against ArcelorMittal based upon well-pleaded facts, they are <u>not</u> entitled to discovery. Both the U.S. Supreme Court and the Fourth Circuit have ruled that "Rule 8 requires 'more than conclusions' to 'unlock the doors of discovery for a plaintiff." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 260 (4th Cir. 2009) (*quoting Iqbal*, 129 S. Ct. at 1950); *see also In re Alper Holdings USA, Inc.*, 398 B.R. 736, 754 (S.D.N.Y. 2008) (affirming bankruptcy court's dismissal of proof of claim against parent company for alleged contamination by subsidiary due to claimant's failure to plead "specific factual allegations" without discovery because "[d]iscovery would serve no purpose, other than as a fishing expedition for evidence in search of a theory yet to be asserted."). *See, also, Key Items, Inc. v. Ultima Diamonds, Inc. et al.*, 2010 WL 3291582, at *10 (S.D.N.Y. 2010) (denying plaintiff's request for "additional discovery before its alter ego claim is dismissed" because "[l]imited discovery … is not applicable to this motion under 12(b)(6), which is directed only to the sufficiency of the pleadings.").[16]

### E. Plaintiffs Concede They Cannot Allege ArcelorMittal *Actively* "Contributed" to BSC's Coke Oven Operation Wastes As Required for Their RCRA <u>Imminent and Substantial Endangerment Claim (Count III).</u>

Plaintiffs' RCRA citizen suit claim alleges an "imminent and substantial endangerment" under RCRA Section 7002(a)(1)(B), 42 U.S.C. §6972(a)(1)(B), due to "[b]enzene and other wastes associated with the operations at the coke oven area at the Steel Mill Site". Doc. #1, ¶56. Plaintiffs do not allege that Defendants are "in violation" of any RCRA requirement pursuant to Section 7002(a)(1)(<u>A</u>) of RCRA, 42 U.S.C. §6972(a)(1)(<u>A</u>).

---

[16] Nor is there any need for discovery with respect to ArcelorMittal's grounds for dismissal for lack of subject matter jurisdiction under Rule 12(b)(1) because the Bankruptcy Court Sale Order is a public record and there is no factual dispute concerning its terms.

In order to plead an imminent and substantial endangerment claim, Plaintiffs must allege well-pleaded facts plausibly showing that ArcelorMittal "contributed … to the past … handling, storage, treatment, transportation or disposal" of the "[b]enzene and other wastes associated with the operations at the coke oven area" upon which this claim is based. 42 U.S.C. §6972(a)(1)(B). This requires Plaintiffs to allege some *active* contribution by ArcelorMittal to the alleged waste handling at the coke oven area in order for their RCRA claim to survive a motion to dismiss. *See, e.g., Sycamore Indus'l Park Assoc. v. Ericsson, Inc.*, 546 F.3d 847, 854 (7th Cir. 2008) ("A plain reading of the 'had contributed or is contributing' language of §6972(a)(1)(B) compels us to find that RCRA requires ***active involvement*** in handling or storing of materials for liability"; emphasis added); *ABB Indus'l Sys., Inc. v. Prime Tech. Inc.*, 120 F.3d 351, 359 (2d Cir. 1997) (finding passive migration insufficient to establish liability under 42 U.S.C. §6972(a)(1)(B)); *Hinds Investments, L.P. v. Team Enterp., Inc.*, 2010 WL 1663986, *12 (E.D. Cal. 2010) (dismissing plaintiff's RCRA claim under 42 U.S.C. §6972(a)(1)(B) due to the "absence of allegations of '***active involvement*** in handling or storing of materials'"; emphasis added; citations omitted); *Interfaith Comm. Org. v. Honeywell Int'l, Inc.*, 263 F. Supp. 2d 796, 844 (D.N.J. 2003) ("a straightforward reading of RCRA compels a finding that only ***active human involvement*** with waste is subject to liability under RCRA [42 U.S.C. §6972](a)(1)(B)"; emphasis added).

However, Plaintiffs cannot possibly meet this pleading standard in good faith because it is a matter of pubic record that BSC's coke oven operations ceased in 1991, years before it sold the Facility to the entity now known as Severstal Sparrows Point, LLC in 2003. Indeed, neither the Complaint nor the Combined Response makes any attempt to do so. Instead, Plaintiffs rely on cases involving RCRA citizen suit claims for ongoing violations under Section 7002(a)(1)(***A***),

rather than claims for "imminent and substantial endangerment" under Section 7002(a)(1)(***B***).
*See, e.g., Marrero-Hernandez v. Esso Std. Oil Co.*, 597 F. Supp. 2d 272, 283 (D.P.R. 2009)
(claim under 42 U.S.C. §6972(a)(1)(A)); *Cameron v. Peach Cty., Ga.*, 2004 WL 552003, at *26
(M.D. Ga. 2004) (claim under 42 U.S.C. §6972(a)(1)(A)).  Because Plaintiffs do not assert any
claim for ongoing violations under RCRA Section 7002(a)(1)(A), these cases are completely
inapposite.

### F.    Plaintiffs' Common Law Claims (Counts IV, V, VI & VII) Clearly Are Time-Barred.

Plaintiffs do not dispute that their common law claims for negligence (Count IV),
trespass (Count V), nuisance (Count VI) and strict liability (Count VII) are all subject to
Maryland's three-year general tort statute of limitations in Md. Code Ann., Courts §5-101.
Under Maryland's "discovery rule," the statute of limitations begins to run when plaintiff had
"'knowledge of circumstances which ought to have put a person of ordinary prudence on
inquiry … with notice of all facts which such an investigation would in all probability have
disclosed if it had been properly pursued'".  *Poffenberger v. Risser*, 290 Md. 631, 637 (Md. 1981)
(citations omitted); *Legg v. County Comm'rs of Dorchester Cty.*, 200 F. Supp. 2d 535, 537 (D.
Md. 2002) (Motz, J.) (in case involving migratory contamination from neighboring landfill filed
nine years after MDE letter to landfill expressing concern, three-year statute of limitations period
begins to run upon "notice only of potential or possible harm.").

Plaintiffs falsely claim that the "Defendants" entered into a Tolling Agreement with them.
As the Court can plainly see, however, ArcelorMittal is not a signatory to the September 5, 2008
Tolling Agreement in question (Doc. #29-4)[17], and is not included in the "parties" designated to

---

[17]   On ArcelorMittal's information and belief, the Tolling Agreement was drafted by Plaintiffs'
counsel and is signed by a layperson on behalf of Severstal Sparrows Point, LLC.

receive notices under Sec. 1. *Id.* at pp. 2, 3 & 5/5. In fact, ArcelorMittal is not even mentioned anywhere in this Agreement.

Plaintiffs' preposterous argument that the Tolling Agreement is "binding" on ArcelorMittal because it refers to "predecessors" of Severstal Sparrows Point, LLC (Doc. #29 at p. 45/60) makes no sense. The only preceding owner and operator of the Facility before Severstal Sparrows Point, LLC was BSC, and the Bankruptcy Court Sale Order clearly states that "[u]nder no circumstances" may the LLC "be deemed a successor of" BSC." Sale Order, ¶34 (Doc. #23-8 at p. 21/30). Therefore, Severstal Sparrows Point, LLC has no "predecessor" as a matter of law.[18]

Furthermore, Plaintiffs' attempts to circumvent Maryland's discovery rule also are unavailing, because the recorded 1997 Deed between BSC and BMI (Doc. #21-2) clearly placed all on notice that *the Shipyard property itself* had already been contaminated by BSC's historic operations. There can be no doubt that Plaintiffs personally had, at the very least, "inquiry notice" concerning this contamination of the Shipyard by no later than March 4, 2004, the date of the Deed by which BMI transferred ownership of the Shipyard to Plaintiff SPS LP (Doc. #21-3),

---

[18] Nor do Plaintiffs allege any well-pleaded facts that could possibly demonstrate the creation of any actual or apparent agency authority by ArcelorMittal. *See, e.g., Proctor v. Metropolitan Money Store Corp.*, 579 F. Supp. 2d 724, 735 (D. Md. 2008) (Titus, J.) (agency requires "the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other to so act"); *Dickerson v. Longoria*, 995 A.2d 721, 735 (Md. App. 2010) (apparent authority "results from certain acts or manifestations by the alleged principal to a third party leading the third party to believe that an agent had authority to act" and "it is nearly axiomatic that one dealing with an agent must use reasonable diligence and prudence to ascertain whether the agent acts within the scope of his powers"; citations omitted); *Iceland Telecom, Ltd v. Information Sys. and Networks Corp.*, 268 F. Supp. 2d 585, 592 (D. Md. 2003) (Williams, J.) (rejecting claim of apparent authority between parent and current subsidiary because the defendants had taken no action toward the plaintiff to create a belief "that the principal consents to or has authorized the conduct of the agent.").

because this deed also expressly acknowledged that U.S. EPA or MDE could "require[] remedial work to be done" at the Shipyard under the 1997 Consent Decree.  *Id.* at 6.

Plaintiffs' attempt to rely on the "continuing harm" or "continuous violation" doctrine is of no use, because it does not apply to "'continuing ill effects from the original alleged violation'".  *MacBride v. Pishvaian*, 402 Md. 572, 585-86 (Md. 2007) (citation omitted) ("Because there were no ongoing unlawful acts, this is not the type of continuing harm contemplated by the rule."); *Abbott v. Gordon*, 2009 WL 2426052, *6 (D. Md. 2009) (Chasanow, J.) ("'to qualify as continuing violations, the acts must be 'continuing unlawful acts … not merely the continuing effects of a single earlier act'"; *quoting Pishvaian* at 584).

In this case, the "acts" that allegedly caused contamination of the Shipyard—namely, BSC's historic operation of the Facility's coke ovens—*ceased* by 1991.  The environmental conditions upon which Plaintiffs base their claims are simply the "continuing ill effects from the original alleged violation".  Therefore, the "continuing harm" or "continuous violation" doctrine cannot toll the statute of limitations as a matter of law.

In any event, the Combined Response _admits_ that Plaintiffs' claims accrued by September 8, 2005.  Doc. #29 at p. 42/60.  Because the Complaint was filed more than three years later, on September 7, 2010, there is no question that Plaintiff's common law claims are time-barred.

### G.     Plaintiffs' Improper "Request" to File an Amended Complaint is Improper and Should be Ignored.

Finally, this Court should ignore Plaintiffs' last-gasp request that they be permitted to file an amended complaint in the very last line of their Combined Opposition.  Numerous court decisions have held that such informal requests to amend are improper.  *See, e.g., McNamara v. Pre-Paid Legal Servs., Inc.*, 189 Fed. App'x 702, 718 (10th Cir. 2006) (plaintiffs' "cursory

request for leave to amend at the conclusion of their response to … motion to dismiss" was "insufficient" because [n]ot only did they not provide a proposed amended complaint, they also failed to proffer what additional evidence they would plead or how such additional evidence would remedy the Consolidated Complaint's deficiencies."); *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 699-700 (6th Cir. 2004) ("As the D.C. Circuit has found, 'a bare request in an application to a motion to dismiss - without any indication of the particular grounds on which amendment is sought … does not constitute a motion within the contemplation of Rule 15(a)'"; citations omitted); *Begala v. PNC Bank*, *Ohio, N.A.*, 214 F.3d 776, 700 (6th Cir. 2000) ("Absent such a motion, … Plaintiffs were not entitled to an advisory opinion from the Court informing them of the deficiencies of the complaint and then an opportunity to cure those deficiencies."); *see also*, *Spagnola v. Chubb Corp.*, 264 F.R.D. 76, 91, n. 16 (S.D.N.Y. 2010) ("a Plaintiff's options when faced with a motion to dismiss are to fight the motion or to amend the complaint, but not both.").

Should Plaintiffs seek leave to file an amended pleading in accordance with Rule 15 through an appropriate motion, accompanied by "the original of the proposed amended pleading" as required under L.R. 103.6.a, ArcelorMittal reserves the right to respond to such motion at that time.

## CONCLUSION

For the reasons set forth in ArcelorMittal's Memorandum of Law in Support of its Motion to Dismiss and in this Reply, as well as the arguments of Severstal they incorporate by reference, ArcelorMittal respectfully requests that this Court: (1) dismiss with prejudice all claims asserted against ArcelorMittal in this action; (2) deny Plaintiffs' request for discovery; (3)

deny Plaintiffs' improper request for leave to amend; (4) award ArcelorMittal its costs; and (5)

grant ArcelorMittal all such other relief as this Court deems equitable and just.

Dated:  January 10, 2011

Respectfully submitted,

/s/ Vincent Atriano
Vincent Atriano (Ohio Bar No. 0041084)
Andrew O. Etter (Ohio Bar No. 0085013)
Squire, Sanders & Dempsey L.L.P.
2000 Huntington Center
41 South High Street
Columbus, OH  43215
Phone: (614) 365-2700
Fax:  (614) 365-2499
Email: vatriano@ssd.com
           aetter@ssd.com

Dale E. Papajcik (Ohio Bar No. 0036939)
William V. Shaklee (Ohio Bar No. 0075507)
Squire, Sanders & Dempsey L.L.P.
4900 Key Tower
127 Public Square
Cleveland, Ohio 44114
Phone: (216) 479-8500
Fax: (216) 479-8780
Email: dpapajcik@ssd.com
           wshaklee@ssd.com

Amy L. Brown (Bar #15455)
Squire, Sanders & Dempsey L.L.P.
1201 Pennsylvania Avenue, N.W.
Suite 500
Washington, D.C. 20004
Phone: (202) 626-6600
Fax: (202) 626-6780
Email: abrown@ssd.com
*Attorneys for Defendant*
 *ArcelorMittal USA LLC*

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on this 10th day of January, 2011, a true and complete copy of the *Reply Memorandum in Support of Defendant ArcelorMittal USA LLC's Motion to Dismiss* was served upon all counsel of record through the Court's electronic filing system.

 /s/ Vincent Atriano