IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

SPS LIMITED PARTNERSHIP, LLLP,
et al.,
             Plaintiffs,       *

                              *

             v.               *      Civil No. JFM-10-2579

                              *

SEVERSTAL SPARROWS POINT, LLC,   *
et al.,
             Defendants.     *

                              *

                              *

                            ******

## OPINION

Plaintiffs SPS Limited Partnership, LLLP ("SPS LLLP"), and SPS 35, LLC ("SPS 35") are the owners of the Sparrows Point Shipyard located in Sparrows Point, Baltimore County, Maryland (the "Shipyard Site"). Plaintiffs bring this action against Defendants, Severstal Sparrows Point LLC, a/k/a Severstal North America ("Severstal") and ArcelorMittal USA Inc. ("ArcelorMittal") for violations of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901, *et seq.*; the Comprehensive Environmental Response, Compensation and Liability Act, as amended ("CERCLA"), 42 U.S.C. § 9601, *et seq.*; and Maryland common law. Plaintiffs seek to recover cleanup and other response costs, to obtain contribution from the Defendants, to obtain declaratory relief as to liability for future response costs pursuant to CERCLA, 42 U.S.C. § 9607(a), to require Defendants to take all actions necessary to eliminate the imminent and substantial endangerment to health and the environment pursuant to RCRA, and to recover damages pursuant to Maryland common law.

Now pending are ArcelorMittal's and Severstal's Motions to Dismiss, pursuant to Federal Rules of Civil Procedure 12(b)(1), claiming a lack of subject matter jurisdiction, and Rule 12(b)(6), claiming that Plaintiffs have failed to state a claim against Defendants on which relief

can be granted. I have reviewed the papers, and no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2010). As to Count I (CERCLA cost recovery) and Count II (CERCLA declaratory judgment), Defendants' Motions to Dismiss are denied. As to Count III (RCRA), Defendants' Motions to Dismiss are granted, except that they are denied insofar as Plaintiffs state a narrow claim for post-2003 contribution to disposal of hazardous substances migrating to the Shipyard Site after 2006. As to Count IV (negligence), Count V (trespass), Count VI (nuisance), and Count VII (strict liability), Defendants' Motions to Dismiss are granted.

## I. Factual Background

The Shipyard Site was developed around 1880 and is comprised of approximately 131.5 acres of dry land, with a 13.4 acre excavated shore dry dock (the "Graving Dock"). (Compl. ¶ 17.) The Graving Dock, constructed in 1969, is flooded in order to bring ships into the dock, and then can be pumped dry to facilitate repair, maintenance or construction work on ships. (*Id.*) The Shipyard Site is adjacent to and surrounded on three sides by the Sparrows Point steel mill (the "Steel Mill Site"), which has been in operation for over 100 years. (*Id.* ¶ 3.) The Shipyard Site and Steel Mill Site were both owned by Bethlehem Steel Corporation ("BSC") at one time.

In 1997, the Environmental Protection Agency ("EPA") and Maryland Department of the Environment ("MDE") brought an action against BSC for violations of RCRA and corresponding state law, which the parties settled by executing a Consent Decree, entered in this Court on October 8, 1997.[1] (*Id.* ¶¶ 19-20.) Under the Consent Decree, BSC agreed to investigate and address certain environmental conditions at both the Shipyard Site and Steel Mill Site. (*Id.* ¶ 20.) BSC sold the Shipyard Site to Baltimore Marine on September 30, 1997, after the Consent Decree was lodged in February 1997, but before the Consent Decree was entered in this Court in

---

[1] *See Maryland v. Bethlehem Steel Corp.*, No. JFM-97-558 (D. Md. filed Feb. 25, 2007).

October 1997. (Severstal Mot. to Dismiss 11.) Plaintiff SPS LLLP bought the Shipyard Site on March 4, 2004, and Plaintiff SPS 35 acquired a minority ownership interest in the Shipyard Site on or about June 8, 2006. (Compl. ¶ 16.) Shortly before SPS LLLP purchased the Shipyard Site in 2004, it submitted an application to MDE to participate in the Maryland Voluntary Cleanup Program ("VCP"), a Maryland program that allows owners of contaminated property to remediate the contamination under state supervision and receive limited liability protection upon completion of remediation. (*See* Severstal Mot. to Dismiss 11.) On June 15, 2006, EPA approved the removal of the Shipyard Site from the Consent Decree.[2] (Compl. ¶ 21.)

When Plaintiffs acquired the Shipyard Site, they inherited an NPDES permit[3] that had been in draft form for a number of years. (*Id.* ¶ 31.) The NPDES permit included a benzene limit associated with the dewatering/trim pumps at the Graving Dock.[4] (*Id.*) In 2007, MDE informed Plaintiffs that the benzene requirement in the NPDES permit should have been associated with the underdrain pumps, rather than the dewatering/trim pumps, and asked Plaintiffs to sample for benzene at the underdrain pumps. (*Id.* ¶ 32.) In January 2009, Plaintiffs and MDE finalized a revised NPDES permit with a new benzene requirement at the underdrain pumps to become

---

[2] The EPA likely approved the removal of the Shipyard from the Consent Decree because in order to be eligible for the Maryland VCP program, a contaminated site generally cannot be under "active enforcement." *See* Md. Code Ann., Envir. § 7-501(g)(2)(ii). "Active enforcement" is defined as "a notice of violation, order, consent order, or other enforcement action of the Department." *Id.* § 7-501(b).

[3] The Clean Water Act established the National Pollution Discharge Elimination System ("NPDES"). *See* 33 U.S.C. § 1342. "Generally speaking, the NPDES requires dischargers to obtain permits that place limits on the type and quantity of pollutants that can be released into the Nation's waters." *S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe of Indians*, 541 U.S. 95, 102 (2004).

[4] Dewatering/trim pumps operate to pump out the water in the Graving Dock that comes from the Patapsco River when the gate is open for a vessel to enter or exit the Graving Dock. (Compl. ¶ 31.)

effective on February 1, 2010. (*Id.* ¶ 34.) In order to comply with the new benzene requirement in the NPDES permit, Plaintiffs have installed a wastewater treatment system designed to remove benzene at the Graving Dock. (*Id.* ¶ 35.) Plaintiffs claim that the cost of installing and operating the wastewater treatment system has amounted to more than $700,000 and is expected to cost an additional $20,000 per month in operating and maintenance costs. (*Id.* ¶ 36.)

## II.  Procedural Background

On September 5, 2008, Plaintiffs and Defendants entered into a Tolling Agreement, which tolled and suspended any limitations periods set forth in any statute of limitations applicable to any claims Plaintiffs possessed against Defendants as of August 28, 2008. (Compl. ¶ 8.) On May 11, 2010, after negotiations to resolve this dispute out of court proved unsuccessful, Plaintiffs provided written notice of their intent ("NOI") to bring this action, as required by section 7002(b)(2)(A) of RCRA, 42 U.S.C. § 6972(b)(2)(A) (requiring a citizen give notice of its intent to sue to the EPA Administrator, the State in which the violations are alleged to have occurred, and the alleged violator ninety (90) days prior to the initiation of a civil action), and section 310(d)(1) of CERCLA, 42 U.S.C. § 9659(d)(1) (requiring a citizen give notice of its intent to sue to the President, the State in which the violations are alleged to have occurred, and the alleged violator sixty (60) days prior to the initiation of a civil action). (*Id.* ¶ 9.) Plaintiffs filed this action on September 17, 2010, more than 90 days after the NOIs were given. (*Id.* ¶ 9.) Defendant ArcelorMittal filed its Motion to Dismiss on November 29, 2010, Defendant Severstal filed its Motion to Dismiss on December 3, 2010. Plaintiffs' opposition and Defendants' replies were filed in a timely manner.

## III.  Statutory Background

RCRA is a comprehensive environmental statute that governs the treatment, storage, and disposal of solid and hazardous waste. *See Chicago v. Envtl. Def. Fund*, 511 U.S. 328, 331-32 (1994). RCRA's primary purpose is to "reduce the generation of hazardous waste and to ensure the proper treatment, storage, and disposal of that waste which is nonetheless generated. . . ." *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 483 (1996). Citizens are permitted to bring private suits under RCRA in certain circumstances, but the "chief responsibility for the implementation and enforcement of RCRA rests with the Administrator of the Environmental Protection Agency." *Id.* at 483-84 (citing 42 U.S.C. § 6902(b)). Section 3006 of RCRA, 42 U.S.C. § 6926, allows the states to develop hazardous waste programs at least as stringent as RCRA, subject to authorization by the Administrator of the EPA. After receiving authorization, the state may implement its hazardous waste program "in lieu of the Federal program." 42 U.S.C. § 6926(b). Maryland has received final authorization for its hazardous waste program. *See* 50 Fed. Reg. 3511 (Jan. 25, 1985) (as revised by 69 Fed. Reg. 44463 (July 26, 2004)).

Congress enacted CERCLA "in response to the serious environmental and health risks posed by industrial pollution. The Act was designed to promote the timely cleanup of hazardous waste sites and to ensure that the costs of such cleanup efforts were borne by those responsible for the contamination." *Burlington N. & Santa Fe Ry. v. United States*, 129 S. Ct. 1870, 1874 (2009) (internal quotations and citations omitted). By permitting private individuals to recover specified costs of cleanup from those parties responsible for environmental hazards, CERCLA encourages private individuals to remediate those hazards. *Westfarm Assocs. Ltd. P'shp. v. Washington Suburban Sanitary Comm'n*, 66 F.3d 669, 677 (4th Cir. 1995). CERCLA was passed several years after RCRA went into effect, and CERCLA addresses many of the same toxic waste problems as RCRA. "CERCLA differs markedly from RCRA, however, in the remedies it

provides." *Meghrig*, 516 U.S. at 485. CERCLA's citizen suit provision mirrors RCRA's citizen suit provision in providing district courts with the authority "to order such action as may be necessary to correct the violation" of any CERCLA standard or regulation. 42 U.S.C. § 9659(c). CERCLA is distinct from RCRA, however, in that it expressly permits the Government to recover "all costs of removal or remedial action," § 9607(a)(4)(A), and it expressly permits the recovery of any "necessary costs of response, incurred by any . . . person consistent with the national contingency plan," § 9607(a)(4)(B). CERCLA also provides that "any person may seek contribution from any other person who is liable or potentially liable" for these response costs. *See* § 9613(f)(1). The Supreme Court has described CERCLA's remedies as "sweeping: *everyone* who is potentially responsible for hazardous-waste contamination may be forced to contribute to the costs of cleanup." *United States v. Bestfoods*, 524 U.S. 51, 56 n.1 (1998).

## IV.    Standard of Review

Defendants move to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(1), asserting that this Court lacks subject matter jurisdiction over Plaintiffs' RCRA and common law claims. (Severstal Mot. to Dismiss 1; ArcelorMittal Mot. to Dismiss 12-14.) The Plaintiffs have the burden of proving that subject matter jurisdiction exists. *See Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999). When a defendant challenges subject matter jurisdiction pursuant to Rule 12(b)(1), "the district court is to regard the pleadings as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Id.* (quoting *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991)). The district court should grant the Rule 12(b)(1) motion to dismiss "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Id.*

Defendants also move to dismiss the Plaintiffs' action pursuant to Federal Rule of Civil Procedure 12(b)(6). The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test the sufficiency of the plaintiff's complaint. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). Except in certain specified cases, a plaintiff's complaint need only satisfy the "simplified pleading standard" of Rule 8(a), *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The Supreme Court has recently clarified that in order to survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Generally, when ruling on a 12(b)(6) motion, the court assumes that the facts alleged in the complaint are true and draws all reasonable factual inferences in the nonmoving party's favor. *Edwards*, 178 F.3d at 244. A complaint need not provide "detailed factual allegations," but it must "provide the grounds of [the plaintiff's] entitlement to relief" with "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555 (internal quotations omitted).

Plaintiffs' Complaint alleges in Count I that Defendants are liable for Plaintiffs' response costs under CERCLA. (Compl. ¶¶ 37-47.) Count II of the Complaint seeks a declaratory judgment that Defendants are liable for a share of Plaintiff's future response costs under CERCLA. (*Id.* ¶¶ 48-49.) Count III alleges that Defendants' storage, treatment, and handling of solid or hazardous wastes presents an imminent and substantial endangerment to health and the environment under Section 7002 of RCRA, 42 U.S.C. § 6972(a)(1)(B), and requests that this Court order Defendants to eliminate the endangerment. (*Id.* ¶¶ 50-57.) Counts IV-VII assert

claims under Maryland common law for negligence, nuisance, trespass, and strict liability. (*Id.* ¶¶ 58-80.) Defendants move this Court to dismiss all seven Counts under Federal Rules of Civil Procedure 12(b)(1) and/or 12(b)(6).

## V.  Admissibility of Exhibits

As an initial matter, the parties dispute the extent to which this Court may consider exhibits outside the pleadings in deciding the Motions to Dismiss without converting them to Rule 56 motions for summary judgment. Defendant Severstal's Motion includes 29 exhibits and Defendant ArcelorMittal's Motion includes 6 exhibits. Defendants claim that all the exhibits can be considered by this Court in evaluating the Motions to Dismiss, without converting the motions to Rule 56 motions for summary judgment, because they are all authentic and are either public records or integral to the claims asserted in the Complaint. (Severstal Mot. to Dismiss 13-15.) Plaintiffs assert, however, that only 8 of Defendants' combined 35 exhibits meet these criteria. (Pls.' Opp'n 8.)

In order to resolve this dispute, an important distinction must be drawn between the evidence a court may consider in reviewing a Rule 12(b)(1) motion to dismiss, as opposed to a Rule 12(b)(6) motion to dismiss. Where a motion to dismiss under Rule 12(b)(1) presents a factual challenge to the court's jurisdiction, a court need not assume that all facts alleged in the complaint are true.[5] *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991) ("In determining whether jurisdiction exists, the district court is to regard the pleadings' allegations as mere evidence on the issue . . . ."); *Mortensen v. First Fed.*

---

[5] The challenge presented to this Court is factual. With respect to a Rule 12(b)(1) *facial* challenge, however, a court  must accept all factual allegations in the complaint as true and may consider only the complaint and the documents on which it is based. *See Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982); *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977).

*Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977) ("In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims."); 5B, Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1350 (3d ed. 2004) ("[O]nce a factual attack is made on the federal court's subject matter jurisdiction, the district judge is not obliged to accept the plaintiff's allegations as true . . . ."). Moreover, a court may consider matters outside the pleadings in deciding whether it has jurisdiction. *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999) ("When a defendant challenges subject matter jurisdiction pursuant to Rule 12(b)(1), the district court . . . may consider evidence outside the pleadings without converting the proceeding to one for summary judgment.") (internal citation omitted).

In contrast, in ruling on a motion to dismiss pursuant to Rule 12(b)(6), a court may not consider extrinsic evidence at the 12(b)(6) stage, generally. A court may, however, "consider a document that the defendant attaches to its motion to dismiss if the document was integral to and explicitly relied on in the complaint and if the plaintiffs do not challenge its authenticity." *CACI Int'l, Inc. v. St. Paul Fire & Marine Ins. Co.*, 566 F.3d 150, 154 (4th Cir. 2009). An integral document is a document that by its "very existence, and *not the mere information it contains*, gives rise to the legal rights asserted." *Walker v. S.W.I.F.T. SCRL*, 517 F. Supp. 2d 801, 806 (E.D. Va. 2007) (emphasis added).[6] In addition to integral and authentic exhibits, on a 12(b)(6) motion the court "may properly take judicial notice of matters of public record." *Philips v. Pitt Cnty. Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).

---

[6] As examples, "courts have found integral the allegedly fraudulent document in a fraud action, the allegedly libelous magazine article in a libel action, and the documents that constitute the core of the parties' contractual relationship in a breach of contract dispute." *Fisher v. Md. Dep't of Pub. Safety & Corr. Servs.*, 2010 U.S. Dist. LEXIS 68772, at *7 (D. Md. July 8, 2010) (internal quotation and citations omitted).

In the instant case, Defendants move this Court to dismiss all seven Counts of the Complaint pursuant to Rule 12(b)(1).[7] (ArcelorMittal Mot. to Dismiss 12-14; Severstal Mot. to Dismiss 15.) Accordingly, in deciding whether subject matter jurisdiction exists, this Court need not attach presumptive truthfulness to the facts alleged in the Complaint and may consider all the attached exhibits without converting the motions to motions for summary judgment. In the alternative, Defendants move this Court to dismiss Counts I-III, and VII of the Complaint under 12(b)(6). (Severstal Mot. to Dismiss 15, 29; ArcelorMittal Mot. to Dismiss 14, 21.) To the extent that this Court finds that subject matter jurisdiction exists over these Counts, the Court's consideration of the 12(b)(6) motion will be limited to the pleadings and to exhibits that are both integral and authentic, or matters of public record.

## VI. Effect of Bankruptcy Sale Order Entered in the Southern District of New York

For the reasons I have stated in the Opinion I am issuing today in *Severstal Sparrows Point, LLC v. United States Environmental Protection Agency*, No. JFM-97-558 (D. Md. July 5, 2011), the Bankruptcy Sale Order entered by the United States Bankruptcy Court for the Southern District of New York on April 23, 2003 relieves defendants of liability for the release or migration of hazardous waste and hazardous constituents occurring before April 23, 2003.

## VII. Federal Claims

### A. *Claims For Cost Recovery and Declaratory Relief Under CERCLA*

---

[7] Severstal and ArcelorMittal assert that this Court lacks subjects matter jurisdiction over all of Plaintiffs' claims because they are barred and enjoined by the Bankruptcy Sale Order. (Severstal Mot. to Dismiss 15; ArcelorMittal Mot. to Dismiss 12-14.) Additionally, Defendants claim that Count III should be dismissed for lack of subject matter jurisdiction due to diligent prosecution (Severstal Mot. to Dismiss 16; ArcelorMittal Mot. to Dismiss 2 n.1), and that Counts IV-VII should be dismissed for lack of subject matter jurisdiction because these claims are barred by Maryland's three year statute of limitations. (Severstal Mot. to Dismiss 26; ArcelorMittal Mot. to Dismiss 23).

Defendants argue that Plaintiffs' Complaint fails to demonstrate compliance with the National Contingency Plan ("NCP"), which is one of the *prima facie* elements for a private cost recovery claim under CERCLA.[8] (ArcelorMittal Mot. to Dismiss 19; Severstal Mot. to Dismiss 15.) In particular, Defendants claim that Plaintiffs' Complaint cites the wrong standard of NCP compliance for a private cost recovery claim under Section 107 of CERCLA, 42 U.S.C. § 9607(a)(4)(B), because Plaintiffs claim that their response costs are "not inconsistent" with the NCP, rather than "necessary" and "consistent," as the statute requires. (ArcelorMittal Mot. to Dismiss 19.) Additionally, Defendants assert that Plaintiffs have failed to plead facts that demonstrate their compliance with the NCP regulatory requirements imposed by EPA, detailed at 40 C.F.R. Part 300. (*Id.*) Plaintiffs concede that the correct standard for a private cost recovery claim under CERCLA, 42 U.S.C. § 9607(a)(4)(B), is consistency with the NCP, but claim that the Complaint contains allegations sufficient to  meet this standard and sufficient to demonstrate compliance with the NCP regulatory requirements. (Pls.' Opp'n 19.)

A plaintiff seeking to recover response costs under CERCLA must establish that the plaintiff incurred necessary cleanup costs "consistent with the national contingency plan." 42 U.S.C. § 9607(a)(4)(B); *see also Westfarm Assocs. Ltd. P'shp. v. Washington Suburban Sanitary Comm'n*, 66 F.3d 669, 677 (4th Cir. 1995). At the liability stage, Plaintiff need only "prove that it incurred *some* response costs consistent with the NCP," which would be recoverable under CERCLA. *Sherwin-Williams Co. v. ARTRA Grp., Inc.*, 125 F. Supp. 2d 739, 752 (D. Md. 2001).

---

[8]ArcelorMittal has also moved to dismiss the claims against it on the independent ground that ArcelorMittal never owned or operated the Sparrows Point Facility (ArcelorMittal Mot. to Dismiss 14).  That argument ultimately may prove to be well founded.  However, in light of ArcelorMittal's acknowledgements that it "formerly held an interest in Defendant Severstal Sparrows Point LLC," (*id.* at 17), I will permit discovery to proceed on this issue.  ArcelorMittal may, of course, renew its argument by way of a motion for summary judgment at a later stage of these proceedings.

Response costs are considered "consistent with the NCP" where there is "substantial compliance" with the NCP. 40 C.F.R. 300.700(c)(3)(i); *see also Sherwin-Williams*, 125 F. Supp. 2d at 752. "[P]roof of the consistency of the remaining costs may wait until trial on the issue of damages." *Weyerhaeuser v. Koppers Co., Inc.*, 771 F. Supp. 1406, 1413 (D. Md. 1991).

By alleging that their response costs are "not inconsistent" rather than "consistent" with the NCP (*see* Compl. ¶ 45), Plaintiffs confuse the standard for Government recovery with the standard for private cost recovery. *Compare* 42 U.S.C. § 9607(a)(4)(A) (responsible parties are liable under CERCLA for "all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan"), *with* 42 U.S.C. § 9607(a)(4)(B) (responsible parties are liable under CERCLA for "any other necessary costs of response incurred by any other person consistent with the national contingency plan"). Nevertheless, I find that Plaintiffs' Complaint contains factual allegations sufficient to demonstrate that some of their response costs substantially comply with the NCP. The Complaint details the investigation and remediation that Plaintiffs have conducted in order to comply with the NPDES permit. (*See* Compl. ¶¶ 30-36.) Specifically, Plaintiffs allege that they have installed a benzene treatment system. (*Id.* ¶ 35.) The NCP lists treatment of ground water to reduce or eliminate contamination as an appropriate action to respond to contaminated ground water. 40 C.F.R. 300 Appx. D(c). Installation of this treatment system thus appears to be "consistent" with the NCP.[9]

Defendants also argue that "Plaintiffs fail to allege any facts plausibly demonstrating they have complied with 40 C.F.R. § 300.700(c)(6), which requires that private parties 'provide an opportunity for public comment concerning the selection of the response action.'" (ArcelorMittal

---

[9] The treatment system also appears to be "necessary" given the MDE's revision of the Shipyard Site's NPDES permit. (*See* Compl. ¶ 34.)

Mot. to Dismiss 19-20.) Importantly though, several courts, including this Court, have held that government oversight of hazardous waste cleanup efforts may serve to satisfy the public participation and comment element of the NCP. *See Sherwin-Williams*, 125 F. Supp. 2d at 752; *Bedford Affiliates v. Sills*, 156 F.3d 416, 428 (2nd Cir. 1998). The EPA administers NPDES permitting for each State, "but a State may apply for a transfer of permitting authority to state officials. If authority is transferred, then state officials . . . have the primary responsibility for reviewing and approving NPDES discharge permits, albeit with continuing EPA oversight." *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 650 (2007). The State of Maryland is authorized to administer the NPDES program and does so through MDE. *See Piney Run Pres. Ass'n v. Cnty. Comm'rs (Piney Run I)*, 268 F.3d 255, 265 (4th Cir. 2001).

Plaintiffs allege that after MDE informed Plaintiffs that the benzene requirement should have been associated with the underdrain pumps, rather than the dewatering/trim pumps, MDE revised the NPDES permit to contain a new benzene requirement at the underdrain pumps, effective February 1, 2010. (Compl. ¶¶ 32, 34.) Plaintiffs installed the benzene treatment system to comply with the revised NPDES. (*Id.* ¶ 35.) There has thus been MDE involvement during Plaintiffs' remediation process sufficient to satisfy the public participation and comment requirement under the NCP. Moreover, Plaintiffs' NPDES permit itself was subject to a public comment period. *See* Md. Code Ann., Envir. § 9-324(d). Plaintiffs have therefore met their burden of demonstrating that at least some of their response costs substantially comply with the NCP for liability purposes.

### B. RCRA Claims

1. *Coke Oven Area as Basis for RCRA Claim*

Next, Defendants claim that Count III fails to state a claim under RCRA because the coke ovens that were the alleged source of benzene ceased operations years before Defendants acquired the Steel Mill Site. (ArcelorMittal Mot. to Dismiss 21-22; Severstal Mot. to Dismiss 15-16.) Defendants correctly argue that in order to state a RCRA "imminent and substantial endangerment" claim against Defendants, Plaintiffs must allege facts demonstrating that Defendants "contributed or . . . [are] contributing to the past or present handling, storage, treatment, transportation, or disposal," *see* 42 U.S.C. § 6972(a)(1)(B), of the "[b]enzene and other wastes associated with the operations at the coke oven area" upon which their claims are based (*see* Compl. ¶ 56). Defendants claim that because the coke ovens ceased operations in December 1991, before Defendants acquired the Steel Mill Site, neither ArcelorMittal nor Severstal could have "contributed" to the coke oven waste on which Plaintiffs base their "imminent or substantial endangerment" under RCRA (ArcelorMittal Mot. to Dismiss 21-22) because a claim under RCRA, 42 U.S.C. § 6972(a)(1)(B), requires a well-pled allegation of "active" contribution to the handling, treatment, transportation, or disposal of hazardous waste (ArcelorMittal Reply Mem. 20).

Under RCRA, "disposal" is defined as "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." 42 U.S.C. § 6903(3).[10] It is well established in the Fourth Circuit that the term "disposal" includes passive migration. *See Nurad, Inc. v. William E. Hooper & Sons Co.*, 966 F.2d 837, 845 (4th Cir. 1992). Based upon this interpretation of "disposal," the *Nurad* Court held that a former owner of a

_____

[10] CERCLA incorporates by reference the RCRA definition of "disposal." *See* 42 U.S.C. § 9601(29).

manufacturing facility could be held liable under CERCLA for passive migration of hazardous substances that occurred during ownership, even if the former owner took no active role in the management of the underground storage tanks that leaked the hazardous substances. *See Nurad, Inc.*, 966 F.2d at 844-48.

Importantly, though, *Nurad* concerned alleged violations of Section 107 of CERCLA, which imposes liability upon "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of." 42 U.S.C. § 9607(a)(2). Accordingly, ownership of a facility where passive migration occurred is sufficient to incur liability under CERCLA. In contrast, Section 7002 of RCRA, 42 U.S.C. § 6972(a)(1)(B), permits citizen suits against a "past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." RCRA thus requires the additional showing of "contribution" to the "disposal" of hazardous waste in order for liability to attach.

Neither RCRA nor its regulations define "contribute to." I therefore rely on the basic principle that an undefined statutory phrase must be given its "ordinary or natural meaning." *Air Line Pilots Ass'n, Int'l v. US Airways Grp., Inc.*, 609 F.3d 338, 342 (4th Cir. 2010) (quoting *FDIC v. Meyer*, 510 U.S. 471, 476 (1994)). The Eighth Circuit has noted that the plain meaning of "contribute to" is "to have a share in any act or effect," *United States v. Aceto Agric. Chems. Corp.*, 872 F.2d 1373, 1384 (8th Cir. 1989) (citing Webster's Third New International Dictionary 496 (1961)). The Seventh Circuit has found that the ordinary meaning of "contribute" is "to act

as a determining factor." *Sycamore Indus. Park Assocs. v. Ericsson, Inc.*, 546 F.3d 847, 854 (7th Cir. 2008) (citing Webster's II New College Dictionary (2005)).

The plain meaning of "contribute to" is not to be considered in a vacuum. As the Eighth Circuit explained in *Aceto*, RCRA's "relevant legislative history supports a broad, rather than a narrow, construction of the phrase 'contributed to.' Although RCRA's contemporaneous legislative history is not very helpful . . . subsequent reports which reviewed the statute after enactment expressly state that 'contributing to' is to be liberally construed." *Aceto*, 872 F.2d at 1383 (citing H.R. Rep. No. 96-IFC 31 at 31 (1979) (the Eckhardt Report); S. Rep. No. 96-172, at 5 (1980), reprinted in 1980 U.S.C.C.A.N. 5019, 5023); *accord United States v. Waste Indus., Inc.*, 734 F.2d 159, 167 (4th Cir. 1984). This is in keeping with the liberal construction generally accorded to RCRA because it is "a remedial statute." *Aceto*, 872 F.2d at 1383.

Nevertheless, many of the courts considering this issue have read RCRA to require affirmative action rather than mere passive conduct—such as failing to remediate contamination and prevent its passive migration (*see* Pls.' Opp'n 22). *See Sycamore Indus. Park Assocs. v. Ericsson, Inc.*, 546 F.3d 847, 854 (7th Cir. 2008) ("By definition, the phrase 'has contributed or is contributing' requires affirmative action."); *ABB Indus. Sys., Inc. v. Prime Tech., Inc.*, 120 F.3d 351, 359 (2d Cir. 1997) ("Because [plaintiff] cannot show that [defendants] spilled hazardous chemicals or otherwise contaminated the site, [plaintiff] cannot establish that the defendants have contributed or are contributing to an endangerment to the environment."); *Interfaith Cmty. Org. v. Honeywell Int'l*, 263 F. Supp. 2d 796, 844 (D.N.J. 2003) ("[A] straightforward reading of RCRA compels a finding that only *active* human involvement with the waste is subject to liability under RCRA § 7002 (a)(1)(B)."); *Delaney v. Town of Carmel*, 55 F. Supp. 2d 237, 256 (S.D.N.Y. 1999) ("The term ['contributed to'] has been universally held to

infer something more than mere ownership of a site; some level of causation between the contamination and the party to be held liable must be established.").[11]

Plaintiffs have alleged that the "operation of the coke ovens and facilities associated with the coke ovens . . . at the Steel Mill Site has resulted in releases of hazardous substances," which have migrated or are migrating to the Shipyard Site. (Compl. ¶ 24.) Defendants argue that such allegations are insufficient to plead an imminent and substantial endangerment claim under RCRA because the coke ovens ceased operations years before Defendants acquired the Steel Mill Site. (*See* ArcelorMittal Mot. to Dismiss 22.) I agree. Because RCRA requires "contribution" to "disposal" of hazardous waste, rather than simply "disposal" during "ownership," as required by CERCLA, Defendants could not have "contributed" to the "disposal" of hazardous waste generated by the coke ovens. Accordingly, I grant Defendants' Motions to Dismiss Count III insofar as Plaintiffs' RCRA claims relate to releases resulting from operations at the Coke Oven Area that occurred before Defendants acquired the Steel Mill Site.

*2. Diligent Prosecution*

Defendants also argue that Count III is statutorily barred by EPA and MDE's diligent prosecution of the same RCRA claim and must be dismissed for lack of subject matter jurisdiction pursuant to Rule 12(b)(1). (ArcelorMittal Mot. to Dismiss 2 n.1; Severstal Mot. to Dismiss 16-24.) RCRA grants primary enforcement responsibility to the state and federal governments, while citizen suits are meant "to supplement rather than supplant governmental action." *Piney Run Pres. Ass'n v. Cnty. Comm'rs (Piney Run II)*, 523 F.3d 453, 456 (4th Cir. 2008) (citing *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 60

---

[11] The Fourth Circuit has yet to interpret the language "has contributed or is contributing" under RCRA.

(1987)).[12] Accordingly, Section 7002 of RCRA provides for citizen suits under certain conditions only, and prohibits such suits where the government "has commenced and is diligently prosecuting" an action involving the same claim against an alleged violator. 42 U.S.C. § 6972(b).

Defendants claim that the consolidated action commenced by EPA and MDE in 1997, *see Maryland v. Bethlehem Steel Corp.*, No. JFM-97-558 (D. Md. filed Feb. 25, 2007), fully covers the scope of Plaintiffs' claims in this Count, and that EPA and MDE continue to diligently prosecute through implementation of the Consent Decree. (Severstal Mot. to Dismiss 17.) Plaintiffs respond that their RCRA claim is not barred by diligent prosecution because their claims derive from the ongoing release and migration of benzene from the Steel Mill Site to the Shipyard Site, which Plaintiffs claim is not covered by the Consent Decree. (Pls.' Opp'n 24.) In the alternative, Plaintiffs argue that even if their claims overlap with the Consent Decree, the Consent Decree has not been diligently enforced. (*Id.* at 26.) I take up each of these claims separately.

    a.   Scope of the Consent Decree

While RCRA contains a diligent prosecution bar to citizen suits, if the citizen suit seeks to enforce different standards or regulations, *see Dodge v. Mirant Mid-Atl., LLC*, 732 F. Supp. 2d 578, 585 (D. Md. 2010), or concerns releases of a different pollutant, *see Sanchez v. Esso Standard Oil Co.*, 572 F.3d 1, 12 (1st Cir. 2009), than the government enforcement action, the

---

[12] Both *Piney Run II* and *Gwaltney* involved claims under the Clean Water Act ("CWA"), but RCRA and the CWA contain the same "diligent prosecution" bar to citizen suits. Courts have found it appropriate to interpret the language in both statutes in the same manner. *See Ailor v. City of Maynardsville*, 368 F.3d 587, 601 (6th Cir. 2004) (finding that RCRA citizen suits can be brought "in substantially the same capacity as provided for in the CWA"); *Cox v. City of Dallas*, 256 F.3d 281, 308 (5th Cir. 2001) ("We are persuaded that the similarity of the citizen suit provisions of the CWA and the RCRA requires like interpretation."); *Supporters to Oppose Pollution v. Heritage Grp.*, 973 F.2d 1320, 1324 (7th Cir. 1992) (citing to a CWA citizen suit to determine the standard for diligent prosecution in a RCRA citizen suit).

citizen suit will not be precluded by the government action. The key inquiry thus becomes whether EPA and MDE's claims that led to the 1997 Consent Decree, and the Consent Decree itself, address Plaintiffs' RCRA claims. To the extent that they do, and that the Consent Decree is being implemented to resolve these claims, Plaintiffs' citizen suit is barred.

Count III of Plaintiffs' Complaint specifically alleges that "benzene and other wastes associated with the operations at the coke oven area at the Steel Mill Site are solid or hazardous wastes," which are presenting an imminent and substantial endangerment to health or the environment, in violation of RCRA Section 7002(a)(1)(B), 42 U.S.C. § 6972(a)(1)(B). (Compl. ¶¶ 56-57.) Plaintiffs contend that these claims of release and migration of benzene from the Steel Mill Site to the Shipyard Site are not covered by the Consent Decree. (Pls.' Opp'n 24.) Plaintiffs' argument regarding the *release* of hazardous waste at the Steel Mill Site is unpersuasive. Plaintiffs' claim regarding *migration* of hazards poses a more complicated question, however.

The Consent Decree was entered in response to the claims filed by EPA and MDE in 1997, which alleged unlawful discharges of hazardous waste, threatening human health or the environment under Section 7002(a) of RCRA, 42 U.S.C. § 6972(a). (*See* Severstal Mot. to Dismiss, Exs. 3 & 4.) In addition, the MDE complaint expressly refers to unlawful releases at the Coke Oven Area in alleging violations of Section 7002(a) of RCRA, 42 U.S.C. § 6972(a) (*see* Severstal Mot. to Dismiss, Ex. 4 at ¶ 20), thus making an allegation of unlawful release that is practically indistinguishable from Plaintiffs' RCRA claim in Count III.

Moreover, the Consent Decree itself requires the implementation of corrective measures, including interim measures, in order to address releases at or from the Sparrows Point Facility that pose a threat to human health or the environment. (Severstal Mot. to Dismiss, Ex. 1 at 8-15.) Specifically, Section V.B. mandates a site-wide investigation ("SWI") of environmental

conditions. (*Id.*, Ex. 1 at 13-14 & Attach. B.) The "Conceptual Plan for the Site Wide Investigation," incorporated by reference into the Consent Decree, states the purpose and approach of the SWI: "[t]he SWI shall be a comprehensive evaluation of the potential for both current and future risk to human health and the environment from current and past releases of hazardous wastes and hazardous constituents at the Facility." (*Id.*, Ex. 1, Attach. B.) This Conceptual Plan requires an area-specific characterization of the Coke Oven Area, based on sampling of subsurface conditions, contamination, and releases. (*Id.*, Ex. 1, Attach. B at 4.) The Consent Decree is thus clearly designed to address the release of hazardous waste, and particularly the release of hazardous waste from the Coke Oven Area. Accordingly, to the extent that Plaintiffs allege unlawful releases by Defendants under RCRA, I find that the overlap between Plaintiffs' RCRA claims in Count III and the claims brought by EPA and MDE, as well as the resulting Consent Decree, precludes Plaintiffs' citizen suit. *See* 42 U.S.C. § 6972(b)(2)(C)(i).

Plaintiffs also allege, however, that Defendants are responsible for the continued migration of hazardous substances to the Shipyard Site. (*See* Compl. ¶ 24.) The Shipyard Site was subject to the Consent Decree, which was designed to address contamination at the entire Sparrows Point Facility, until EPA and MDE approved the removal of the Shipyard Site from the Consent Decree in 2006. (*See* Severstal Mot. to Dismiss, Ex. 29.) Therefore, migration of hazardous substances to the Shipyard Site that occurred after the Shipyard Site was removed from the Consent Decree in 2006 is not covered by the Consent Decree, and Plaintiffs' RCRA claims relating to post-2006 migration of hazardous substances are not precluded by the diligent prosecution bar. However, the portion of Plaintiffs' claims relating to post-2006 migration of hazardous substances, while not barred by diligent prosecution, falls within the ambit of

excluded BSC liabilities under the Bankruptcy Sale Order if they "result[] from the transport, disposal or treatment of any Hazardous Materials by any Seller on or prior to the Closing Date to or at any location other than the Real Property." (Severstal Mot. to Dismiss, Ex. 6 at 6.) That is, to the extent Plaintiffs claim that migration of hazardous substances from the Steel Mill Site to the Shipyard Site occurred after 2006, but resulted from discharge or dumping of the hazardous substances occurring on or prior to the Closing Date of April 23, 2003, those claims are barred by the Bankruptcy Sale Order. As a result, the only RCRA claim that survives Defendants' Motions to Dismiss is a very narrow one: migration of hazardous substances that occurred after the Shipyard Site was removed from the Consent Decree in 2006, resulting from releases of hazardous substances that occurred after April 23, 2003.

b. Diligent Enforcement of the Consent Decree

Plaintiffs argue that to the extent there is overlap between their RCRA claims and the Consent Decree, as I find there is, the Consent Decree has not been diligently enforced. (Pls.' Opp'n 26.) Plaintiffs have the burden of proving that prosecution is not diligent. *Cmty. of Cambridge Envtl. Health & Dev. Grp. v. City of Cambridge*, 115 F. Supp. 2d 550, 554 (D. Md. 2000). "This burden is a heavy one because diligence on the part of the enforcement agency is presumed." *Id.* (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 890 F. Supp. 470, 487 (D.S.C. 1995)); *see also Karr v. Hefner*, 475 F.3d 1192, 1198 (10th Cir. 2007) ("Citizen-plaintiffs must meet a high standard to demonstrate that [a government agency] has failed to prosecute a violation diligently.").

The Fourth Circuit has held that a prosecution is "diligent" where the action "is capable of requiring compliance with the Act and is in good faith calculated to do so." *Piney Run II*, 523 F.3d at 459. The citizen suit provision "'does not require government prosecution to be far-

reaching or zealous. It requires only diligence.' Thus, a citizen-plaintiff cannot overcome the presumption of diligence merely by showing that the agency's prosecution strategy is less aggressive than he would like or that it did not produce a completely satisfactory result." *Id.* (citing *Karr*, 475 F.3d at 1197). Administrative decisions, including consent decrees, are given deference because a court "must be particularly deferential to the agency's expertise" and should not interpret the scope of the "diligent prosecution" bar "in a manner that would undermine the [government agency's] ability to reach voluntary settlements with defendants." *Id.* (internal quotation omitted). Courts have found that consent decrees, and their enforcement, amount to diligent prosecution. *See, e.g.*, *id.* at 460; *Community of Cambridge*, 115 F. Supp. 2d at 556.

Plaintiffs' arguments for lack of diligent prosecution center on the migration of benzene, rather than its release. (*See* Pls.' Opp'n 27 ("[E]ven if the Consent Decree covered some or all of Plaintiffs' claims, it has not been diligently enforced with respect to the migration of benzene to the Shipyard Site.").) However, to the extent Plaintiffs argue that the Consent Decree has not been diligently enforced with respect to releases of benzene or pre-2006 migration of benzene to the Shipyard Site, Plaintiffs have not met their burden of proving that enforcement is not diligent. Plaintiffs claim only that "13 years have passed since the entry of the Consent Decree and Defendants have still not stopped the migration of benzene from the Steel Mill Site to the Shipyard Site." (Pls.' Opp'n 27.) Diligent prosecution, however, "does not require success, but rather that an agency 'try, diligently.'" *Cmty. of Cambridge*, 115 F. Supp. 2d at 555 (citing *Supporters to Oppose Pollution Inc. v. Heritage Grp.*, 973 F.2d 1320, 1324 (7th Cir. 1992)).

EPA and MDE filed claims, executed and entered a Consent Decree, and continue to oversee implementation of the Consent Decree. Since entry of the Consent Decree in 1997, the owners of the Severstal Sparrows Point Facility have conducted multiple studies of the

groundwater system in order to identify the extent of contamination, completed a facility investigation and human health risk evaluation, repaired and/or replaced sumps and storage tanks, constructed a full-scale pilot hydrocolone facility to recycle blast furnace gas cleaning slurry solids/filter cake, conducted maintenance dredging operations to remove material from Tin Mill Canal, and operated a groundwater pump as an interim measure, among other remediation efforts. (*See* Severstal Mot. to Dismiss 8-10.) Moreover, EPA and MDE have sought interim measures at locations throughout the Severstal Sparrows Point Facility, including the Coke Oven Area (*see id.* at 10), and have partially disapproved Severstal's proposed workplans, resulting in the dispute resolution currently pending in this Court that I am deciding today in my opinion issued in *Severstal Sparrows Point, LLC v. United States Environmental Protection Agency*, No. JFM-97-558 (D. Md. July 5, 2011). This pending action is further evidence that EPA and MDE are "diligently prosecuting an action under subsection (a)(1)(B)." 42 U.S.C. § 6972(b)(2)(C)(i). Accordingly, I find that with the exception of any narrow claims relating to post-2006 migration of hazardous substances released post-2003, Plaintiffs' RCRA claims in Count III of the Complaint are barred by diligent prosecution.[13]

---

[13] In the alternative, Defendants argue that this Court should "abstain from considering these claims based on the doctrine of primary jurisdiction due to EPA and MDE's expertise and continuing jurisdiction over remediation matters at the Sparrows Point Facility." (Severstal Mot. to Dismiss 24.) The doctrine of primary jurisdiction "is a doctrine specifically applicable to claims properly cognizable in court that contain some issue within the special competence of an administrative agency. It requires the court to enable a 'referral' to the agency, staying further proceedings so as to give the parties reasonable opportunity to seek an administrative ruling." *Reiter v. Cooper*, 507 U.S. 258, 268 (1993). The doctrine has been deemed to apply to circumstances in which federal litigation raises a difficult, technical question that falls within the expertise of a particular agency. *See, e.g.*, *Am. Auto. Mfrs. Ass'n. v. Mass. Dep't of Envtl. Prot.*, 163 F.3d 74, 81 (1st Cir. 1998).

Plaintiffs argue that this Court should not apply the doctrine because RCRA claims are "well within this Court's competence to decide and will not interfere with the regulatory agencies' proceedings under the Consent Decree." (Pls.' Opp'n 27.) Plaintiffs cite to several RCRA cases in which the court has declined to invoke the doctrine of primary jurisdiction based

## VII. State Common Law Claims

Finally, Defendants argue that the three-year statute of limitation for civil claims in Maryland, Md. Code Ann., Cts. & Jud. Proc. § 5-101, bars Plaintiffs' claims for negligence (Count IV), trespass (Count V), nuisance (Count VI), and strict liability (Count VII). (ArcelorMittal Mot. to Dismiss 23-24; Severstal Mot. to Dismiss 26-29.) Defendants claim that these claims accrued in 2004 when the Shipyard Site was acquired because Plaintiffs had notice and actual knowledge of potential contamination at that time. (Severstal Mot. to Dismiss 28.) In support of this contention, Defendants state that because the Consent Decree was subject to public notice, and because the deeds through which BSC transferred the property to Baltimore Marine, and Baltimore Marine to SPS LLLP, referenced the Consent Decree, Plaintiffs had notice of potential contamination when they purchased the Shipyard Site in 2004. (*Id.* at 28-29.) Defendants also argue that Plaintiffs' VCP application, submitted in February 2004, demonstrates that Plaintiffs had actual knowledge that the Shipyard Site was contaminated. (*Id.* at 29.)

In response, Plaintiffs argue that their claims accrued, at the earliest, on September 5, 2005, when MDE sent Plaintiffs a letter informing Plaintiffs that the NPDES permit for the Shipyard Site should have contained a benzene requirement associated with the underdrain pumps, rather than the dewatering/trim pumps, and requesting that Plaintiffs sample for benzene at the underdrain pumps. (Pls.' Opp'n 35.) Only upon sampling the graving dock pump outfall

---

on congressional direction as to when federal district courts should entertain such suits. (*Id.* at 28.) *See, e.g.*, *PMC, Inc. v. Sherwin-Williams Co.*, 151 F.3d 610, 619 (7th Cir. 1998) (declining to apply the doctrine of "primary jurisdiction" to a RCRA citizen suit because "[t]hat would be an end run around RCRA. Congress has *specified* the conditions under which the pendency of other proceedings bars suit under RCRA," and where "those conditions have not been satisfied," the district court should hear the case). I find Plaintiffs' arguments persuasive, and to the extent that Plaintiffs' Count III survives Defendants' Motions to Dismiss, this Court will not abstain from considering it under the doctrine of primary jurisdiction.

for pollutants did Plaintiffs discover that the benzene levels were four times the level permitted under the NPDES permit. (*Id.*) Less than three years later, in September 2008, Plaintiffs entered into a Tolling Agreement with Defendants, which suspended the running of limitations as of August 28, 2008. (*Id.* at 35 & Ex. 4.) Accordingly, Plaintiffs assert that their common law claims are not barred by the statute of limitations as fewer than three years passed between September 5, 2005 and August 28, 2008. (*Id.* at 35.)

The Maryland Code provides that "[a] civil action at law shall be filed within three years from the date it accrues . . . ." Md. Code Ann., Cts. & Jud. Proc. § 5-101. In the absence of statutory guidance, determination of when an action "accrues" has been left to the courts, which have adopted the "discovery rule." *See Pappano v. Chevy Chase Bank*, 806 A.2d 334, 338 (Md. Ct. Spec. App. 2002). Under the discovery rule, "a statute of limitations [is] triggered when a plaintiff knows or, with the exercise of reasonable diligence, should have known, of the existence of an injury." *Id.* More specifically, "a plaintiff is [] on inquiry notice, and thus the statute of limitations will begin to run, when the plaintiff has 'knowledge of circumstances which would cause a reasonable person in the position of the plaintiff[] to undertake an investigation which, if pursued with reasonable diligence, would have led to knowledge of the alleged [tort].'" *Lumsden v. Design Tech Builders, Inc.*, 749 A.2d 796, 802 (Md. 2000) (quoting *O'Hara v. Kovens*, 503 A.2d 1313, 1324 (Md. 1986)).

Of course, when ruling on a 12(b)(6) motion, the court assumes that the facts alleged in the complaint are true and draws all reasonable factual inferences in the nonmoving party's favor. *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999). Because "the question of notice generally requires the balancing of factual issues and the assessment of credibility or believability of the evidence . . . 'whether or not the plaintiff's failure to discover his cause of

action was due to failure on his part to use due diligence . . . is ordinarily a question of fact for the jury.'" *Frederick Rd. Ltd. P'ship v. Brown & Sturm*, 756 A.2d 963, 974 (Md. 2000) (quoting *O'Hara*, 503 A.2d at 1320). Accordingly, taking the facts in the light most favorable to Plaintiffs, I must decide whether Plaintiffs had inquiry notice of contamination at the Shipyard Site more than three years prior to entering into the Tolling Agreement with Defendants,[14] which suspended the running of limitations as of August 28, 2008, or whether a reasonable jury could conclude otherwise.

As indicated above, Defendants contend that Plaintiffs were on inquiry notice because the Consent Decree was subject to public notice before Plaintiffs acquired the Shipyard Site, and because the deeds through which the Shipyard Site was transferred to Plaintiffs contained references to the Consent Decree. (Severstal Mot. to Dismiss 28-29.) The deeds contain the same language:

> EXCEPTING AND RESERVING, HOWEVER, to Bethlehem, its successors and assigns, the right to enter upon the above-described tract of land at all reasonable times during the pendency of the Consent Decree lodged on February 25, 1997, in the cases of <u>United States of America v. Bethlehem</u>

---

[14] ArcelorMittal argues that it was not a party to the Tolling Agreement because it was not a signatory to the September 5, 2008 Tolling Agreement, and is not included in the "parties" designated to receive notices in the Agreement. (ArcelorMittal Reply 21-22.) ArcelorMittal echoes its earlier argument regarding owner and operator liability in claiming that the Tolling Agreement cannot be binding on ArcelorMittal because it refers to "predecessors" and "[t]he only preceding owner and operator of the Facility before Severstal Sparrows Point, LLC was BSC . . . ." However, the Tolling Agreement states that it was entered into by Severstal Sparrows Point, LLC f/k/a ISG Sparrows Point, LLC and "its parents, subsidiaries, affiliated companies, predecessors, successors, and assigns (collectively, 'Steel Mill Parties') . . . ." (Pls.' Opp'n, Ex. 4 at 1.) The Tolling Agreement further specifies that "[t]he Steel Mill Parties are the current or former owners of the steel mill in Sparrows Point, Baltimore County, Maryland . . . ." (*Id.*) Because ArcelorMittal admits that it "formerly held an interest in Defendant Severstal Sparrows Point, LLC," (ArcelorMittal Mot. to Dismiss 17), and because at this stage in the litigation, Plaintiffs have adequately alleged a chain of ownership involving ArcelorMittal sufficient to survive ArcelorMittal's Motion to Dismiss, *see supra* note 8, I find that there is a dispute of material fact regarding whether the Tolling Agreement is binding on ArcelorMittal and reject ArcelorMittal's argument in this regard.

> Steel Corporation Civil Action No. JFM-97-559 and Maryland v. Bethlehem
> Steel Corporation Civil Action No. JFM-97-558, in the United States District
> Court for the District of Maryland so that Bethlehem may perform the
> obligations imposed upon Bethlehem pursuant to the terms and conditions of
> the Consent Decree. In the event the Environmental Protection Agency or the
> Maryland Department of the Environment, after receiving the report more
> particularly referred to in Section V.C. of the Consent Decree [the "Corrective
> Measures Study" report] requires remedial work to be done on the above-
> described tract of land, Bethlehem shall have the further right to enter upon
> the above-described tract of land at all reasonable times to perform such
> remedial work, including any operation and maintenance work and
> monitoring.

(*Id.*, Ex. 26, at 6 & Ex. 27, at 5-6.) Plaintiffs correctly observe that pursuant to Section V.C.1 of the Consent Decree, the Corrective Measures Study report is due within 30 days after EPA and MDE issue final approval of the Site Wide Investigation Report. (Pls.' Opp'n 33 n.6; Severstal Mot. to Dismiss, Ex. 1 at 14.) However, to date EPA and MDE have yet to issue such final approval. As such, no Corrective Measure Study report has been provided, and neither BSC nor Defendants have been ordered to perform remedial work on the Shipyard Site, the potential for which was contemplated by the deeds. Plaintiffs contend that consequently, the deeds did not put Plaintiffs on notice of the benzene contamination migrating to the Shipyard Site, and therefore did not start the running of limitations with respect to Plaintiffs' common law claims. (Pls.' Opp'n 33 n.6.)

Defendants argue that in addition to inquiry notice, Plaintiffs had actual knowledge of contamination at the Shipyard Site based on the application to Maryland's VCP submitted by Plaintiffs on February 22, 2004. (Severstal Mot. to Dismiss 29.) Plaintiffs argue, however, that a closer look at the VCP application belies Defendants' claim. (Pls.' Opp'n 33 & n.7.) Plaintiffs highlight that the application's cover letter states, "the shipyard which is to be acquired by SPS Limited Partnership, LLLP ('SPS'), in significant part, is unaffected by contamination [at the

Steel Mill Site]." (Severstal Mot. to Dismiss, Ex. 28.) Additionally, the Phase I Environmental Assessment of the Shipyard Site attached to the VCP application reveals that no investigation of the Shipyard Site had been conducted, nor would be conducted for several years, and therefore, the extent of contamination at the Shipyard Site, if any, was unknown.[15] (*See* Severstal Mot. to Dismiss, Ex. 28 at II-1 – II-2.) The Phase I Environmental Assessment does state "that contamination from at least one of [the five special study areas], the Coke Oven Area, could be impacting the [Shipyard] Site," (*id.*, Ex. 28 at III-23), but Plaintiffs argue that because the same Assessment states that "comprehensive investigation of the [Shipyard] Site is considered a low priority and . . . is not expected to begin for several more years," (*id.*, Ex. 28 at III-24), the "unsubstantiated suspicion that groundwater contamination from the Steel Mill Site *might* be impacting the Shipyard Site is not sufficient to start the running of limitations," (Pls.' Opp'n 33 n. 7).

Defendants cite the September 29, 2004 Phase II Work Plan as conclusive evidence that Plaintiffs had actual knowledge of the benzene contamination at the Coke Oven Area, and that the flow of contaminant migration might be pulled towards the Shipyard Site's Graving Dock by the seepage pumps:

> The primary constituents detected were benzene and naphthalene. Benzene concentrations up to 1,100 mg/l and naphthalene up to 5.1 mg/l have been detected in the shallow zone. In the intermediate zone benzene has been detected at concentrations up to 390 mg/l and naphthalene has been detected at concentrations up to 3.5 mg/l. The most significant of these groundwater

---

[15] The Phase I Environmental Assessment of the Shipyard Site states, "Although the [Shipyard] property was owned by BSC at the time of the [RCRA Facility Assessment ('RFA')], [it] was excluded from the scope of the RFA. For this reason, no specific actions in the Consent Decree are directed at the [Shipyard] property. However, the Consent Decree also specifies a required 'site-wide' investigation that includes the [Shipyard property]. BSC has agreed to perform an RFA of the [Shipyard] Site; however, according to USEPA representative, the Site is considered a low priority and the RFA is not expected to begin for several more years." (Severstal Mot. to Dismiss, Ex. 28 at II-1 – II-2.)

> impacts are observed on the northeast side (downgradient) of the Coke Oven area. These wells are located approximately 400 feet upgradient/sidegradient of the Shipyard Site. The lateral extent of these groundwater impacts have not been fully defined. There exists a suggestion, based on the available data, that the seepage pumps associated with the Graving Dock may influence the flow of this plume.

(Pls.' Opp'n, Ex. 2 at 6.) Defendants argue that "[i]t defies all reason for Plaintiffs to now claim that they had no knowledge of the potential for contamination of the Shipyard Site from the Steel Mill Site if they knew of the closely located benzene contamination in September 2004, and had proposed groundwater investigations to evaluate off-site releases at that time." (Severstal Reply 18.)

Plaintiffs may well have had actual notice of contamination when they submitted the application to Maryland's VCP on February 22, 2004, but I find they certainly had inquiry notice. It is clear that Plaintiffs knew "or, with the exercise of reasonable diligence, should have known, of the existence of an injury." *Pappano*, 806 A.2d at 338.[16] Because the Phase I Environmental Assessment that Plaintiffs attached to the VCP application states "that contamination from at least one of [the five special study areas], the Coke Oven Area, could be impacting the [Shipyard] Site," it is clear that Plaintiffs had "knowledge of circumstances which would cause a reasonable person in the position of the plaintiff[] to undertake an investigation which, if pursued with reasonable diligence, would have led to knowledge of the alleged [tort]." *Lumsden*, 749 A.2d at 802 (quoting *O'Hara*, 503 A.2d at 1324). Accordingly, I find that there is no genuine issue of material fact as to when Plaintiffs' common law claims accrued, and that the

---

[16] Plaintiffs were also aware when they purchased the Shipyard Site in March 2004 that, pursuant to the Consent Decree, remediation might be required at the Shipyard Site. (Severstal Mot. to Dismiss, Ex. 26, at 6 & Ex. 27, at 5-6.) Moreover, by September 2004, Plaintiffs were aware that contamination from the Coke Oven Area could be affecting the Shipyard Site (Severstal Mot. to Dismiss, Ex. 28 at III-23), and that benzene contamination had been detected at the Coke Oven Area 400 feet upgradient/sidegradient from the Shipyard Site (Pls.' Opp'n, Ex. 2 at 6).

statute of limitations began to run in February 2004.[17] Plaintiffs' common law claims are therefore barred by Maryland's statute of limitations as more than three years passed between February 22, 2004 and August 28, 2008. Defendants' Motions to Dismiss Counts IV-VII are granted.

A separate order is being entered herewith.

July 5, 2011
Date

/s/
J. Frederick Motz
United States District Judge

---

[17] Plaintiffs argue in the alternative that their common law claims for trespass (Count V) and nuisance (Count VI) are not barred by the three-year statute of limitations because those claims continue to accrue with continued migration of the contamination onto Plaintiffs' property. (Pls.' Opp'n 35.) "The 'continuing harm' or 'continuing violation' theory tolls the statute of limitations in situations where there are ongoing violations of a potential plaintiff's rights." *MacBride v. Pishvaian*, 937 A.2d 233, 235 (Md. 2007). However, the "continuing harm" theory "only tolls the statute of limitations 'unless the potential plaintiff sooner knew or should have known of the injury or harm.'" *Id.* at 241 (citing *Duke St. Ltd. P'shp. v. Bd. of Cnty. Comm'rs*, 684 A.2d 40, 48 (Md. Ct. Spec. App. 1996)). Because I find that Plaintiffs had inquiry notice that benzene contamination generated at the Steel Mill Site was potentially migrating towards the Shipyard Site as of February 2004, the "continuing harm" theory does not toll the statute of limitations in this case.