IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
BALTIMORE DIVISION

| | |
|---|---|
| SPS LIMITED PARTNERSHIP, LLLP, et al., | ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) |
| SEVERSTAL SPARROWS POINT, LLC, et al., | ) ) ) ) |
| Defendants. | ) ) |

Case No. 1:10-cv-02579

Judge J. Frederick Motz

### DEFENDANT ARCELORMITTAL USA LLC'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION TO LIFT STAY AND SCHEDULE LIMITED DISCOVERY

Plaintiffs SPS Limited Partnership, LLLP and SPS 35, LLC (collectively "Plaintiffs") filed this action on September 17, 2010 against the entity now known as RG Steel Sparrows Point, LLC[1] (hereinafter "RG Steel") and ArcelorMittal USA LLC ("ArcelorMittal"). RG Steel has continuously owned and operated the Sparrows Point steelmaking facility ("the Facility") located adjacent to Plaintiffs' 226-acre Shipyard since 2003, when it[2] purchased the Facility out of Bethlehem Steel Corporation's ("Bethlehem's") bankruptcy pursuant to an April 23, 2003 Bankruptcy Court Sale Order,[3] until the recently-approved sale of the Facility in RG Steel's own

---

[1] At the time of filing, Defendant RG Steel Sparrows Point, LLC was known as "Severstal Sparrows Point, LLC." Its name was changed to "RG Steel Sparrows Point, LLC" on or about April 14, 2011. *See* RG Steel Notice of Name Change (Doc. #43).

[2] At the time it acquired the Facility out of Bethlehem Steel Corporation's bankruptcy in 2003, Defendant RG Steel Sparrows Point, LLC was known as "ISG Sparrows Point Inc."

[3] "Order Authorizing (I) Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims and Encumbrances, (II) Assumption and Assignment of Certain Executory Contracts, and (III)

pending bankruptcy proceeding.[4] Immediately prior to RG Steel's acquisition, Bethlehem had owned and operated the Facility "for over 100 years" to produce steel. Cmplt. (Doc. #1) ¶¶3, 4.

Plaintiffs' claims in this action are based upon alleged migratory contamination from the Facility's former coke ovens. The Complaint alleges that "operation of the coke ovens … at the Steel Mill Site has resulted in releases of hazardous substances … which … have migrated, and are migrating, to the Shipyard Site," and that "the area of the coke oven operations is the 'source area' of contamination". Cmplt. (Doc. #1) ¶¶24, 26. However, as noted in U.S. EPA's online fact sheet, the Facility's "coke ovens ceased operations in December 1991 and the coke batteries have been or are being torn down."[5] Thus, any alleged contamination from the Facility's coke oven operations dates back *more than 11 years* prior to RG Steel's acquisition of the Facility out of Bethlehem's bankruptcy in 2003.

In its July 5, 2011 Opinion, this Court has already ruled that "the Bankruptcy Sale Order entered by the United States Bankruptcy Court for the Southern District of New York on April 23, 2003 relieves defendants of liability for the release or migration of hazardous waste and hazardous constituents occurring before April 23, 2003." Doc. #33 at p. 10. Accordingly, this Court has already dismissed Plaintiffs' RCRA claims insofar as they "relate to releases resulting from operations at the Coke Oven Area that occurred before Defendants acquired the Steel Mill Site." *Id.* at p. 17.

---

Assumption of Certain Liabilities" (Doc. #23-8) entered in *In re Bethlehem Steel Corp., et al.*, Ch. 11 Case Nos. 01-15288 through -15302, 01-15308 through -1531 (Bankr. S.D.N.Y.).

[4] *See* 8/15/12 Order Authorizing and Approving (I) Sale of Sparrows Point Assets Free and Clear of Liens, Claims, Encumbrances, and Interests; and (II) Granting Related Relief entered in *In re WP Steel Venture LLC, et al.*, Case No. 12-11661 (Bankr. D. Del.), which authorized the sale of the Facility assets to various Purchasers.

[5] http://www.epa.gov/reg3wcmd/ca/md/pdf/mdd053945432.pdf at p. 8.

On May 31, 2012, Defendant RG Steel Sparrows Point, LLC itself commenced Chapter 11 bankruptcy proceedings in the U.S. Bankruptcy Court for the District of Delaware. *See* 6/5/12 RG Steel Suggestion of Bankruptcy (Doc. #55). By Order dated June 8, 2012 (Doc. #56), this case was administratively closed due to the automatic stay under the U.S. Bankruptcy Code as a result of RG Steel's bankruptcy petition.

On June 22, 2012, counsel for Plaintiffs sent an email to counsel for ArcelorMittal which stated:

> As you know Judge Motz administratively closed the entire case given RG Steel's bankruptcy. Please confirm that Arcelormittal agrees that Judge Motz' action suspends all dates in the current scheduling order, including the dates for expert disclosures.

6/22/12 3:26 PM Email from J. Thrope to V. Atriano. In response, counsel for ArcelorMittal replied:

> Defendant ArcelorMittal USA LLC agrees with Plaintiffs that Judge Motz's June 8, 2012 Order (#56) entered in *SPS Limited Partnership, LLP, et al. v. Severstal Sparrows Point, LLC, et al.*, No. 1:10-cv-02579-JFM (D. Md.), administratively closes the entire case and suspends all scheduling order dates, including the dates for expert disclosures by any party.

6/25/12 3:22 PM Email from V. Atriano to J. Thrope to V. Atriano. Consequently, Plaintiffs and ArcelorMittal <u>agreed</u> that this Court's June 8, 2012 Order (Doc. #56) stayed <u>all</u> claims in this case, not just those claims involving RG Steel.

Nonetheless, on September 10, 2012, Plaintiffs apparently changed their minds and filed their Motion to Lift Stay and to Schedule Limited Discovery against ArcelorMittal. Doc. #57. Plaintiffs' request to conduct limited discovery was especially surprising, because Plaintiffs have never sought to undertake any discovery whatsoever against ArcelorMittal at any time while this case was active from September 2010 until it was administratively closed in June 2012. During this period, which spanned more than 20 months, Plaintiffs never served a single interrogatory,

3

request for production or notice of deposition upon ArcelorMittal. On the other hand, Plaintiffs conducted extensive discovery against Defendant RG Steel during this period.

Plaintiffs' Memorandum in Support relies on only a single case in support of its position that "[t]he automatic stay provisions of the bankruptcy code *generally* apply to the debtor and not to non-bankrupt co-defendants in a civil action." Mem. Supp. (Doc. #57-1) at p. 2 (emphasis added). While this may be the *general* rule, Plaintiffs conveniently ignore the numerous recognized *exceptions* to this general rule, which clearly apply in this case. The leading case on these exceptions is the Fourth Circuit's holding in *A.H. Robins Co., Inc. v. Piccinin,* 788 F.2d 994 (4th Cir. 1986), which recognized four separate grounds on which the automatic stay may extend to claims against parties other than the debtor. In particular, *A.H. Robins* recognized that Section 362(a)(1) of the Bankruptcy Court may stay proceedings against non-bankrupt co-defendants where there are "unusual circumstances," such as when the non-debtor co-defendant is entitled to contractual indemnification from the bankruptcy debtor.

This exception clearly applies to ArcelorMittal because it has filed a Proof of Claim against Debtor RG Steel demonstrating that ArcelorMittal is entitled to contractual indemnification for all fees, expenses, liability and other Losses arising out of Plaintiffs' claims in this action under the terms of a March 20, 2008 Purchase and Sale Agreement and an April 9, 2008 Joinder to Purchase and Sale Agreement. *See* 9/24/12 ArcelorMittal Proof of Claim No. 1706 (excerpt only), Exhibit 1 hereto.

In addition, Plaintiffs' allegation that ArcelorMittal was the "alter ego" of RG Steel also constitutes another "unusual circumstance" independently justifying continuation of the automatic stay as to ArcelorMittal under *A.H. Robins.*

Moreover, because Plaintiffs' CERCLA claim against ArcelorMittal necessarily requires this Court to allocate Plaintiffs' response costs between all parties, including RG Steel, this claim cannot be properly adjudicated without RG Steel's involvement. RG Steel is an indispensable party to this claim, and any attempt to adjudicate it without RG Steel's participation would prejudice its interests and likely require re-litigation of these same issues once RG Steel is able to proceed. Because both controlling precedent and equitable considerations overwhelmingly favor continuation of the stay as to ArcelorMittal, Plaintiffs' Motion should be denied.

In the alternative, if this Court were to lift the stay with respect to ArcelorMittal, then Plaintiffs should not have an exclusive right to conduct discovery. Indeed, if the stay is lifted, then ArcelorMittal should be allowed the same opportunity to conduct discovery *against Plaintiffs* with respect to all claims, counterclaims and defenses asserted in this proceeding. Such discovery would include but not be limited to Plaintiffs' voluntary assumption of legal responsibility for all environmental conditions at the Shipyard under the Maryland Voluntary Cleanup Program. *See* 7/5/11 Opinion (Doc. #33) at 3 ("Shortly before SPS LLLP purchased the Shipyard Site in 2004, it submitted an application to MDE to participate in the Maryland Voluntary Cleanup Program."). It would be fundamentally unfair and contrary to the Rules of Civil Procedure to allow only Plaintiffs to conduct discovery while denying the same discovery rights to ArcelorMittal.

**A.   The Automatic Stay Applies to Claims Against Non-Debtors Who Are Entitled to Indemnification from the Bankruptcy Debtor.**

This Court's June 8, 2012 Order (Doc. #56) administratively closing this case due to the automatic stay in RG Steel's bankruptcy proceeding provided that Plaintiffs may move to "reopen this action for good cause shown." Consequently, Plaintiffs have the burden of demonstrating "good cause" in order to lift the stay as to ArcelorMittal.

5

Section 362(a)(1) of the U.S. Bankruptcy Code establishes an automatic stay of litigation relating to the bankruptcy debtor (subject to certain exceptions which are not relevant here). It provides that the filing of a Chapter 11 bankruptcy petition "operates as a stay, applicable to all entities, of—(1) the … continuation … of a judicial … proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title." 11 U.S.C. § 362(a)(1). The statute also stays "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3).

A district court has jurisdiction to determine whether the automatic stay applies to a case pending before it. *See, e.g., United States Dept. of Housing and Urban Dev. v. Cost Control Mktg. and Sales Mgmt. of Va., Inc.*, 64 F.3d 920, 927 n. 11 (4th Cir. 1995) ("The district court had concurrent jurisdiction with the bankruptcy court to determine the affect [sic] of the bankruptcy proceeding on this case… and, because the district court's jurisdiction attached first in time, it was superior."; citations omitted); *Brock v. Morysville Body Works, Inc.*, 829 F.2d 383, 387 (3rd Cir. 1987) ("whether the stay applies to litigation otherwise within the jurisdiction of a district court or court of appeals is an issue of law within the competence of both the court within which the litigation is pending … and the bankruptcy court supervising the reorganization."; citation omitted).

Numerous court decisions have recognized that the automatic stay may apply to litigation against parties other than the bankruptcy debtor in certain circumstances. The leading case on application of the automatic stay to non-debtors is *A.H. Robins Co., Inc. v. Piccinin,* 788 F.2d 994 (4th Cir. 1986), which Plaintiffs fail to mention in their Motion to Lift Stay. In that case, the

6

Fourth Circuit recognized no less than *four separate grounds* on which the automatic stay may extend to claims against parties other than a bankruptcy debtor.

First, under Section 362(a)(1) of the Bankruptcy Code, a court "'may properly stay the proceedings against non-bankrupt co-defendants'" where there are "'unusual circumstances,'" such as "when there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant and that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor." *Id*. at 999 (citations omitted). The Court noted that an illustration of such a situation "would be **a suit against a third-party who is entitled to absolute indemnity by the debtor on account of any judgment that might result against them in the case**." *Id.* (emphasis added). It explained that "a stay is proper" where there is "a contract to indemnify" between the debtor and the third-party defendant. *Id*. at 1000-01. The Court recognized that failure to extend the automatic stay to claims against the debtor's indemnitee "would defeat the very purpose and intent of the statute." *Id*. at 999.[6]

Second, the Fourth Circuit recognized that Section 362(a)(3) of the Bankruptcy Code "directs stays of any action, *whether against the debtor or third-parties*, to obtain possession or to exercise control over property of the debtor." *Id*. at 1001 (emphasis in original). The Court noted that Section 541(a)(1) of the Bankruptcy Code defines "property" as "all legal or equitable interests of the debtor in property as of the commencement of the case," which includes insurance contracts. *Id*.

---

[6] *Accord*, *In re Brentano's*, 27 B.R. 90 (Bankr. S.D. N.Y. 1983) (automatic stay applied to claims against guarantor who was entitled to contractual indemnification from Chapter 11 debtor); *see also In re Metal Center*, 31 B.R. 458, 462 (Bankr. D. Conn. 1983) (declining to grant relief from a stay of claims against non-debtor on equitable grounds "where … debtor and nondebtor are so bound by … contract that the liability of the nondebtor is imputed to the debtor by operation of law").

Third, the Court noted that Section 105(a) of the Bankruptcy Code, 11 U.S.C. §105(a), which authorizes the court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title," "'empowers the bankruptcy court to enjoin parties other than the bankrupt' from commencing or continuing litigation." *Id*. at 1002 (citations omitted). Under this authority, it is appropriate to "'enjoin a creditor's action against a third party … [if] failure to enjoin would effect [sic] the bankruptcy estate and would adversely or detrimentally influence and pressure the debtor through the third party.'" *Id*. at 1003 (citation omitted).

Finally, the Fourth Circuit noted in *A.H. Robins* the "'inherent power of courts under their general equity powers and in the efficient management of the dockets to grant relief' to grant a stay." *Id*.

Based upon these authorities, the Fourth Circuit upheld the district court's stay of Dalkon Shield product liability claims against non-debtor parties who "were entitled to indemnification by the debtor" pursuant to corporate bylaws, state statute or "an express contract of indemnification." *Id*. at 1007.[7] The Court explained:

> It seems incontestable that, if the suits are permitted to continue and discovery allowed, any effort at reorganization of the debtor will be frustrated, if not permanently thwarted. It is obvious from the record that if suits are permitted to proceed against indemnitees on claims on which the indemnitees are entitled to indemnity by [debtor], either a binding judgment against the debtor will result or … inconsistent judgments will result, calling for the exercise of the court's equitable powers.

*Id*. at 1008.

---

[7] The case relied upon by Plaintiffs, *Kreisler v. Goldberg*, 478 F.3d 209 (4th Cir. 2007), did not disagree in any way with the Fourth Circuit's prior decision in *A.H. Robins*. In fact, *Kreisler* cites *A.H. Robins* with approval for the proposition that there is an exception to the general rule relied upon by Plaintiff – namely that the automatic stay in Section 362(a)(1) generally applies only to the debtor – where the third-party defendant is entitled to indemnification from the debtor. *Id*. at 213. The exception did not apply in that case because no contractual indemnity existed between the debtor and its non-bankrupt subsidiary to which debtor sought to extend the stay.

8

Similarly, numerous other court decisions have extended the automatic stay to non-debtors who are entitled to contractual indemnification from a bankruptcy debtor. *See, e.g., In re Mountain Laurel Res. Co.*, 2000 WL 341913, *6 (4th Cir. 2000) (unpublished) (injunction under Sec. 105 affirmed where claims against non-debtors implicated debtor's indemnification obligations); *Trimec, Inc. v. Zale Corp.*, 150 B.R. 685, 687 (N.D. Ill. 1993) (staying proceeding against non-debtors where the debtor was a "guarantor under the contract and agreed to indemnify the other [non-debtor] defendants."); *In re W.R. Grace & Co.*, 315 B.R. 353, 360 (Bankr. D. Del. 2004) (extension of automatic stay to non-debtors warranted because upon a finding of liability against non-debtors, "Debtors' indemnification obligation will be triggered"); *In re Global Indus'l Tech., Inc.*, 303 B.R. 753, 764 (Bankr. W.D. Pa. 2004) (motion to enforce automatic stay with respect to non-debtor granted due to effect on debtor's indemnification obligations); *In re American Film Tech., Inc.*, 175 B.R. 847, 855 (Bankr. D. Del. 1994) (staying prosecution of wrongful discharge claims against former and present directors of debtor corporation because of debtor's indemnification obligations and its possible exposure to collateral estoppel prejudice).

The Fourth Circuit's holding in *A.H. Robins* was recently followed by the U.S. District Court in *Dunnam v. Sportsstuff, Inc.*, 2008 WL 200287, *1 (E.D. Va.). In that case, the Court granted a non-debtor retailer's motion for stay of product liability claims filed against both it and the bankruptcy debtor manufacturer due to the existence of an indemnity agreement under which the debtor agreed to indemnify the non-debtor. Because the indemnity agreement appeared valid on its face and appeared to cover the claims at issue, the Court found that "[t]his case, therefore, appears to be exactly like the paradigmatic illustration provided by the Fourth Circuit as guidance in [*A.H. Robins*], it is a 'suit against a third-party who is entitled to absolute indemnity

9

by the debtor on account of any judgment that might result against them in the case.'" *Id*. at *3 (citation omitted). The Court further explained:

> Were this case to proceed against [non-debtor] alone, any finding of liability on the part of [non-debtor] would pass through to [debtor]. In effect, the proceeding against [non-debtor] would unavoidably become a *de facto* proceeding against [debtor] and would frustrate the purposes of 11 U.S.C. § 362(a)(1). That is exactly the scenario that [*A.H. Robins'*] holding was designed to avoid.

*Id*. The Court found it immaterial that the debtor and non-debtor were disputing the terms of the indemnity agreement through their pending cross-claims, noting that "the Court cannot make a determination regarding [debtor's] liability under the indemnity agreement without violating the stay imposed by § 362(a)(1)." *Id*. at *3, n. 1.

**B.  ArcelorMittal is Entitled to Contractual Indemnity from Debtor RG Steel for All Fees, Expenses and Liability Arising Out of Plaintiffs' Remaining Claims and Therefore the Stay Should be Continued as to ArcelorMittal.**

On September 24, 2012, ArcelorMittal filed a Proof of Claim against Debtor RG Steel in its pending Chapter 11 bankruptcy proceeding styled *In re WP Steel Venture LLC, et al.*, Case No. 12-11661 (Bankr. D. Del.). *See* 9/24/12 ArcelorMittal Proof of Claim No. 1706 (excerpt only), Exhibit 1. This proof of claim demonstrates that ArcelorMittal is entitled to contractual indemnification from Debtor RG Steel for all fees, expenses, liability and other Losses arising out of Plaintiffs' claims in this action under the terms of a March 20, 2008 Purchase and Sale Agreement ("PSA") and an April 9, 2008 Joinder to Purchase and Sale Agreement entered into by RG Steel's predecessor by merger, Severstal Sparrows Point Holding Corp.[8]

---

[8]  As demonstrated in the Proof of Claim and its supporting documentation, Severstal Sparrows Point Holding Corp. was converted to a limited liability company and renamed Severstal Sparrows Point Holding LLC ("SSPH") on May 1, 2008. On May 13, 2008, SSPH merged into ISG Sparrows Point LLC, and the surviving entity was renamed Severstal Sparrows Point, LLC. Then on April 14, 2011, Severstal Sparrows Point, LLC was renamed RG Steel Sparrows Point, LLC.

10

Promptly after the filing of Plaintiffs' Complaint herein, ArcelorMittal notified its indemnitors under the PSA of its demand for indemnification "'from and against any and all Losses to the extent arising or resulting from' the SPS Litigation." *See* Ex. 1, ¶16. All such Losses arising out of this action constitute "Assumed Liabilities" of Debtor RG Steel under Sections 3.3(b), 3.3(d), 10.1(b) and other sections of the PSA. *Id.* at ¶¶19, 21. Consequently, Debtor RG Steel is immediately and absolutely liable to ArcelorMittal for all attorney's fees, expenses, disbursements and other Losses arising or resulting from this litigation. The amount of this indemnity claim remains unliquidated and will continue to accrue as this case proceeds, especially if the current stay is lifted with respect to ArcelorMittal.

Consequently, ArcelorMittal clearly is entitled to a continuation of the current stay under the holdings in *A.H. Robins* and the other cases cited above. Because of ArcelorMittal's undisputed contractual right to indemnification from Debtor RG Steel for all fees, costs and expenses incurred in this litigation, "there is such identity between the debtor [RG Steel] and the third-party defendant [ArcelorMittal] that the debtor may be said to be the real party defendant and that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor." This situation falls squarely within the example of circumstances warranting extension of the stay offered by the Fourth Circuit in that case—namely, "a suit against a third-party [ArcelorMittal] who is entitled to absolute indemnity by the debtor [RG Steel] on account of any judgment that might result against [ArcelorMittal] in the case."

As the District Court noted in *Dunnam,* "[w]ere this case to proceed against [ArcelorMittal] alone, any finding of liability on the part of [ArcelorMittal] would pass through to [RG Steel]. In effect, the proceeding against [ArcelorMittal] would unavoidably become a *de*

*facto* proceeding against [RG Steel] and would frustrate the purposes of 11 U.S.C. § 362(a)(1). That is exactly the scenario that [*A.H. Robins'*] holding was designed to avoid."

Accordingly, this Court clearly is authorized to continue the stay of this proceeding with respect to ArcelorMittal under 11 U.S.C. §362(a)(1), 11 U.S.C. §362(a)(3), 11 U.S.C. §105(a), and/or its inherent general equity power.

**C.     Plaintiffs' "Alter Ego" Allegation Against ArcelorMittal Also Constitutes An "Unusual Circumstance" Justifying Continuation of the Automatic Stay as to ArcelorMittal.**

Plaintiffs have not disputed and cannot dispute the fact that the entity now known as Debtor RG Steel has continuously owned and operated the Facility adjacent to Plaintiffs' Shipyard from 2003 until the recently-approved sale of the Facility in RG Steel's pending bankruptcy proceeding. There is no deed evidencing any ownership of the Facility by ArcelorMittal at any point in time. Thus, Plaintiffs' remaining claims against ArcelorMittal are necessarily derivative of RG Steel's undisputed direct ownership and operation of the Facility. Indeed, in their Combined Opposition to Defendants' Motions to Dismiss, Plaintiffs argued that "ArcelorMittal was really the alter ego" of RG Steel, which ArcelorMittal denies. *See* Doc. #29 at p. 17.

Courts have recognized that the assertion of such derivative "alter ego" claims based upon a non-debtor's alleged relationship to a bankruptcy debtor also constitutes "unusual circumstances" justifying extension of the automatic stay to the non-debtor. For example, in *Acadian Energy Res., LLC v. Carpenter*, 2010 WL 3061421 (S.D. W.Va. July 30, 2010), the District Court continued and extended the automatic stay to non-debtors against whom similar "alter ego" claims had been asserted. The Court began by quoting *A.H. Robins* and noting that

"[u]nder 'unusual circumstances' … a stay may be extended to reach non-debtors." *Id*. at *7. It recited the plaintiff's alter ego allegation against the non-debtors in that case and observed:

> The allegation presents the unique circumstances contemplated explicitly by the [4th Circuit] panel in [*A.H. Robins*]. [Plaintiff] asserts that there is such an identity between debtors … on the one hand and the non-debtor third-party defendants on the other that the former may be said to be one or more of the real parties in interest. If [Plaintiff's] theory is borne out, a judgment against the nondebtor defendants would, in effect, be a judgment against one or more of the debtors. This circumvention of the policy behind the automatic stay is the precise evil sought to be avoided by the panel in [*A.H. Robins*].

*Id*. at 8. The Court further noted that lifting the stay as to the non-debtors likely would have an "impact upon the debtors' estates if an alter ego relationship is ultimately found to exist via a piecemeal trial involving only the nondebtor third-party defendants." *Id*.

Moreover, the District Court in *Central W. Va. Energy Co. v. Mountain State Carbon, LLC*, No. 5:09-cv-00467 (S.D. W. Va.), recently found "unusual circumstances" under *A.H. Robins* justifying extension of the automatic stay to non-debtor co-defendants in a case involving another debtor in the RG Steel bankruptcy proceeding – RG Steel Wheeling, LLC – due to similar alter ego theories of liability asserted by the plaintiffs in that case. *See* 7/16/12 Order (Exhibit 2 hereto). The District Court noted that "Plaintiffs' theories of liability include, in part, alter ego and instrumentality doctrines and seek to pierce the corporate veils of all of the corporate Defendants." *Id*. at p. 2. Accordingly, the Court's Order stated: "In light of Plaintiffs' theories of liability against all the Defendants, … the Court **FINDS** this case presents the type of unusual circumstance identified [in] *A.H. Robbins v. Piccinin*, 788 F.2d 994, 1000 (4th Cir. 1986)." *Id*. at p. 1. Consequently, the Court ruled: "In light of the nature of these claims, this

case is **STAYED** as to all Defendants during the pendency of RG Steel Wheeling, LLC's bankruptcy proceeding." *Id*.[9]

Likewise, Plaintiffs' alter ego allegations against ArcelorMittal in this case clearly constitute "unusual circumstances" justifying continuation of the automatic stay as to ArcelorMittal. Under these derivative claims, RG Steel unavoidably is "the real party in interest." If Plaintiffs prevailed on such claims against ArcelorMittal, such a judgment would, in effect, be a judgment against RG Steel as well. Piecemeal litigation against ArcelorMittal on these claims would necessarily impact RG Steel's estate if such an alter ego relationship were ultimately found to exist. As the District Court noted in *Acadian Energy*, this would circumvent the policy behind the automatic stay and "is the precise evil" that the Fourth Circuit sought to avoid in *A.H. Robins*. Accordingly, Plaintiffs' alter ego allegations constitute an independent "unusual circumstance" justifying continued extension of the automatic stay to ArcelorMittal.

**D.  Because Plaintiffs' CERCLA Claim Against ArcelorMittal Necessarily Requires Allocation of an Equitable Share to RG Steel, it Cannot Be Properly Adjudicated Without RG Steel's Involvement.**

Finally, given the nature of Plaintiffs' CERCLA claim, which necessarily requires allocation of equitable shares to all parties, including RG Steel and Plaintiffs, the claim cannot be properly adjudicated without RG Steel's involvement. This was recognized by the District Court in *Lewis v. Russell*, 2009 WL 1260290 (E.D. Cal. 2009), which involved a similar CERCLA claim against both bankrupt debtors and a non-debtor. The Court noted that the automatic stay could be applied to non-debtors in "special circumstances." *Id*. at *2. Because the plaintiffs'

---

[9] *See also In re Mountain Laurel Res. Co.*, 2000 WL 341913, *6 (4th Cir. 2000) (unpublished) (noting that plaintiff's "alter ego claim" justified the bankruptcy court's issuance of an injunction under Section 105 of the Bankruptcy Code); *Iron Workers' Local 25 Pension Fund v. Detroit Door & Hardware Co.*, 2010 WL 3790080, *3 (E.D. Mich. 2010) (declining to lift bankruptcy stay to allow plaintiffs to pursue claims alter ego claims).

14

CERCLA claim against the debtors was subject to the automatic stay, the Court noted that it "may not rule on issues that require the court to consider the possible liability of the debtor." *Id*.

However, it found that "[b]ecause of the nature of the [CERCLA] claims in this case, … it is not possible to draw a meaningful distinction between claims asserted against the [debtors] and all other claims." *Id*. The Court explained that by virtue of CERCLA Section 113(f)(1), "[t]he ultimate resolution of these claims on the merits will require the court to 'allocate response costs among liable parties using such equitable factors as the court determines are appropriate.'" *Id*. It explained:

> Such highly inter-related and dependent claims are typical of multi-party litigation concerning the recovery of environmental response costs…. [T]he cumulative effect of all the parties' claims is essentially an equitable allocation of response costs by the court. The cleanup costs simply comprise a single finite obligation, that must be divided among the liable parties…. **[T]he court cannot determine the relative shares of the non-bankrupt parties without making findings as to the size of the share allocatable to the [debtors]**….
>
> Consequently, **claims 'against' the [debtors] cannot be meaningfully excised from the litigation – as long as the litigation moves forward, the court will have to make findings as to the [debtors'] potential liability in order to allocate shares of liability to all the other parties**.

*Id*. at *3 (emphasis added).

The Court also recognized the discovery issues that would be created by piecemeal litigation of such CERCLA claims:

> In addition, going forward with litigation of all claims other than those asserted against the [debtors] would create insoluble discovery issues….
>
> Because of the inter-related and dependent nature of the claims in this case, however, discovery against the [debtors] would inherently touch on factual issues regarding the [debtors'] potential liability for response costs and may serve to bolster claims against the [debtors]. Even discovery directed against the non-bankrupt parties may be aimed at building a case against the [debtors]….
>
> In order to effectively protect themselves against the risk that their liability to the other parties may be established by continued litigation of this action, the [debtors] would have to actively litigate the remaining claims, which would run

afoul of one of the central purposes of the automatic stay – to relieve the debtor "of the financial pressures that drove him into bankruptcy."

*Id*. at \*\*3-4 (citations omitted). For these reasons, the Court held that "the entire action must be stayed pursuant to 11 U.S.C. § 362(a)," and stayed the claims against the non-debtors as well. *Id*. at \*5.

Similarly, the District Court in *Dunnam v. Sportsstuff, Inc.*, 2008 WL 200287, \*8 (E.D. Va.), recognized that a court should exercise its "equitable discretion" to stay products liability claims against a non-debtor retailer where the bankruptcy debtor manufacturer was an "indispensable party." The Court explained that proceeding without the debtor manufacturer would prejudice the debtor and undermine judicial economy:

> [Debtor] is an indispensable party in this matter and proceeding against [non-debtor] alone prejudices the [debtor] manufacturer. Should a trial ensue without [debtor], [plaintiff's] claims nonetheless dictate that the trial will center around [debtor's] design and manufacturing …. **[Debtor] will not be able to defend itself in this action, but will eventually be held liable for any judgment awarded through the indemnity agreement** [with non-debtor]. Furthermore, [debtor's] executives and employees will still be required to expend significant amounts of time testifying at depositions and trial which undermines the respite from litigation that § 362(a)(1) was intended to impose.… Finally, **judicial economy concerns indicate a stay is appropriate because proceeding against [non-debtor] now would result in a second, nearly identical, litigation of the issues at a later date once [debtor] is able to proceed**. Taking all of these factors into consideration, staying the proceedings against [non-debtor] appears to be the most equitable action.

*Id*. at \*8 (emphasis added; citation omitted).

All of the foregoing considerations are present in the instant case as well and overwhelmingly support continuation of the stay as to ArcelorMittal. Because this Court can only resolve Plaintiffs' CERCLA claim (and ArcelorMittal's CERCLA counterclaim) by allocating response costs among all of the parties based upon equitable factors, it cannot determine the relative shares of the non-bankrupt parties without making findings as to the size of the share allocable to RG Steel. This would force RG Steel to actively litigate these claims in

order to protect its interests, which "would run afoul of one of the central purposes of the automatic stay – to relieve the debtor 'of the financial pressures that drove [it] into bankruptcy.'"

Because RG Steel is an indispensable party to Plaintiffs' CERCLA claim, adjudication of this case without RG Steel's participation would prejudice its interests and likely require re-litigation of these same issues once RG Steel is able to proceed. Consequently, continuation of the stay as to all claims and parties is the only equitable solution.

## **CONCLUSION**

For all of the foregoing reasons, ArcelorMittal respectfully requests that this Court:

(1) deny Plaintiffs' Motion to Lift Stay and to Schedule Limited Discovery and continue the current stay as to all claims and parties, including ArcelorMittal;

(2) in the alternative, if this Court is inclined to grant Plaintiffs' Motion to Lift Stay and to Schedule Limited Discovery, order that ArcelorMittal also is entitled to conduct discovery with respect to all claims, counterclaims and defenses asserted in this proceeding; and

(3) grant ArcelorMittal such other relief as this Court deems equitable and just.

Dated:  September 27, 2012

Respectfully submitted,

/s/ Vincent Atriano
Vincent Atriano (admitted pro hac vice)
Andrew O. Etter (admitted pro hac vice)
Squire Sanders (US) LLP
2000 Huntington Center
41 South High Street
Columbus, OH 43215
Telephone: (614) 365-2783
Facsimile: (614) 365-2499
Email: vincent.atriano@squiresanders.com
         andrew.etter@squiresanders.com

Dale E. Papajcik (admitted pro hac vice)
Squire Sanders (US) LLP
4900 Key Tower
127 Public Square
Cleveland, Ohio 44114
Telephone: (216) 479-8500
Facsimile: (216) 479-8780
Email: dale.papajcik@squiresanders.com

Amy L. Brown (Bar #15455)
Squire Sanders (US) LLP
1201 Pennsylvania Avenue, N.W.
Suite 500
Washington, D.C. 20004
Telephone: (202) 626-6600
Facsimile: (202) 626-6780
Email: amy.brown@squiresanders.com

*Attorneys for Defendant ArcelorMittal USA LLC*

**CERTIFICATE OF SERVICE**

I certify that on this 27th day of September, 2012, a true and complete copy of the *Defendant ArcelorMittal USA LLC's Memorandum in Opposition to Plaintiffs' Motion to Lift Stay and Schedule Limited Discovery* was served upon all counsel of record through the Court's electronic filing system.

/s/ Vincent Atriano
*Attorney for Defendant ArcelorMittal USA LLC*